```
               UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
                WEST PALM BEACH DIVISION
                CASE NO. 16-81530-CIV-DMM

GEO GROUP, INC.,

            Plaintiff,          WEST PALM BEACH, FLORIDA
       vs.
                                OCTOBER 14, 2016
MATTHEW J. SWANDO
                                  PAGES 1 - 103
            Defendant.
_____/



     TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION HEARING
          BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
                UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:      COURTNEY B. WILSON, ESQ.
                        Littler Mendelson, P.C.
                        2 S. Biscayne Boulevard
                        Suite 1500
                        Miami, Florida  33131



FOR THE DEFENDANT:      JONATHAN POLLARD, ESQ.
                        DEAKEN SHULER, ESQ.
                        Pollard, LLC
                        401 E. Las Olas Boulevard
                        Suite 1400
                        Fort Lauderdale, Florida 33301



REPORTED BY:            DIANE M. MILLER, RMR, CRR
                        Official Court Reporter
                        701 Clematis Street
                        West Palm Beach, FL  33401
                        (561)514-3728
                        diane_miller@flsd.uscourts.gov
```

I-N-D-E-X

WITNESSES                                           PAGE

JOCK WALDO

    Direct Examination by Mr. Wilson              4

    Cross-Examination by Mr. Pollard             26

    Redirect Examination by Mr. Wilson           57


MATTHEW SWANDO

    Direct Examination by Mr. Pollard            62

    Cross-Examination by Mr. Wilson              64


YOGANAND RAJALA

    Direct Examination by Mr. Pollard            66

    Cross-Examination by Mr. Wilson              70

Friday, October 14, 2016.

```
 1                     P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Good morning; please be seated.
 3          This is a hearing in the case of the GEO Group versus
 4   Matt Swando, case number is 16-81530.  Could we please have
 5   appearances?
 6          MR. WILSON:  Good morning, Your Honor; on behalf of
 7   the plaintiff GEO Group, Courtney Wilson.  With me at the table
 8   is client representative Ann Schlarb; in-house counsel,
 9   Mr. David Harvey; and a witness we have with us, Jock Waldo.
10          THE COURT:  Okay, good morning.
11          MR. POLLARD:  Good morning, Your Honor; Jonathan
12   Pollard; with me at the table is my colleague, Deaken Shuler;
13   in the seat behind us are my client Matt Swando and witness
14   Yogi --
15          Yogi, I will not attempt to pronounce your last name,
16   sir.
17          THE COURT:  Okay.  Well, I have read all of your
18   papers including the ones filed, the motion for leave to file
19   surreply, and the supplemental affidavit.  I didn't read the
20   1200 pages that -- there was some mention of judicial notice
21   about -- I guess those are a bunch of bid documents, as I
22   understand it.  I haven't read that.
23          Okay, let's start.
24          MR. WILSON:  Could we present openings, Your Honor?
25          THE COURT:  If you would like.  I mean, I think I
```

Friday, October 14, 2016.

1   know what it is about.  If you feel -- if you feel like you

2   need to, go ahead; but otherwise, let's get some witnesses

3   under way.

4                MR. WILSON:  We would like to call Mr. Waldo.

5                JOCK WALDO, PLAINTIFF WITNESS, SWORN.

6                         DIRECT EXAMINATION

7   BY MR. WILSON:

8   Q.  State your name for the record.

9   A.  Yes, it is Jock Waldo.

10  Q.  And, Mr. Waldo, can you tell the Court what your present

11  employment position is?

12  A.  Yes.  I work for a BI, in Boulder, Colorado, divisional

13  vice-president.

14  Q.  We are here on behalf of the GEO Group.  Can you explain

15  generally to the Court what the business of the GEO Group is?

16  A.  It is a group based in Boca Raton, Florida, has two major

17  areas of business:  One is the corrections and detention side

18  of the business; and then the other side of the business is

19  known as GEO Care, and that's the community corrections side of

20  the business.  That entails three separate business divisions.

21  One that provides services to youth; second for reentry

22  services; and the final is the firm I'm responsible for, BI.

23  In our business, we provide monitoring technology and services

24  for the criminal justice market.

25  Q.  Who was your predecessor in the position of divisional

Friday, October 14, 2016.

1  vice-president?

2  A.  Matt Swando.

3  Q.  How long have you known Mr. Swando?

4  A.  Quite sometime, 2004.

5  Q.  How did you meet Mr. Swando in 2004?

6  A.  I hired Matt to work with the company.

7  Q.  Have you worked with him consistently over that 12-year

8  period?

9  A.  I have.

10  Q.  You placed him in the position of divisional vice-president

11  of BI?

12  A.  I did.

13  Q.  And so the Court may more easily understand, can you give

14  examples of what the business of BI is?

15  A.  Yes, of course.

16        BI is known by many as the founder of the monitoring

17  business often called house arrest.  Years and years ago, it

18  was a radio frequency technology.  So the technology, it was a

19  presence/absence technology.  It knew if an offender was home

20  or not at home.

21        In today's market, it is -- technology has advanced

22  dramatically.  It is mostly GPS tracking technology, so it is a

23  body-worn device, pretrial detainee, probationer, could be a

24  variety of applications.  And we also provide technology for

25  at-the-home monitoring, even monitoring folks from their smart

Friday, October 14, 2016.

```
 1  phone.
 2  Q.  And can you tell the Court about the product development
 3  process at BI?
 4  A.  Yes.  Product development is a long process.  It is
 5  something that starts with our marketing organization, and it
 6  starts with the development of what we are trying to
 7  accomplish.
 8          So the marketing organization will bring in variety
 9  of sources.  It could be directly from our customers, it could
10  be from what a competitor is doing, it could be something we
11  learned because of a relationship with Sprint or Verizon, or
12  AT&T, some other technological advancement.  So the marketing
13  organizations, it pools all of those -- all of that
14  information, if you will, together into what we refer to as a
15  marketing requirements document, and that document defines what
16  that product should be.  And then in conjunction with the
17  engineers, in the organization, they then define how they will
18  design something, a product or it could even be a service, that
19  meets the definition that was provided in the marketing
20  requirements document.
21          Often, the product development cycle can be anywhere
22  from one to as long as three years or something from the
23  concept to actual fruition and delivery.
24  Q.  And during the development of that marketing research
25  document --
```

Friday, October 14, 2016.

```
1   A.   Requirements.

2   Q.   Marketing requirement document --

3   A.   Document.   We typically called it the MRD.

4   Q.   During the development of the MRD and the collection of

5   that information, is that information shared publicly?

6   A.   No.

7   Q.   And would you, as the divisional vice-president, have

8   access to that information?

9   A.   I would.

10  Q.   Would Mr. Swando have had access to that information?

11  A.   He would.

12  Q.   And once it moves to the next phase of working with the

13  engineers to develop the hardware and the software, is that

14  information shared with the public?

15  A.   No.

16  Q.   Is that information shared with anybody outside of the

17  company?

18  A.   No.   The only folks who would know about it outside of the

19  company would be firms that we would hire on a consulting basis

20  contractually to assist us with the development, but those --

21  we would have NDAs in place with the firm that do that for us.

22  Q.   Nondisclosure agreement?

23  A.   Yes.

24  Q.   And Mr. Swando would have access to that same information,

25  when he was divisional vice-president?
```

Friday, October 14, 2016.

1  A.  Yes.  It's a collaborative effort throughout the company

2  when we are developing something.

3  Q.  And when you are developing a new product, how many

4  personnel are devoted to collecting that information and

5  developing the technology?

6  A.  Well, it really varies depending on the time, where they

7  are in the development process.  It could be as few as two or

8  three, at the very beginning when the MRD is about created, and

9  it can swell to 30, 40, perhaps even 50 depending on how

10  massive the project is that they are working on because it

11  isn't necessarily just -- it might be a software team that's

12  working on it to write the code that operates the service of

13  the device, and then you have got hardware engineers that are

14  actually potentially developing it.

15  Q.  And are there still product development processes going on

16  that were commenced when Mr. Swando was the divisional

17  vice-president?

18  A.  It is an ongoing process, yes.

19  Q.  The majority of BI's business is done through public

20  bidding?

21  A.  Correct.

22  Q.  Can you describe the process of responding to a request for

23  proposals?

24  A.  Yes.  The vast majority of our customers, as the Court, I

25  believe, would know, the government, could be federal

Friday, October 14, 2016.

1  government, state government, county, municipalities.  And most

2  government agencies are required to go out to bid, so it does

3  represent the majority of the business that we do.  It is not

4  all of the business that we do.

5          We also do sole source business, I can answer that if

6  you would like as well; and then we have a number of private

7  entities, resellers that we work with that don't go out to

8  public bid.

9          But to answer your question, agencies will go out to

10  bids.  Part of our job, part of the organization's job,

11  principally the sales organization is to have relationships

12  with those customers well in advance of the bid to really

13  understand what that customer wants when the bid comes out,

14  what the subtleties and nuances are, what they are looking for.

15  Recognizing that when a bid comes out, what is in the

16  specifications for the bid may not really capture in its

17  entirety what they are looking for.  So we really depend on the

18  sales folks to understand that.  And then when the RFP, it

19  could be a variety of forms, a request for proposals; ITB,

20  invitation to bid; RFQ, request for quotation; lots of

21  different procurement mechanisms to actually to go out to bid.

22  So we respond to those; and then that information, of course,

23  is submitted to the agency that's put out the procurement; they

24  go into an evaluation period; and then, they ultimately make a

25  decision to whom they want to award the contract.

Friday, October 14, 2016.

1  Q.  How long is a typical -- or if you can provide a range of

2  the cycle of BI doing work prior to the time an RFB comes out.

3  A.  Well, it really doesn't end.  If a salesperson, for

4  example, they are engaged kind of throughout the lifetime of

5  the relationship with that customer.  So there might be bids

6  that are coming in '17 and '18 that we are working on today

7  from an understanding standpoint, from a relationship point,

8  trying to ascertain what they are looking for and what might be

9  different than the services that they have today versus the

10  services they are looking for when the next bid cycle comes

11  out.  So it is really an ongoing process.  It is a relationship

12  business where you have to stay in touch.

13          We strive not to be a company where we are just

14  simply sitting at a computer terminal waiting for an electronic

15  bid to pop up on the screen and then just formulating a

16  response and sending it in.

17  Q.  And when you ultimately get to the point of submitting a

18  bid, how do you develop the pricing?

19  A.  That's developed internally and, of course, confidentially

20  because the pricing model is an important component of the bid.

21  In the end, what the prospective customer sees isn't the

22  pricing model.  They see the resulting price for the bid.  But

23  there is a lot that goes into understanding the cost structure

24  as well as the service model that we are providing to that

25  customer that goes into the pricing but doesn't -- isn't

Friday, October 14, 2016.

```
 1  reflected necessarily in that final pricing page of the
 2  document.
 3  Q.  Again, would Mr. Swando, as the divisional vice-president,
 4  have access to all of that pricing structure?
 5  A.  On a per bid basis, yes.
 6  Q.  And access to all of the intelligence that goes into
 7  learning from the customers what they expect prior to the RFB?
 8  A.  Potentially.  It just depends on how much of that was part
 9  of that bid preparation process and how much of that was shared
10  throughout the entire group.
11  Q.  And are the profits and margins taken into account in
12  developing the price for the bid?
13  A.  They are.
14  Q.  And are the profits and margins disclosed in the bid?
15  A.  No.
16  Q.  Are they disclosed to anybody outside of the company?
17  A.  No.
18  Q.  Did Mr. Swando, as the divisional vice-president, have
19  access to that information?
20  A.  He would.
21  Q.  Now, once you submit a bid, is that bid public information?
22  A.  It really depends; it can be.  Generally speaking, that
23  information is found within the bid itself, and we fully have
24  our internal legal counsel reviewing bids to understand what
25  the FOIA process is or how that particular bid falls under
```

Friday, October 14, 2016.

1  FOIA.

2          Some agencies, some states, the federal government,

3  it is a little bit different in various locations, so we will

4  typically submit information differently based on how that

5  information will be shared.

6          For example, there are some bids that we know are

7  going to be released, so at the time -- at one point, BI was a

8  private company and we were comfortable releasing our

9  financials.  So rather than putting our financials in the bid,

10 we would put our financials in the bid under a separate sealed

11 envelop with the separate NDA attached to the financials

12 requiring that agency, should they choose to read the

13 financials, they would have to sign a separate NDA so that that

14 information wouldn't be subject to FOIA.

15          In some cases, again, agency dependent, sometimes we

16 are given the opportunity from the agency to actually alert us

17 when one of our proposals has been requested under FOIA, give

18 us a chance to redact the document for anything that we deem to

19 be confidential and propriety, and then it gets released.

20 Q.  And are there some agencies that don't release that bid

21 information in any case?

22 A.  There are, yes.

23 Q.  What agencies?

24 A.  Well, I can't --

25 Q.  By way of example.

Friday, October 14, 2016.

1   A.   I can't state specific agencies, but like the AOUSC,

2   Administrative Office of the United States Courts, which is the

3   federal probation and pretrial agency, to the best of my

4   knowledge, we have never been able to FOIA anything from a

5   competitor from the AOUSC.

6           In my experience, getting information via FOIA from

7   federal agencies is much, much harder than any state or local

8   agency.

9   Q.   So is it fair to say that some of our -- is a lot of

10  confidential information that BI develops that doesn't go into

11  the bid?

12  A.   That is correct.

13  Q.   And then there is some information in the bid that may not

14  become public even though we included it?

15  A.   Correct.

16  Q.   What is ISAP?  We have informed the court about a major

17  program we have called ISAP, can you talking about that?

18  A.   It is a program that stands for intensive supervised

19  appearance program, and it is operated for the Department of

20  Homeland Security through their ATD, alternative to detention,

21  organization.  The ISAP program operates throughout the United

22  States, and it's for individuals who are going through the EOIR

23  process, the Executive Office of Immigration Review process,

24  and so it is the immigration court process.

25          So individuals would cross the border, be -- have a

1   GPS device placed on them, monitored with that GPS device as

2   they are moving throughout the United States to their city of

3   designation; and, at that point, they would go to one of our

4   more than 65 offices throughout the U.S., be assigned a case

5   manager, and then they would be essentially managed and

6   assisted as they go through the immigration court process.

7          So their whereabouts would be managed but also their

8   court appearances.  We speak, I believe the last count, 34

9   languages that we have available in our ISAP offices.  And so

10  we really offer, if you will, a service not just to the

11  Government but also to the immigrants, the participants that

12  are going through this program.  It is our single largest

13  contract.

14  Q.  And when did that contract start?

15  A.  It started as a pilot in 2004.  We are now on ISAP three,

16  so in the third iteration of that contract and also the third

17  bid cycle for that contract.  There was a 2004 bid; a 2009;

18  and, most recently, September of 2014.

19  Q.  And what is the term in terms of years of the current

20  iteration of the ISAP?

21  A.  It is one-year contract with four- or one-year renewals.

22  So if all of the renewals are exercised by the federal

23  government, the contract will run through September of 2019.

24  Q.  Was Mr. Swando involved with is the ISAP contract, when he

25  was at BI?

Friday, October 14, 2016.

1    A.   I'd probably clarify that and say, I think Matt was most

2    involved probably in the ISAP three contract.

3    Q.   The most recent one?

4    A.   The most recent one.   I can't speak to the one in --

5    Q.   What was his involvement in the ISAP three contract?

6    A.   Just providing overall leadership to the company, at the

7    time of that contract was bid and ultimately won.

8    Q.   Okay.   And if that's renewed annually, then it would run

9    out in 2019?

10   A.   That is correct.

11   Q.   Is BI undertaking any efforts to try to get the renewal of

12   that contract?

13   A.   As I noted earlier, that's an ongoing process.   In fact, we

14   meet with the agency on a monthly basis, and we have since

15   2004.   And part of that, part of those monthly meetings is to

16   not only gauge, discuss the status of the current program, what

17   is going well, what isn't going well, what changes might need

18   to be made, but also an ongoing basis to look at is current

19   technology being provided adequate; are there other

20   technologies that the agency might want to see; are there

21   different service packages that would make sense for the

22   agency; do we need to open a new office, expand an office, or

23   contract an office.   So that process is very iterative, and it

24   is ongoing.

25           And then, ultimately, when that next RFP comes out,

Friday, October 14, 2016.

1  much of what was developed in those many, many, many meetings

2  will show up in that next RFP.

3  Q.  And do BI's competitors have access to the information we

4  derive from those meetings?

5  A.  No.

6  Q.  Does Mr. Swando have access to that information up to the

7  point that he was the divisional vice-president?

8  A.  Yes.

9  Q.  Now you mentioned that not all of the work is bid work, is

10 that correct?

11 A.  Is --

12 Q.  Not all BI's work is public bidding?

13 A.  That's correct.

14 Q.  Can you -- and you touched on that, but can you give the

15 Court examples -- let me first ask.  What volume, in terms of

16 either a percentage or rough dollar amount, is the work BI does

17 that is not public bid?

18 A.  I would estimate, on the electronic monitoring side, it's

19 between 10 and $12 million a year that we do.  That's not the

20 public bid business.  It is either sole source business or it

21 is business to business.  So it is like our company directly

22 with a reseller, with another business, so a non-government

23 organization that's not subject to government procurement

24 requirements.

25 Q.  And also not subject to FOIA requests?

1   A.   Correct.

2   Q.   Can you explain what you mean by "sole source" or provide

3   an example of that?

4   A.   Yes.   There are really a couple of ways that agencies can

5   go through a sole source process, if you will.   One is referred

6   to as a noncompetitive purchase order, NCPO; and a NCPO is

7   something that the Government can use, the federal government

8   can use as long as the dollar amount stays below a particular

9   threshold so that it gives the federal district, in many cases,

10  the opportunity to just issue a purchase order for a service.

11  Now those are generally pretty small, often a 5,000 or

12  10,000-dollar cap on a NCPO.

13           A sole source procurement is a lot more work with the

14  agency and also with the vendor; but if the agency deems that

15  the services being provided are so unique that they are not

16  provided by any other company or any other entity, they are

17  free to enter into a sole source agreement.   And we have a

18  number of those, as well, where the services we provide through

19  particularly one of our divisions, they are -- get a lot of

20  sole source work because they are kind of a one-of-a-kind

21  entity.

22  Q.   And again, none of the information we develop in providing

23  those products and services needs to be made public?

24  A.   Correct.

25  Q.   And you talked about resellers.   Can you explain what you

Friday, October 14, 2016.

1   mean by that?

2   A.   Yes.   A reseller is almost like a dealer or a distributor

3   that we would work with.   There is an entire level, if you

4   will, of the marketplace that is at, you know, a municipal

5   level often, court by court in many locations where we are not

6   in a position as a company to have employees and kind of the

7   interlends of smaller communities in the United States, so we

8   would typically partner with a local entity, a local, again,

9   reseller as we call them; and then they will distribute and

10  they will have their staff go into the various municipal courts

11  and provide GPS technology and alcohol technology or something

12  like that.

13          BI's primary business is going government -- or

14  business to government direct to the agency; but again, we

15  still have a fair amount -- we have over 100 resellers in the

16  U.S. that we currently have under contract.

17  Q.   Okay.   And are you familiar with the company Mr. Swando

18  works for now, Numerex?

19  A.   I'm generally familiar with Numerex.

20  Q.   Are they involved in the reselling business?

21  A.   It is probably important to point out, I know more about

22  OmniLink than I do about Numerex.   Numerex is a parent company

23  that acquired OmniLink.   I can speak better to the fact that

24  OmniLink is like BI, involved in working with resellers, yes.

25  Q.   Has BI competed directly with OmniLink in that industry?

1  A.   Yes.

2  Q.   Can you give the example of -- or how do you know that they

3  have competed directly with --

4  A.   Just bid submissions and current customers, in any county

5  of Denver, for example, used OmniLink products at one point.

6  We are currently providing the technology to them.   OmniLink

7  has been a bidder in a variety RPs and procurements around the

8  country.

9  Q.   Now, again, going back to when Mr. Swando was the

10  divisional vice-president of BI, what kind of strategy meetings

11  would he have been involved with?

12  A.   Well, there are a variety of strategy meetings, if you

13  will.   I'll start at the BI level.   So we have -- we are

14  responsible for developing our own annual strategy of where the

15  business is, where we are going, what technologies and services

16  that we intend to offer and develop, but also what markets that

17  we intend to pursue.

18           Those conversations can be as informal as something

19  in the hallway for a conference room, and then we also have

20  regularly scheduled strategy sessions that are generally led by

21  the divisional vice-president.   Those happen either once or

22  twice a year.   So that's what -- so we do that at the BI level.

23           And then we are also involved in strategic direction

24  and creation at the GEO Care level which, again, is that side

25  of the GEO Group that's the community correction side.   So my

Friday, October 14, 2016.

1  supervisor, Ann Schlarb, would hold quarterly meetings where

2  the leaders of the various divisions come together and

3  essentially roll up our individual strategies and directions to

4  support where Ann is going with her division.

5          And then, similarly, we have the GEO Group, which is

6  the parent, the corporate entity, and we attend regular

7  meetings, quarterly shareholder meetings -- I'm not sure if

8  quarterly board meetings as well as an annual meeting where all

9  of these business unit -- or division and business unit

10  strategies roll up to support the overall corporate strategy.

11  Q.  And again, none of that information would be shared outside

12  of the company?

13  A.  That's correct.

14  Q.  And, Mr. Swando, as divisional vice-president of BI, would

15  have been at all of those meetings?

16  A.  Yes.

17  Q.  What about acquisitions, would Mr. Swando, in his position

18  as divisional vice-president, have knowledge of acquisitions or

19  potential acquisitions by BI?

20  A.  Yes.  And I think the qualifying point is, as long as they

21  were an acquisition that was relative to BI's business, we

22  generally will assign internal subject matter experts and

23  internal leaders of the company to drive those particular

24  acquisitions from a business concept standpoint where the GEO

25  Group would have the financial and the legal staff that would

Friday, October 14, 2016.

1  step in to assist with an acquisition.

2          What the BI folks would do would be, again, look at

3  that acquisition more from how does it fit into our business,

4  is it complimentary, what do we do with offices, with staff,

5  those types of things.

6  Q.  Do you recall any particular acquisitions that Mr. Swando

7  was involved in?

8  A.  Yes.  In fact, two of our most recent acquisitions both

9  Matt and I were partnered together on.  One was a California

10  company called Soberlink, and the other was Illinois company

11  called Protocol.

12  Q.  And again, as part of the acquisition team, did you have

13  access to confidential information?

14  A.  Quite a bit, yes.

15  Q.  And Mr. Swando did as well?

16  A.  Yes.

17  Q.  And were both of those acquisitions consummated?

18  A.  Those were.

19  Q.  Did Mr. Swando participate on any acquisitions teams on

20  acquisitions that weren't consummated?

21  A.  I don't -- I don't know.

22  Q.  Okay.  Now, as part of its business strategy, does BI

23  participate in industry programs or trade shows?

24  A.  We do.

25  Q.  Can you talk a little bit about that?

Friday, October 14, 2016.

1    A.   Our market is unique in the sense we are not a

2    business-to-consumer entity, so we are not advertising in Time

3    Magazine or USA Today because we are dealing, generally

4    speaking, with the Government.  So we have limited avenues to

5    get the word out about what we do.  So one of them is through

6    trade shows.

7          We attend approximately 100 trade shows per year.

8    The biggest ones would be American Corrections Association,

9    ACA; the American Probation and Parole Association, APPA; and

10   then National Sheriff's Association, NSA; and so there is a

11   handful of national organizations.  And then there are, of

12   course, dozens and dozens of state organizations, so the

13   Illinois Sheriff's Office Association, the Pennsylvania

14   Probation Association, Judge's conferences, all kinds of things

15   to get the word out.

16         We also do a limited amount of advertising in the

17   industry publications that support those organizations I was

18   just describing.

19   Q.   Okay.  When Mr. Swando was the divisional vice-president,

20   he would have attended some of those trade shows on behalf of

21   BI?

22   A.   That's correct.

23   Q.   Do you know if he attended those trade shows on behalf of

24   his current employer?

25   A.   I have been informed that he has.

Friday, October 14, 2016.

1   Q.  Do other competitors attend those trade shows along with BI

2   and Numerex?

3   A.  Yes, absolutely.

4           MR. WILSON:  Your Honor, if I might retain the right

5   to recall Mr. Waldo, if I need to, in rebuttal.  I think, in

6   terms of our prima facie case, that concludes it for me.

7           THE COURT:  Let me ask a question.

8           THE COURT:  The defendant seems to have changed

9   direction a little bit in its latest filing where, essentially,

10  he seems to argue that he hadn't done anything and didn't have

11  access to any information about for about a year.

12          He suggests, as I read it -- and there is, I guess,

13  some indication that maybe this was a termination and severance

14  agreement.  He says he didn't do anything as a consultant, and

15  he had no access to any information, that he had to give up his

16  phone, give up his laptop.  That's a little consistent with his

17  initial filing which said he served as a consultant.  So can

18  you deal with that?

19          MR. WILSON:  Certainly.

20  BY MR. WILSON:

21  Q.  Can you address that?

22          First of all, you know, briefly, how did it come

23  about that Mr. Swando ceased to be the divisional

24  vice-president?

25  A.  I preface this by saying I don't have intimate knowledge of

Friday, October 14, 2016.

1  all of the details.  That is really something -- at the time,

2  Matt reported to Ann, so it would be appropriate for Ann to

3  address some of that.

4          I can simply speak to what I was involved in which

5  was in the July-August timeframe of 2015; and Ann approached

6  me, advised me that Matt would be away from his position for a

7  bit and asked me to step in, in an acting role, into his

8  position, which I did.

9          Subsequent to that, it is my understanding -- and

10 again, this was between Matt and others within the GEO Group --

11 he left the organization but stayed on in a consulting role, in

12 that consulting agreement that I understand terminated in about

13 July of this year.

14 Q.  And what was Mr. Swando's role while he was a consultant?

15 Did you have interaction with him?

16 A.  I did.  I spoke to Matt a number of times, as we explored

17 different areas that he could work; and I think the biggest

18 opportunity that we had -- and I can't speak for Chris Ryan

19 [phonetic], Ann, or Dr. Zoley, but it was the MOJ contract,

20 which is the Ministry of Justice, a United Kingdom based

21 contract.  It was one of the largest electronic monitoring

22 contracts in the world; and when it was last out to bid, Matt

23 led, spearheaded our BI team; spent a great deal of time in the

24 UK and was and is, I presume, very, very knowledgeable about

25 the MOJ contract.  So at the time of his separation, that was a

Friday, October 14, 2016.

1  looming opportunity; and it is my understanding that depending

2  on where that opportunity was going to, if we were going to

3  reengage, which we ultimately did not, then Matt would have

4  been a key member of the team to pursue that business.

5          THE COURT:  When you say "separation," are you

6  talking about from the -- as an employee or as a consultant?

7          THE WITNESS:  Your Honor, I meant as an employee.

8          THE COURT:  I mean, it seems like their argument is

9  that maybe a year of these two years shouldn't count.  I may be

10  anticipating something, but it seemed like that's the gist of

11  that affidavit.

12          MR. WILSON:  I would agree that seems like the gist

13  of it.  And to be candid, Your Honor, it is true, he was no

14  longer the divisional vice-president.  We focused on the

15  legitimate business interests, you know, up to that time, the

16  information he had when he signed the noncompete.

17          We are here for a preliminary injunction; but,

18  certainly, those are issues that just came up yesterday at 5:30

19  and, you know, we could briefly address as to the duration.

20  But I think for today's purposes, our position is that it's

21  true that he was not in as sensitive a position those last nine

22  months before he joined the competitor, but we certainly think

23  that for purposes of preliminary injunction, you know, our

24  processes that Mr. Waldo has talked about run a lot longer than

25  nine months.

Friday, October 14, 2016.

1          So even if he was completely out, even if he

2    terminated in October of 2015, it really wouldn't change our

3    position.

4          THE COURT:  All right, thank you.

5          Are we ready then for cross-examination?

6          MR. POLLARD:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8    BY MR. POLLARD:

9    Q.  Good afternoon, Mr. Waldo -- rather good morning.

10   A.  Good morning.

11   Q.  How are you, sir?

12   A.  I'm well, thanks.  And you?

13   Q.  I'm fabulous.

14          So you say that you hired Mr. Swando approximately

15   2004?

16   A.  That's correct.

17   Q.  Where did you hire him from?

18   A.  A competitor, a company by the name of Protech.

19   Q.  Protech.  Did Mr. Swando have a noncompete agreement at

20   that point in time?

21   A.  He did.

22   Q.  And did Protech contend that they had these legitimate

23   business interests?

24   A.  You have to define by what you mean by "legitimate business

25   interests."

Friday, October 14, 2016.

1   Q.  Strike that.

2          Did GEO Group or did Mr. Swando's employer pay for

3   his legal defense of that matter?

4   A.  Here's my recollection of what happened then.  It might be

5   easier, if that's okay.

6          So when I had hired Matt, his employer, at the time

7   and his boss, a guy by the name of Steve Chapin [phonetic], I

8   don't know the specific details.  I don't recall -- I don't

9   know that he actually went to court.  I just know that there

10  was a lot of legal action going back and forth.  And yes, when

11  I hired Matt, BI agreed to essentially a stipend, if you will,

12  to fund up to, if I recall, $10,000 of his legal fees during

13  that -- that process.

14         We again -- to the best of my knowledge, we didn't

15  engage -- BI didn't.  We weren't named by Protech; but in

16  hiring Matt, we agreed to support Matt through that process.

17  And again, my recollection is that at the time, given Matt's

18  role in sales with Protech, the concern that Protech had was

19  not really about propriety and confidential information, it was

20  really about Matt's knowledge of territory and customer

21  relations.

22         So where we ultimately ended up was when Matt joined

23  the company, he agreed not to have contact with the customers

24  that he had gained when he was at Protech, and also worked in a

25  different part of the country, worked in the Western U.S.

Friday, October 14, 2016.

```
1    Q.   Thank you.

2         You mentioned earlier you are familiar with a company

3    called OmniLink?

4    A.   I am.

5    Q.   Are there any particular OmniLink monitoring products you

6    are familiar with?

7    A.   Yes.   There is I think a OM300, an OM310, I think there is

8    a OM400.   Those are the devices that I'm most familiar with,

9    recognizing that those may be a bit dated given what Omni is

10   producing today because I haven't been in a sales capacity in a

11   number of years, and that's where I would typically have the

12   most exposure in the field to competitive devices.

13   Q.   And what are these devices that you just mentioned, these

14   OM300?

15   A.   Those are devices that are competitive devices to our GPS

16   devices.   So it is an ankle-worn GPS tracking device produced

17   and sold by OmniLink to a similar customer base that we would

18   offer ours to.

19   Q.   Did BI ever go find OmniLink's manufacturer --

20   A.   We did.

21   Q.   -- and then attempt to use them to manufacture a similar

22   product?

23   A.   We did.

24   Q.   How did you find their manufacturer?

25   A.   By opening up the device.
```

Friday, October 14, 2016.

1   Q.  Could you flush that out a bit for me, sir?

2   A.  It is a pretty common practice by opening the device or, in

3   this case, going to the FCC website.  And when you look at the

4   photographs, just like we have to do, the photographs on the

5   FCC website show the printed circuit board, and it says

6   "manufactured by," in this case, Sendum.  So we just picked up

7   the phone, talked to Sendum, found out that they didn't have

8   any legal restrictions in working with us, so we partnered with

9   them.

10  Q.  Are you familiar with the complaint that was filed against

11  Mr. Swando in this action?

12  A.  Yes.

13  Q.  Are you familiar with the plaintiff's allegations as to the

14  nature of the confidential and proprietary information at

15  issue?

16  A.  I believe generally, yes.

17  Q.  Okay.  I would like to ask you some questions about the

18  categories of information listed herein and denoted as

19  "confidential" or "proprietary."

20          The complaint in this matter contends that there is

21  confidential customer data at issue, correct?

22  A.  Yes, that's one of the areas, yes.

23  Q.  Understood.

24          Mr. Waldo, do you have any evidence that Mr. Swando

25  physically took any corporate information or data with him upon

1  his departure from BI?

2  A.  Beyond the knowledge that myself and everyone in this

3  industry gains by building relationships with customers,

4  understanding what they are doing and where they are going, I

5  can't speak to anything that Matt physically took with him.

6  But I would also contend, I've been doing this for 30 years,

7  that there are a lot of things I know and I presume and believe

8  all of my peers in this industry know that didn't necessarily

9  have on a computer or on a piece of paper.

10 Q.  Let's talk about these customer -- or this customer data.

11         Mr. Swando ceased to be in your role over a year ago

12 today, correct?

13 A.  That's correct.

14 Q.  What specific customer data was Mr. Swando exposed to

15 during his tenure with the company that he could use right now

16 today to engage in unfair competition?

17 A.  Well, as I said a second ago, every day that we are in the

18 business, we are exposed to what a customer is doing, whether

19 it is the federal government, state government.  Again, we are

20 planning for a bid that's coming out years from now, so, you

21 know, I would contend that there is valuable information that

22 all of us have, myself, Matt, and others in this industry, as

23 it relates to what a customer's needs are and what they are

24 doing and where they are going.

25 Q.  So I understand correctly, sir, your contention with

Friday, October 14, 2016.

```
1   respect to customer data is that simply by virtue of being in
2   the industry, working for BI, Mr. Swando was exposed to
3   information about what the customers need, "customers" being
4   principally government entities?
5   A.   Correct.  And to add on, it is more than just being in the
6   industry, it is going to association trade shows, it's going to
7   meet face to face with government agencies and understanding
8   what their needs are and where they are going in the future.
9   Q.   So is it your contention that the government's assertion of
10  "I need X" is confidential information?
11  A.   No.  My assertion is that when you say "the government
12  needs X," I tried to define earlier that what the government
13  puts in a specification and if you are you defining "X" as in
14  the formal procurement document, then yes, that's what they
15  need.  But I would also argue that what that agency is really
16  looking for may or may not always be captured by the sentence
17  in the specifics.
18  Q.   Mr. Waldo, is it your contention that the Government is
19  having secret, off-the-record conversations about its
20  procurement needs with BI alone in the entire industry?
21  A.   Heavens no.  And first off, they are not secret or
22  inappropriate any way, as I think you are inferring.  They are
23  just typical meetings that are scheduled through a process with
24  the government agency.  It could be, as I described, with our
25  ISAP contract, they are regular, monthly meetings that are
```

Friday, October 14, 2016.

1 attended by representatives of the Department of Homeland

2 Security, but they are hardly secret, but they also aren't --

3 the results of those meetings aren't shared beyond the

4 government and the contractor.

5 Q.  Mr. Waldo, I'm a little bit confused, sir, because moments

6 ago, you told me that the information derived from these

7 meetings with the government is what constitutes your

8 confidential information; and now, you are testifying that that

9 is not secret information.  So is it is it confidential

10 information or is it not confidential information?

11 A.  Again, I'm not following you.

12         So a meeting, for example, that's held with the

13 Department of Homeland Security, as we view them as monthly

14 meetings, I would deem that information shared at those

15 meetings because it is not shared beyond the members of

16 Homeland Security that are in the meeting and the members of

17 our organization that attend the meeting.  It is not shared

18 outside of those individuals, so, in that sense, that

19 information is confidential to those that were in the room or

20 those that have a need-to-know within an organization like BI.

21 Q.  You have a competitor named 3M?

22 A.  I do.

23 Q.  3M is a large company, isn't it?

24 A.  Correct.

25 Q.  3M submits proposals for a lot of these bids, correct?

Friday, October 14, 2016.

1  A.  Sure.

2  Q.  To your knowledge, does 3M have similar meetings with

3  government agencies or officials to ferret out other details

4  about what they are looking for in these bids?

5  A.  I believe that virtually every provider has meetings with

6  their customers and does irrespective of who they might be.  So

7  yes, I think 3M has meetings with their current customers to --

8  I guess as I have already described, to make sure they are

9  providing a good service and understanding what that agency

10  wants to do.

11  Q.  So in these meetings that --

12  A.  I'm not privy to the information that 3M got from the

13  meeting with one of their customers.

14  Q.  If the government needed something and let's say they

15  needed blue -- just as a hypothetical, say, "we need blue," is

16  it your contention that the government would tell you, "We need

17  blue, that's what we really need;" and they would tell 3M, "We

18  need purple"?

19  A.  Possibly.  Again, I think I would take --

20  Q.  Why?

21  A.  -- with the example of -- I mean, blue and purple are

22  obvious that, you know, the agency may say something like,

23  "Well, we really want to go out to bid for this device, because

24  that's what we are going out to bid for today, but what we are

25  really looking for is an iteration on this device so it will do

Friday, October 14, 2016.

1    a different thing down the road; so we are more interested in

2    talking to you because, yes, your device will meet the spec

3    today, but what we are really looking for is a change of this

4    sort or that sort a year from now, six months from now; we are

5    going to migrate to a different technology."

6    Q.  So your position --

7    A.  That may not be disclosed in an RFP.

8    Q.  So your position is the government is telling you stuff

9    that it is not telling its competitors, is that your testimony?

10   A.  I can't speak to what -- if one of my competitors goes into

11   that same government agency and meets with them, they maybe

12   told the exact same thing.  I don't know.  I can only speak to

13   what we learn when we meet with customers.

14   Q.  Let's talk about suppliers.

15   A.  Okay.

16   Q.  Your complaint indicates that among this very valuable

17   confidential information that's at issue that must be protected

18   with an injunction is your supplier data.  What does this even

19   mean, "supplier data"?

20   A.  We work with a number of suppliers, have relationships with

21   folks like Sendum -- of course, Omni has a relationship with

22   Sendum, as well.  Chip providers, U-blox, Qual Comm, Motorola,

23   we try to have a relationship with these entities so that we

24   can understand where they are going from a technology

25   standpoint to be able to take advantage of that.

Friday, October 14, 2016.

1   Q.  These suppliers maintain exclusive relationships with BI?

2   A.  I don't know.

3   Q.  Sendum certainly doesn't, right?

4   A.  No, no.  They build technology for anybody that calls them.

5   Q.  Motorola certainly doesn't, correct?

6   A.  Qual Comm does.  You can't -- you or I just can't go to

7   Qual Comm to buy something, you have to be on their list, their

8   special list.

9   Q.  But they don't have a one-person list, do they?

10  A.  I believe there are 28 people on that list today.

11  Q.  That's a lot more than one, correct?

12  A.  Yes.

13  Q.  So in terms of a competing company like a Numerex, it's

14  fair to say, Numerex would be able to readily identify who the

15  suppliers are in this particular market space?

16  A.  Obviously, there are -- there are the known kind of normal

17  suppliers and then there are certainly suppliers that are

18  probably less well-known.  I can't speak to Numerex and their

19  ability to identify every supplier that is out there.

20  Q.  And the type of supplier data that the plaintiff is

21  alleging must be protected here, what exactly is that data at

22  issue?

23  A.  I believe it would be data that, again, has information

24  about unique supplier relationships that wouldn't be the

25  commonly known Qual Comms or the U-blox firms, entities like

Friday, October 14, 2016.

1  that.  It is more of the specialty items.

2  Q.  What are these specialty items?

3  A.  I don't really feel like I should disclose something like

4  that in this setting.

5  Q.  Mr. Waldo, you are taking the position that you -- strike

6  that.

7          Your company is taking the position that it is

8  entitled to an extraordinary remedy of a preliminary injunction

9  to protect confidential information.  You have taken the

10  position that certain supplier information is confidential.

11  You have said there are certain unique suppliers who might not

12  be well-known.  I'm not asking you for the names of these

13  unique suppliers.  I'm asking you what are the parts that are

14  at issue here?

15  A.  Well, we would be talking about --

16          MR. WILSON:  Excuse me.

17          THE WITNESS:  I'm sorry.

18          MR. WILSON:  Your Honor, I object to the whole line

19  of questioning as beyond the scope of direct.  That may be in

20  our complaint, that may be something that we address later in

21  the case or at trial; but we put on our prima facie case,

22  suppliers weren't mentioned, they aren't a subject.  And I'm

23  sure we have limited time.  I would like to focus on the

24  evidence we actually presented today.

25          THE COURT:  I will overrule the objection.  I'm not

Friday, October 14, 2016.

```
 1  going to require him to answer the question, but I think it is
 2  a fair question to ask, given the parameters of the complaint,
 3  and we'll decide the case based on whatever evidence is
 4  presented.
 5          MR. POLLARD:  Thank you, Your Honor.
 6  BY MR. POLLARD:
 7  Q.  Well, Mr. Waldo, what I'm trying to get at is can't a
 8  competitor go look at publicly available documents, bids, the
 9  FCC website, et cetera, and identify all of the different
10  component parts going into an ankle monitor?  Couldn't they do
11  that?
12  A.  For a device that's been released to the market and has
13  gone through, as I noted earlier, the FCC testing, the answer
14  is yes.
15          Now, can you learn everything you need to know by
16  looking at a photograph or what is known as a BOM, a B-O-M, a
17  bill of materials which lists the components for the FCC?  Not
18  necessarily.  There is a lot that goes into making a device
19  work and how it operates that isn't necessarily just right
20  there in the photograph.  But I think, you know, part of what
21  I'm trying to describe is that it isn't just the device that's
22  released, it is what is happening with that technology going
23  forward.
24          MR. POLLARD:  Your Honor, I don't know if this would
25  be helpful, but if we may, we would like to introduce certain
```

Friday, October 14, 2016.

1    of these FCC documents so that, you know, Mr. Waldo can confirm

2    whether or not these are the types of graphics and specs that

3    get submitted to the FCC and so that Your Honor can see what we

4    are talking about in terms of the degree of specificity, the

5    pictures, et cetera, all that goes into these submissions.

6              THE COURT:  You all can talk to each other, try to

7    reach an agreement; otherwise, we will just follow the rules of

8    evidence.  I guess you can ask him something about a document,

9    identify it, and ask him, but whether it is admissible or not,

10   there are a number of ways to do it but --

11             MR. POLLARD:  Your Honor, may I approach the witness,

12   please?

13             THE COURT:  Sure.  Sure.

14             MR. POLLARD:  Thank you, sir.

15   BY MR. POLLARD:

16   Q.  Mr. Waldo?

17   A.  Yes.

18             MR. POLLARD:  Your Honor, would you like a copy?

19             THE COURT:  Not at this point.

20             MR. POLLARD:  Okay.

21             MR. WILSON:  Is this in the notebook?

22             MR. POLLARD:  This is in our exhibit list.  This was

23   filed with our motion for judicial notice.  This is a public

24   document with the FCC that GEO Group BI submitted.

25             MR. WILSON:  But do I have a copy of it in these

Friday, October 14, 2016.

1    three notebooks?

2           MR. POLLARD:  Yes, sir.  It is Exhibit H.  It is the

3    very front tab of Exhibit H.

4    BY MR. POLLARD:

5    Q.  Mr. Waldo, is something like this what BI would submit to

6    the FCC?

7    A.  Yes, it appears to be.

8    Q.  Could you flip through a couple of these photographs.  Can

9    you tell me what are these renderings of?

10   A.  They are the photographs of the internal components of our

11   current GPS tracking device, our most recent tracking device as

12   well as a test report.  As you have noted, all of this is

13   submitted to the FCC, and it is all public information.

14   Q.  And you testified several moments ago that you, in fact, at

15   one point in time, opened up a device and saw that Sendum was a

16   manufacturer for OmniLink?

17   A.  That's correct.  And we also, as I noted, looked at the FCC

18   data as well.

19   Q.  What do you mean, "looked at the FCC data"?

20   A.  This information that I'm looking at right now, for that

21   device, not for our own device, of course.

22   Q.  By that, you said -- did you just look at the pictures or

23   is there some other data you looked at?

24   A.  I never looked at it, so I can't answer that question.  I

25   just know that our engineers did.

Friday, October 14, 2016.

1  Q.  Okay.  And from your experience, can engineers look at a

2  report like this submitted by a competitor and ascertain what

3  the device is?

4  A.  As I noted a few minutes ago, I think my answer would be

5  yes, generally.  I don't think you can know everything about

6  everything from the photograph, but I think you can figure out

7  quite a bit by the details in the FCC, yes.

8  Q.  Mr. Waldo, to your knowledge, is this document at Tab H, is

9  this a submission that BI GEO Group made to the FCC?

10 A.  Yes, it is appears to be based on the FCC ID number and the

11 letter from Intertek appears to be our actual FCC submission.

12           MR. POLLARD:  Your Honor, I would like to move this

13 into evidence, if we may.

14           THE COURT:  Any objection?

15           MR. WILSON:  I object, Your Honor, it is not on their

16 exhibit list.

17           THE COURT:  I don't recall that you all even -- was

18 there a requirement of exhibit lists?  I mean, do you have a

19 substantive objection?

20           MR. WILSON:  No.

21           THE COURT:  A lot of this was filed last night,

22 apparently.  A lot of this, apparently, they followed last

23 night.

24           MR. WILSON:  Right.  Your Honor's order required us

25 to do exhibit lists, I believe these were filed Monday morning.

```
 1              THE COURT:  Is there any --
 2              MR. WILSON:  We never got the documents, it wasn't on
 3    their list.  Substantively, I think it is irrelevant.  We have
 4    not asserted anything about the product design once the product
 5    is released, being confidential information, having anything to
 6    do with our motion or the enforcement of the noncompete today,
 7    this is an entirely different issue.
 8              THE COURT:  All right.  I'm going to deny the
 9    objection as to relevance.
10              MR. POLLARD:  Your Honor, with respect to the exhibit
11    list we had --
12              THE COURT:  Do you want to wait for me to rule or are
13    you just going to go ahead and interrupt me?
14              MR. POLLARD:  I wanted to explain why it wasn't
15    argued and I thought it was.
16              THE COURT:  Apparently because you only filed it last
17    night or very recently, at least we got it last night, I think.
18    Is that the reason?
19              MR. POLLARD:  We just obtained it.  We just obtained
20    it.  We had a number of outstanding FOIA requests served on
21    various governments.  We received a response to one FOIA
22    request from the government of Florida which led us to this
23    document because it contained an FCC submission number.
24              THE COURT:  All right.  As I started to say,
25    relevance, I'm going to deny.  Given the promptness of the --
```

Friday, October 14, 2016.

1  or the need to have an early hearing on preliminary

2  injunctions, I'm going to deny your motion as to the exhibit

3  list.  If there is no question about the authenticity or the

4  fact they filed it, I will admit whatever this -- what is the

5  number on this?

6            MR. POLLARD:  We have it in our binder as H but --

7            THE COURT:  All right.  H is admitted.

8      (Evidence admitted as Defense Exhibit H)

9            MR. POLLARD:  Thank you, Your Honor.

10  BY MR. POLLARD:

11  Q.  Mr. Waldo, at the time that BI developed a product in

12  competition with the OmniLink products mentioned earlier, when

13  it identified Sendum as a supplier, was Sendum a big supplier

14  at that point?

15  A.  They were a large supplier for our marketplace.

16  Q.  And is it reasonably possible for a competitor to go

17  through these FCC documents and identify a variety of the

18  suppliers with the component parts to these devices?

19  A.  Again, I think I said this.  I'll say it again:  I'm not an

20  engineer, so I couldn't look at a document like this and have

21  any idea where a component might come from or what that

22  component is, but I think that schooled engineers and

23  developers that work with chip sets like this and printed

24  circuit boards every day, they can look at a document and have

25  a general sense of what that chip is.

Friday, October 14, 2016.

1    Q.  Let's talk about pricing information.

2    A.  Okay.

3    Q.  Pricing information has come up repeatedly as somehow being

4    confidential and proprietary.  What pricing information is at

5    issue?

6    A.  Well, as our counsel represented earlier, when you are

7    developing a bid, there is an extensive amount of internal

8    pricing discussion.  That is very confidential.  It is not

9    released in the bid.  It is not released anywhere about how we

10   get to the ultimate pricing.  It is the modeling.  It is -- I

11   would argue that virtually every company -- if General Motors

12   is building a car, they have a lot of work that goes into all

13   of the costs to build that, before it gets to the

14   manufacturer's suggested retail price.  That's what we are

15   trying to describe.

16   Q.  Can we clarify the scope of this dispute?  Numerex is not

17   competing against BI in terms of running secure facilities?

18   A.  I'm sorry, we don't run secure facilities.

19   Q.  Strike that.

20        I'm trying to get a handle on what BI's main concern

21   is with respect to Mr. Swando's involvement at Numerex.  Is it

22   fair to say that BI's main concern is Mr. Swando's involvement

23   with development of electronic monitoring products?

24   A.  That's one of the stated areas.

25   Q.  Well, what are the other concerns there?

Friday, October 14, 2016.

1   A.   Well, I think you just mentioned one, which is just

2   knowledge of our pricing model, how we derive pricing.

3   Q.   But in terms of the actual segment of the business, or

4   segment of the market, this is really limited to Mr. Swando

5   being involved in the development of competing monitoring

6   products?

7   A.   It's, again, partly that; but it would also be, you know,

8   developing a proposal and a bid response that requires pricing.

9   Q.   In the market for monitoring products?

10  A.   Correct.

11  Q.   So in these bids for monitoring products you submit to

12  government entities, you have to submit your actual price per

13  unit or per day, correct?

14  A.   That is correct.

15  Q.   So that's all public information?

16  A.   Right, but that misses the point I was trying to make

17  earlier, that there might be 50 pages of analysis and work and

18  spreadsheets that culminate in one number that goes in, as you

19  just referenced, into the bid.

20  Q.   So it is your contention that when you put together a

21  proposal or create something for a government, there is a whole

22  bunch of work product that may go into it, and that's

23  confidential?

24  A.   Yes.

25  Q.   Sir, are you from Colorado?

Friday, October 14, 2016.

1   A.  I live there now, yes.

2   Q.  And does BI have contracts with the Department of

3   Corrections for the State of Colorado?

4   A.  We do.

5   Q.  How familiar are you with the terms of the contracts

6   between BI and Colorado Corrections Department?

7   A.  I have a high level of understanding of the contract, but

8   I'm not -- I don't have any specifics or details.

9           MR. POLLARD:  Your Honor, may I approach the witness

10  and show him the contract?

11          THE COURT:  Sure.

12          MR. POLLARD:  Thank you, sir.

13  BY MR. POLLARD:

14  Q.  Mr. Waldo, sir --

15  A.  Do you want this one back?

16  Q.  Yes, thank you.

17          MR. POLLARD:  Binder 1, Exhibit A.

18  BY MR. POLLARD:

19  Q.  Mr. Waldo, sir, do you recognize this document in front of

20  you?

21  A.  Well, again, I don't recognize it specifically, but from

22  the title, it appears to be our contract with the DOC,

23  Department of Corrections, for Colorado.

24  Q.  Okay.  Could you just scroll through this?  The first

25  question I have is -- I'm just trying to understand.  Do you

Friday, October 14, 2016.

1  have any reason to doubt the authenticity of this document as a

2  contract between BI and the State of Colorado?

3  A.  No, I do not.  I suspect it, as I have indicated in my

4  prior testimony that there are lots of agencies that will do

5  the FOIA process, release their contracts, and I would presume

6  that that's what's happened here.

7  Q.  Can you -- by looking at this, can you tell us what this is

8  a contract to provide?

9  A.  I presume, without seeing it yet, that it is the contract

10 for our electronic monitoring for the State of Colorado.  I

11 have not found that yet, but I'm going through the Ts and Cs

12 right now, and general provisions.

13         Yes.  When I look at the definitions, it speaks to

14 radio frequency, GPS, electronic home monitoring; so yes, it is

15 the contract for our contract with the state.

16 Q.  Understood.  Thank you, sir.

17         And in a contract like this or a situation like this,

18 you're providing the, say, ankle monitor, GPS monitor to the

19 State of Colorado?

20 A.  We are.  This particular contract, as an example, is a bit

21 more complex because in addition to providing the technology,

22 we have relationships throughout the state where we are doing

23 the installation services, so we have -- we inventory equipment

24 at certain locations.  We have staff, either our own staff or

25 contracted staff, that go to the Corrections offices, meet with

Friday, October 14, 2016.

1  the offenders when they are released from a state institution

2  and install the equipment, and then subsequently remove the

3  equipment when they are done.

4  Q.  So in connection with a product like this or a service like

5  this, you do studies, you do reports, you do testing, et

6  cetera?

7  A.  Correct.

8  Q.  And is that the sort of stuff you contend Mr. Swando would

9  have had access to or been knowledgeable about?

10 A.  Certainly, he would have knowledge about that and may have

11 access.

12 Q.  And you consider that confidential and proprietary?

13 A.  That's communication that's only going between us, as the

14 vender, the provider, and the agency.  We are not providing

15 monthly status reports, tamper reports, performance reports,

16 things like that to our competitor.

17 Q.  Could you turn to page 11 of this document.  Go down to

18 number 17, rights and data documents and computer software.

19 A.  Okay.

20 Q.  It says, "Any software, research, reports, studies, data,

21 photographs, negatives or other documents, drawings, models,

22 materials, or work product of any type, including drafts

23 prepared by contractor in the performance of its obligations

24 under this contract shall be the exclusive property of the

25 state, and all work product shall be delivered to the state by

Friday, October 14, 2016.

1    contractor upon completion or termination hereof."

2    A.   Uh-huh.

3    Q.   Do you agree with me that under BI's agreement with

4    Colorado, any work product reports, et cetera, that went into

5    providing these services, they're the province of the State of

6    Colorado.

7    A.   My interpretation of that is anything that we prepared

8    specifically for Colorado in response to this bid, but if we

9    existing technology and services that were in place, months and

10   years before we submitted this bid, then we are clearly not

11   turning everything in our business over to the State of

12   Colorado.

13   Q.   But you do agree with me that anything in connection with

14   customizations, et cetera, for this particular product, that

15   belonged to the State of Colorado?

16   A.   We have been in contract with the State of Colorado now for

17   about 20 years and, to the best of my knowledge, we have never

18   turned over anything to the State of Colorado.  We have never

19   just handed them things that we have developed.

20        MR. POLLARD:  Your Honor, I would like to request

21   that this contract between BI and Colorado be moved into

22   evidence.

23        THE COURT:  Is there an objection?

24        MR. WILSON:  Same objection, Your Honor, but I

25   understand your ruling.

                    Friday, October 14, 2016.

```
 1              THE COURT:  All right.  Well, is there some

 2   authenticity issue as to this or not?

 3              Relevance, I don't see an issue.  He says it looks

 4   like one of your contracts.  If there is some doubt about that,

 5   that's an authenticity problem.  He can overcome that at some

 6   point in the future, if it is not a real problem.  I mean, you

 7   all know what your contracts are probably.  I mean, is there

 8   some real issue here or not?

 9              MR. WILSON:  I don't think we could on the spot

10   authenticate this.  For purposes of a preliminary injunction

11   hearing where the rules are somewhat relaxed, I wouldn't have a

12   problem saying --

13              THE COURT:  Okay.

14              MR. WILSON:  -- that it is, in all likelihood,

15   authentic.

16              THE COURT:  I'll admit it for purposes of this

17   hearing subject to some later determination if there is a

18   problem with authenticity.

19              MR. WILSON:  Thank you, Your Honor.

20              (Evidence admitted as Defense Exhibit A)

21   BY MR. POLLARD:

22   Q.  Mr. Waldo, the complaint also puts at issue and calls for

23   proprietary financial solutions.  Could you explain what this

24   entails?  Mr. Swando had access to financial solutions, what

25   does that mean?
```

1  A.   I think it goes to what I was talking about a few moments

2  ago relative to the preparation, the work in developing the

3  financial underpinnings of our business.

4  Q.   The financial underpinnings of what?

5  A.   Of our -- of BI's business.  It's our electronic monitoring

6  business.  It is the service contracts that we have.  It's the

7  product development, that's what I would contend.

8  Q.   Are BI's finances static?

9  A.   No.

10  Q.   So BI's finances, as of right now, are different than its

11  finances as of a year ago, correct?

12  A.   Well, the specific data and the specific numbers from a

13  performance standpoint, yes, are different today than they were

14  a year ago.

15  Q.   So could you walk me through how Mr. Swando could

16  conceivably use any knowledge that he may have had about BI's

17  financial performance from a year ago today in the current

18  market working for Numerex which has a dramatically different

19  financial picture than your company?

20  A.   Again, it is the knowledge that someone in his position, my

21  position, Ann's position, when she was in this role, would have

22  about our business, about how we -- how we do things, if you

23  will, financially relative to what I just described; ratios in

24  our call center, for example; how we operate one of our two or

25  both of our call centers; how we do product development; how we

Friday, October 14, 2016.

1  determine to provide a contract like the ICAP contract, there

2  is a great deal of information and knowledge around all of

3  that.

4  Q.  I was asking about the financial piece of it and how he

5  could use whatever financials he was exposed to a year later

6  right now for Numerex, and I don't understand your answer.

7  A.  If you are talking specifically about corporate financials,

8  then I don't know the relevance of that or what he could do

9  with that.

10       You know, a balance sheet, for example, I don't

11  know -- we get balance sheets from competitors and bids, I am

12  not sure that that specifically is going to have a great

13  impact.

14  Q.  Same question but with respect to a bid.  So for example,

15  if Mr. Swando was privy to a bid, a year and a half ago, how

16  could he use that knowledge in connection with the new bid

17  right now, today, for Numerex which has different inputs,

18  different numbers?

19  A.  Again, it's the understanding of those financial

20  underpinnings and what we have used to create that particular

21  bid.  That may be the same a year or two from now, but to your

22  point, it could be different.  It is possible that that

23  information wouldn't be particularly relevant, but, then again,

24  it could be relevant depending on the service required, the

25  technology required by that agency going forward.

Friday, October 14, 2016.

1   Q.   And when you talk about the financials underlying a bid, do

2   you mean what the most important -- strike that.

3          Do you mean what should be weighted, you know, more

4   importantly?

5   A.   No, because the weighting is -- that's public matter, the

6   agencies will define in a procurement how they are weighting

7   the bid, so there is no uniqueness there or no unique knowledge

8   there.   Again, it is more about the fundamentals of how we do

9   the business, how we price the business to be competitive, but

10  also profitable.

11  Q.   Okay.   Can we talk now about marketing strategies?   The

12  complaint contends that Mr. Swando had access to the company's

13  marketing strategies.   What does this entail?

14  A.   And again, I mentioned this earlier when we talked about

15  our strategic planning and the strategic planning meetings, and

16  one of the components of our strategic planning was around

17  product development and marketing and where we were going in

18  the future, what is the next product, what is the next --

19  because the product management team reports into the marketing

20  organization so it is part and parcel to what we do from a

21  marketing standpoint.

22          So our future planning, our market planning, our

23  market research, what is the next market to pursue might be a

24  year from now, it might be three years from now, something that

25  we are going to go after or would like to go after, that's all

Friday, October 14, 2016.

1  part of what we do from a strategy and marketing standpoint.

2  Q.  How do companies such as BI figure out what the next

3  product market to tackle is?

4  A.  It is a very -- it is a complex process.  We get inputs

5  from a variety of areas.  We might get inputs from our

6  customers based on the challenges they face, the issues they

7  face.  It could be that, for example, there might be a budget

8  cut or budget issue within a state or a county or a level of

9  government that creates a need, creates a problem for a federal

10  officer, for a state officer.  So we -- we are cognizant of

11  what is happening there.

12       We, as I mentioned previously as well, maintain

13  relationships with technology providers.  So if we see a

14  Nascent development, a new chip, a new something that is going

15  to be available, we are tracking chip sets that are going to be

16  released in 2018 and 2019 and understanding what new features

17  those new chips will provide, then will determine is that

18  something that we would either incorporate into a device or

19  build a device around.

20  Q.  So let's try and break this into two halves, okay?  Half

21  one is customer driven, right?

22  A.  Potentially.

23  Q.  Okay.  These customers are states, corrections departments,

24  et cetera, correct?

25  A.  Yes.

1   Q.  And you agree with me that from a standpoint of mapping out

2   what your next market play is, all of your competitors are

3   probably sitting down having meetings with the states and

4   Department of Corrections, and government agencies, et cetera?

5   A.  Yes.

6   Q.  Okay.  And that's where you get that side of the input,

7   right, that's the customer piece of this, okay.

8          Let's talk about the technology piece of this.  Do

9   you think your competitors are monitoring new technological

10  developments in terms of chip technology?

11  A.  I don't know.  I presume they are.

12  Q.  So your marketing strategies or new product launches,

13  that's really going to hinge on what consumer demand is and

14  what technologies are available?

15  A.  Those are two big drivers.

16  Q.  And those big drivers can be accessed by a competitor?

17  A.  In many cases, yes.

18  Q.  Last, but not least, is business forecasts.  That's alleged

19  to be a piece of valuable confidential information, business

20  forecast.  What do we mean by that?

21  A.  Well, it's again where we are going from a business and

22  financial perspective, as a company.  We prepare forecasts for

23  current and future fiscal years.

24  Q.  How fast does market change?

25  A.  In this industry, not very fast.

Friday, October 14, 2016.

1          MR. POLLARD:  Your Honor, I think I'm almost

2   finished.  Thank you, can I have one moment with my colleague,

3   please?

4          THE COURT:  Sure.

5   BY MR. POLLARD:

6   Q.  Mr. Waldo, you mentioned these strategy sessions, planning

7   meetings you would have.

8   A.  Yes.

9   Q.  Correct.  When was the last such meeting where Mr. Swando

10  was also in the room?

11  A.  I don't recall the exact date, but I believe it would have

12  been in the spring of 2015.

13  Q.  So well over a year ago, going on a year and a couple

14  months?

15  A.  Correct.

16  Q.  Have you had any recent strategy meetings over there at BI?

17  A.  We have.

18  Q.  When was the most recent one?

19  A.  Our most recent one was in June of this year.

20  Q.  And that strategy meeting you folks had in June of this

21  year, was that the exact same meeting you all had back in the

22  spring of 2015?

23  A.  It -- it used the '15 meeting, there is a foundation from

24  the '15 meeting because there are ideas that came up in that

25  meeting, some of which haven't been delivered yet.  So there

1  were components of that '15 meeting and even the '14 meeting.

2  That's an ongoing process in product and service development,

3  but there were new ideas introduced in '16 that didn't exist in

4  '15.

5  Q.  Mr. Waldo, to your knowledge -- strike that.

6          Mr. Waldo, what irreparable harm could Mr. Swando

7  working for Numerex in a sales capacity possibly cause to BI or

8  GEO Group?

9  A.  Well, anyone that works in the capacity like Matt was in

10  and the capacity that I'm in today has complete access to

11  everything the company is doing, where we are going,

12  information that we obviously deem to be proprietary and

13  confidential.  So if that information isn't properly protected,

14  an individual could take that and use that to guide product

15  development, guide sales strategy.  It could be used for a

16  variety of things.

17  Q.  Do you have any evidence that Mr. Swando is using any of

18  this purportedly confidential information to drive Numerex's

19  product development?

20  A.  I do not.

21  Q.  Has BI or GEO Group suffered any concrete harm as a result

22  of Mr. Swando's present employment with Numerex?

23  A.  Nothing that I'm aware of.

24  Q.  So it is pure speculation on your part?

25  A.  Again, the term that you use, nothing concrete that I can

1  identify today.

2  Q.  Pure speculation on your part, isn't it, sir?

3  A.  It's speculation that this could occur.

4       MR. POLLARD:  I have nothing further, Your Honor.

5  Thank you.

6       THE COURT:  Do you have redirect?

7       MR. WILSON:  Yes, Your Honor.  Thank you.

8       THE COURT:  Please try to be brief because we have

9  other witnesses, and you all have taken so far an hour and a

10 half on one.  I suspect that this may be one of the longer

11 witnesses, but let's try to move along.

12      MR. WILSON:  Absolutely, and I will be brief.

13                  REDIRECT EXAMINATION

14 BY MR. WILSON:

15 Q.  Mr. Waldo, you were asked questions about how your

16 competitors might develop and collect the same information that

17 BI develops and collects?

18 A.  Yes.

19 Q.  When BI develops and corrects that information, does it

20 have to spend money to do that?

21 A.  I'm not sure I follow, develop --

22 Q.  Let me rephrase.  Does it cost money to develop and collect

23 that information?

24 A.  To develop a product?  I'm sorry -- or to develop -- I mean

25 the information, like, to develop a market requirements

Friday, October 14, 2016.

1  document?

2  Q.  Actually anything.  You touched on a number of subjects,

3  both on direct and cross, where BI collects and develops

4  information that you consider confidential.

5  A.  Correct.

6  Q.  Does BI invest resources in order to collect and develop

7  that information?

8  A.  We do; so yes, it costs money because we have salaried

9  employees that are involved in this process.  It might require

10  travel to a trade show.  It certainly requires travel and

11  expenses to go visit customers.  So yes, as a part of our

12  ongoing business, yeah, it costs money to be gathering up all

13  of this information.

14          I'm sorry, I didn't understand it.

15  Q.  I apologize.

16          And so when you said that our competitors would also

17  have access to the same information, is it fair to say they

18  would also have to devote those resources and incur those costs

19  if they want to develop and collect the same information?

20  A.  Right.  I would be careful about the same information.

21  They are going to go out and collect their own information.  It

22  may or may not be the same information that we are collecting.

23  I can't represent the meeting that BI has with the customer and

24  the meeting that 3M has with the customer, that exactly the

25  same information is going to be shared.  But yes, it is logical

Friday, October 14, 2016.

1   that 3M, using them as an example, they would have to spend

2   money to send their people out to talk to customers, go to

3   trade shows, yes.

4   Q.  And hypothetically, if you called 3M and asked them,

5   "Listen, you have collected and developed a lot of information,

6   would you share it with me so I don't have to spend my own

7   money doing it," would they do that?

8   A.  No, I can't imagine they would.

9           THE COURT:  Thank you, sir.

10          THE WITNESS:  Thank you.

11      (Witness excused.)

12          THE COURT:  Let us take about ten minutes.

13          Have you all tried to talk to each other about

14   resolving this issue in any way?

15          MR. WILSON:  We have, Your Honor; and thus, far we

16   haven't gotten there.

17          THE COURT:  I mean, it seems to me -- I will tell

18   you, at this point, if it is of any help, I don't think that

19   product development, pricing, customer relationships, or

20   marketing strategies are different for the public marketplace

21   or a public customer than private.  I'm not impressed with this

22   argument because a lot of things that are in bid documents are

23   in public records that somehow makes these noncompete

24   agreements suspect or invalid.

25          I mean, there are some issues on time and scope and

Friday, October 14, 2016.

```
1    things like that that, at some point, probably will need to be
2    determined.  So to the degree you want to try to resolve it, I
3    encourage you to do that.  I don't think Shields stands for the
4    proposition that somehow the public marketplace is exempt, so
5    if that is of any help to you in trying to figure out what
6    either side wants to do, you ought to take advantage of that.
7            But let's take ten minutes and either talk about it,
8    or let's continue.  How many witnesses are you going to call?
9            MR. WILSON:  I think we are going to rest, Your
10   Honor.  If I can have ten minutes to confirm that, but I
11   think we pretty much have covered what we need to cover with
12   Mr. Waldo.
13           THE COURT:  I'm interested in -- still seem
14   interested in maybe the preliminary injunction, unless you
15   could try to resolve the whole thing.  This time of two years
16   and when it runs from and whether he really had any access in
17   this last year, he seems to argue, at least in his last
18   affidavit, he didn't.  So that seems to me it could affect.
19           Whether this was a severance or a termination and
20   severance payment and whether that creates some interest that
21   is relevant here, I don't know how that comes out.  I haven't
22   seen a case where that was at issue, whether that also could
23   provide a -- something that is subject to protection.  For
24   example, as part of just an agreement as to severance, if you
25   were to agree, I won't work for a competitor for two years, and
```

Friday, October 14, 2016.

```
1   you get paid for that, what is the significance of that?  And
2   again, I don't know what happened, so maybe I'm asking a
3   question that is irrelevant.
4           But those things -- it seems to me, you are talking
5   about time and scope.
6           MR. POLLARD:  We are not, Your Honor.
7           THE COURT:  What do you mean?
8           MR. POLLARD:  We are respectfully talking about the
9   absence --
10          THE COURT:  Well, two years is two years, that's what
11  I mean about time.
12          MR. POLLARD:  I understand that.  I understand.
13          THE COURT:  So you could negotiate that.
14          MR. POLLARD:  I'm saying, Your Honor, we are
15  challenging the existence of a legitimate business interest.
16          THE COURT:  Okay.  I understand what your position is
17  and what you have been arguing.  I'm telling you I'm not very
18  convinced from your papers or so far, and so you might consider
19  that.
20          MR. POLLARD:  I will absolutely consider it, Your
21  Honor.
22          THE COURT:  Okay.  Thank you.
23      (Recess was had at 11:35 a.m.; and the proceedings
24      resumed at 11:45 a.m.)
25          THE COURT:  Okay, please be seated.
```

Friday, October 14, 2016.

```
 1                    MR. WILSON:  Your Honor, we will rest then.

 2                    THE COURT:  All right.

 3              Go ahead.

 4                    MR. POLLARD:  Yes, sir, your Honor.  I would like to

 5    call Matthew Swando, please.  And we will be exceedingly brief.

 6                         DIRECT EXAMINATION

 7    BY MR. POLLARD:

 8    Q.  Can you state your name for the record, sir?

 9    A.  Matt Swando.

10    Q.  Mr. Swando, where are you presently employed?

11    A.  Numerex Corporation.

12    Q.  Where did you work before that?

13    A.  At the BI division of GEO Group.

14    Q.  And were you an employee or were you a consultant?

15    A.  I was a consultant.

16    Q.  When did you -- strike that.

17              Were you an employee prior to being a consultant?

18    A.  Yes, I was.

19    Q.  When did your employment end?

20    A.  In October of 2015.

21    Q.  Okay.  And upon termination of your employment, did you

22    retain any corporate laptops or documents, equipment?

23    A.  No.

24    Q.  Did you give it back to BI?

25    A.  Yes.
```

Friday, October 14, 2016.

```
1   Q.   Did you download any of BI's information?
2   A.   No.
3   Q.   Did you walk out of their office with any boxes of
4   documents?
5   A.   No.
6   Q.   In terms of your role at Numerex, what is your current
7   position?
8   A.   Vice-president of sales for the personal tracking division.
9   Q.   What do you do in that job capacity?
10  A.   I oversee the business development efforts for two separate
11  business units.  One of them is a GPS electronic monitoring
12  device, so that business unit is called Focal Point; and the
13  second business unit I oversee is a mobile personal emergency
14  response system.  That device is called mySHIELD, which is
15  produced in conjunction with Verizon, and that device is for
16  medical monitoring, loan workers.  It is more of a business to
17  business and business to consumer device.  For example,
18  realtors will use this device because they are often going out
19  into homes by themselves, and it is a device designed to get in
20  touch with someone if there is an emergency.
21  Q.   This mySHIELD device, does this have anything to do with
22  the work you did at BI?
23  A.   No.  It is a new business unit that I'm involved in at
24  Numerex and I have never been involved in before.
25  Q.   To your knowledge, is it competitive with any product of
```

Friday, October 14, 2016.

1    BI's?

2    A.   No.

3    Q.   And on either of these fronts, are you involved in product

4    development and design?

5    A.   No, sir.

6    Q.   Then what specifically is your job function, to put it

7    concretely?

8    A.   My job function is to develop a sales plan and to lead a

9    team of sales and support professionals to achieve quarterly

10   and annual sales targets.

11   Q.   And do you have contact with the suppliers?

12   A.   No.

13   Q.   Do you have contact with the customers?

14   A.   Not directly; indirectly, my sales reps do, and

15   occasionally I'll attend meetings with them.

16   Q.   Okay.

17            MR. POLLARD:   One moment, please.

18            Nothing further for this witness, Your Honor.   Thank

19   you.

20            THE COURT:   Cross-examination.

21                        CROSS-EXAMINATION

22   BY MR. WILSON:

23   Q.   Good morning, Mr. Swando.

24   A.   Good morning.

25   Q.   I had to check if it was still morning or we were into

1  afternoon.

2          You heard Mr. Waldo testify that you were at a trade

3  show recently?

4  A.  Yes, sir.

5  Q.  Were you there?

6  A.  Yes, sir.

7  Q.  Why were you there?

8  A.  I was there representing Numerex and -- with two of my

9  sales reps displaying and marketing my two products that I

10  oversee, both the mySHIELD product and the GPS ankle monitor.

11  Q.  And the ankle monitor competes with BI, correct?

12  A.  It does.

13  Q.  And BI was at the same conference?

14  A.  They were.

15  Q.  And who were the customers that attend that conference?

16  A.  That specific conference is probation and parole.

17  Q.  And do you attend other conferences on behalf of Numerex?

18  A.  Yes.

19  Q.  And you attended those same conferences on behalf of BI?

20  A.  No.  For example, I'm attending -- or attended the National

21  Association of Realtors conference, I don't believe BI attends

22  that.

23  Q.  Do you attend other conferences in the -- you call it, I

24  think, the judicial side of the business, judicial oversight?

25  A.  No, just APPA.

1   Q.  That's the only one you attend?

2   A.  That's the only one I attend, yes.

3   Q.  Do people under you attend other conferences?

4   A.  Yes.

5   Q.  Are some of those the same conferences that BI attends?

6   A.  Yes.

7   Q.  And focusing on the same customers?

8   A.  Yes.  We attend three a year; BI attends, I think Mr. Waldo

9   said over 100.

10  Q.  And Focal Point, that's an ankle bracelet product?

11  A.  It is the name of it, yes.

12          MR. POLLARD:  I don't have any further questions.

13          THE COURT:  All right.  Redirect?

14          MR. WILSON:  No, sir, Your Honor.

15          THE COURT:  All right.  Thank you sir.

16     (Witness excused.)

17          THE WITNESS:  Thank you.

18          MR. POLLARD:  Yes, sir, Your Honor, I would like to

19  call Yogi Rajala, please.

20          YOGANAND RAJALA, PLAINTIFF WITNESS, SWORN.

21                      DIRECT EXAMINATION

22  BY MR. POLLARD:

23  Q.  Good morning, Yogi, how are you?

24  A.  I'm doing good.

25  Q.  Could you state your name for the record, sir?

Friday, October 14, 2016.

1   A.   My name is Yoganand Rajala.

2   Q.   And what is your current occupation, sir?

3   A.   I work at the Numerex engineering department and for the

4   OmniLink products for Numerex.

5   Q.   And you mentioned OmniLink, what was OmniLink?

6   A.   The OmniLink is the electronic monitoring company I founded

7   in 2004 October, and Numerex acquired the OmniLink company two

8   and a half years back.  Since then, I've been working with

9   Numerex.

10  Q.   And you are working there in product development?

11  A.   Yes.

12  Q.   Does Matt Swando work in your division?

13  A.   No.  He is in the product sales department, I'm an

14  engineer.

15  Q.   Does Matt Swando give you guidance on how to develop new

16  products?

17  A.   No.  I mean, in general, engineering departments interact

18  with product management.  Numerex has a product management

19  department which provides us the product requirements,

20  engineering goes and implements it.

21  Q.   You were here earlier during the testimony about the FCC?

22  A.   Yes.

23  Q.   And from your experience, is it possible for engineers to

24  look at FCC filings and other public documents and kind of

25  reverse engineer what their competitors are doing?

Friday, October 14, 2016.

1   A.   In general, yes.  The FCC website reveals all of the

2   [unintelligible] reports and all the lab results of what the

3   devices has gone through, and we look at them generally to know

4   what major components are there in the competitor devices.

5   Q.   The major components?

6   A.   Right.

7   Q.   And once you have identified the major components, how

8   difficult then is it for you to work backwards and identify

9   suppliers of those comments?

10  A.   Yes, the components, once we have the major components,

11  and, you know, from the pictures of FCC, we can find out the

12  suppliers for this.  There could be some components where the

13  supply list is not done, but it might take a little more work

14  to do that.

15  Q.   But you can still eventually identify it?

16  A.   Yes, in general.

17  Q.   Have you ever had an experience where a competing company

18  has used your publicly available documents to create a

19  competing product?

20  A.   Right.  So our first product, a marketed product I wanted

21  to attend, we launched in late 2005-2006, was built by a

22  company called Sendum Wireless.  So I hired Sendum Wireless for

23  OmniLink to build our first anklet, our first electronic

24  monitoring anklet.  And it was a huge successful market that's

25  [unintelligible] very well; and later, we learned that BI also

Friday, October 14, 2016.

```
 1  hired Sendum Wireless, the same company which built our device.
 2  And we had call from Sendum saying that, "Hey, We are not your
 3  competitor," reached out to us to build a device, you know.
 4  Unfortunately, we couldn't come up with a business agreement to
 5  send them to prevent that, so BI hired them for building the
 6  next device.
 7  Q.  And from your experience with OmniLink, how did you plan
 8  out what new products to implement?
 9  A.  So I talked to the customers basically.  So being a small
10  company, OmniLink founded from my garage, initially, I just
11  looked from competitors' websites and talked to the people and
12  learned what competitors are doing and then also try to -- we
13  hired some of the people in the sales in this business and
14  learned from them the customer problems from the existing
15  products; and then, we built the products basically by looking
16  at what people want.  That's how we build the products.
17  Q.  Do you think other well capitalized competitors in the
18  industry can do market research and figure out what the
19  customers want?
20  A.  Yes, yes.  So when we went to a state we wanted to build
21  the next product, that's pretty much what we did.  By then, we
22  have few customers.  We talk to the customers and ask them, you
23  know, how can we do better and what things they like from us,
24  what they don't like from us, what things they like from
25  competitors and don't like from competitors.  So we put
```

Friday, October 14, 2016.

1  together all of that data to build our next product.

2          MR. POLLARD:  Thank you.

3          Can I have one moment, Your Honor, please?

4          THE COURT:  Certainly.

5          MR. POLLARD:  Nothing further, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. WILSON:

8  Q.  Good morning, sir, I won't try to pronounce your name.

9  A.  No worries.

10  Q.  You just said that Numerex does market research to find out

11  what their customers want and expect, is that correct?

12  A.  Numerex did market research, we do buy the Berg Insight

13  report that lists out the people in the electronic marketing

14  space.  So prior to Numerex, OmniLink couldn't afford to buy

15  those reports; but for Numerex, we do have -- you know, we buy

16  the Berg Insight reports, so one of the marketing problems,

17  they did proactive reports on how that electronic marketing is

18  moving in the industry and -- both in US and outside US.  So we

19  buy that -- we do have that report to help us you push in our

20  new products.  But prior to the Numerex OmniLink, we didn't buy

21  those reports.

22  Q.  Who conducts the market research you talked about, which

23  department?

24  A.  Product management.

25  Q.  And then product management conveys the information to

1  engineering about what they should be working on in terms of

2  hardware and software?

3  A.  Correct.

4  Q.  Okay.  Do you know how product management interacts with

5  the sales department where Mr. Swando works?

6  A.  Yes.  I mean, I think product -- after joining with

7  Numerex, I did play the product manager over two years; and we

8  basically, like I mentioned, Berg Insight report and talking to

9  the customers, and of course talking to the internal sales

10  team.  Those are the three people we talked to get the input.

11          For one of the product we did, what we did was we

12  asked each of our contract representatives to find the top two

13  customers, and we collected the input from ten different

14  customers.  And that is one of the input and the Berg Insight

15  and, of course, our salespeople.  Those are the three different

16  inputs we get for that.

17  Q.  Those are the three sources for your information?

18  A.  Correct.

19  Q.  Would you share that information with competitors if they

20  asked you for it?

21  A.  No, of course not.

22          MR. WILSON:  Thank you.

23          THE COURT:  Redirect.

24          MR. WILSON:  Nothing further, Your Honor, we rest as

25  well.

Friday, October 14, 2016.

```
1              THE COURT:  All right.  Thank you, sir.
2         (Witness excused.)
3              THE COURT:  All right.  Is that all the evidence?
4    You had talked about rebuttal, but --
5              MR. WILSON:  Yes; no rebuttal, Your Honor.  Thank
6    you.
7              THE COURT:  Okay, tell me, I guess as I told you, I
8    think -- well, tell me what you think.  Let's start with what
9    is it that you think we should do in terms of an injunction?
10             MR. WILSON:  Your Honor, we think we are entitled to
11   a preliminary injunction restricting Mr. Swando from performing
12   any services for our competitor Numerex, as he has agreed.
13             I understand the issue that's been raised very
14   recently about the scope and duration; but so far, even taking
15   that, you know, as gospel, he was not involved in the business
16   after the end of October, not quite a year ago.  He joined a
17   competitor in June of this year, so we only had nine months of
18   him out of the market before he got right back into it.
19             I don't think under any interpretation we would be
20   entitled to so little time as nine months to enforce our
21   noncompete.  The noncompete is 24 months.  Both the statute and
22   the case law support that, particularly in the case of
23   Mr. Swando who was the most senior executive in this business
24   unit.  So you know, we are talking about nine months versus 24.
25   And at this preliminary injunction stage, I think we are
```

Friday, October 14, 2016.

1   entitled to a preliminary injunction if he can't perform

2   services for a competitor.  And then we are set for trial in

3   May, so certainly, you know, we will address that; I'm sure

4   they will address that, you know, by May, at the very latest.

5   But in the interim, every day we are suffering irreparable harm

6   by having Mr. Swando in that position.  And as the gentleman

7   just told the Court, okay, even if we take him at face value

8   that he is in the sales department, the sales department

9   provides input to the product manager who provides input to the

10  engineers as to what products and software to develop, in

11  direct competition with us.  That's a situation that we

12  can't -- we can't allow to exist, if we have any ability to do

13  anything about it.  So I really think we have shown the basis

14  for the preliminary injunction.

15          THE COURT:  What about this mySHIELD mobile personal

16  device where it doesn't sound like that's a competitive device?

17          MR. WILSON:  As far as I know, it is not.  I'm sure

18  there are aspects of their business that are not competitive

19  with ours.  And in large businesses that's almost always the

20  case.  But as you heard, there are aspects of their business

21  that are directly competitive with ours, and, you know, the

22  case law generally doesn't make those kinds of distinctions.

23  It's the same company, they are a direct competitor.  In fact,

24  they have admitted that the only way to protect us is to keep

25  them out of that direct competitor.  I assume that he won't

1   share information or be asked or pressured to share information

2   or even inadvertently share information.

3       THE COURT:  Well, except, I mean, you probably ought

4   to tailor an injunction, if you could.  I will tell you, I was

5   impressed by both witnesses or all three witnesses, but

6   primarily with the two in terms of their candid responses to

7   questions.  This isn't the kind of case where he apparently

8   took stuff with him.  He has knowledge.  What's the problem

9   with tailoring an injunction not to include this mySHIELD or

10  mobile personal device as long as it was also included that he

11  could not share information at all about the GPS monitoring

12  part of the business?

13      MR. WILSON:  That's -- in our view and I think some

14  of case law, it is impossible to police that, when he is in the

15  business.

16      You know, that would be the same argument that, well,

17  he is in the sales side, which is competitive with us anyway,

18  but in terms of just the confidential information, to say,

19  well, he is in the sales side, well, a couple of questions

20  later, we find out sales gives information to product

21  management which gives information to the software and hardware

22  developers.  I think it is the same situation in any scenario

23  that -- you know, that's why we have a noncompete.  That's why

24  we are doing business in a state that allows you to have a

25  noncompete.  If you have something to protect, the only way you

1  may be able to effectively protect it is to keep a person out

2  of a competitor.  And at this high level, I think that's the

3  only way.

4       We are not talking about a field salesperson, you

5  know, where you might restrict them, as he did when he came

6  aboard with us.  We will go to a different territory, different

7  customers.  And really, there is no overlap, that's a bright

8  line and you can see that out on the street, but we can't see

9  what is going on behind the business doors or even probably

10  define it carefully enough for it to be effective.

11       THE COURT:  Well, I don't know that you need to --

12  need to assume bad faith in a circumstance.

13       What about bond?  What do you have in mind for a

14  bond?

15       MR. WILSON:  I think the bond would probably be

16  whatever Mr. Swando's compensation is, you know, between now

17  and trial.

18       THE COURT:  When do we have trial set, May?

19       MR. WILSON:  May.

20       THE COURT:  Of course, what that does is -- that's

21  one reason I suggested you try to -- the parties try to resolve

22  things.  I mean, you are basically putting a person and his

23  family, assuming he can -- in limbo and financial distress for

24  a period of time, whereas if you could figure out some way to

25  protect your interests and give him some latitude to do

1    something else, that is always desirable.

2              MR. WILSON:  I think, you know --

3              THE COURT:  A good percentage of these cases are

4    resolved, only a handful end up going to trial.

5              MR. WILSON:  That has certainly been my experience,

6    Your Honor.  But I think we need some protection to give us the

7    room to explore that.

8              THE COURT:  Or do it now.

9              Okay.  What is your view?  Tell me your -- as I told

10   you, I'm not very convinced by this public marketplace bidding

11   argument that you are making.

12             MR. POLLARD:  Your Honor, I will be exceedingly

13   brief.  This is not a contract case.  It is a restraint of

14   trade case.  Noncompete agreements are governed by 542.335 of

15   the Florida Statute which is the Florida Antitrust Act.  There

16   is a reason for that.  The reason is that in order for a

17   noncompete agreement to be valid and enforceable, it must be

18   reasonably necessary to protect a legitimate business interest.

19             In the noncompete context, there are two lenses.  The

20   first lens is the antitrust lens, the second lens is the

21   contract lens.  If a restraint of trade does not pass muster

22   under the antitrust lens, then the contract simply goes away

23   because it is not enforceable.

24             The courts have repeatedly held that there must be a

25   legitimate business interest.  That generally takes the form in

Friday, October 14, 2016.

1   95 percent of the cases of either valuable confidential and

2   proprietary information that could be used unfairly against the

3   plaintiff or substantial customer relationships.

4           Our position is that, based on the overwhelming

5   weight of Florida authority, including recent cases out of the

6   Southern District of Florida, out of Middle District, out of

7   the Fourth DCA, out of the Fifth DCA, that the plaintiff has

8   not carried their burden of pleading and proving any legitimate

9   business interests.

10          Putting that aside, we reached the issue of

11  irreparable harm, and the plaintiff has not made a clear and

12  unequivocal case of irreparable harm.  The Eleventh Circuit has

13  said, in this circuit, preliminary injunctions are an

14  extraordinary and drastic remedy.  And I don't believe that

15  remedy is called for here today, because there is no record

16  evidence of any possible irreparable harm.

17          I understand the Court does not find my argument

18  compelling, I appreciate that, I respect that.  So even if the

19  Court doesn't particularly care for my argument with respect to

20  legitimate business interests, irreparable harm, et cetera, I

21  would implore the Court, at a minimum, to consider the matter

22  of mySHIELD, because mySHIELD, as the testimony reflects, is

23  entirely separate and apart from any market in which in BI or

24  the GEO Group competes.

25          THE COURT:  How do we -- if I were to do that, how

Friday, October 14, 2016.

1  would we deal with it?

2          He is apparently in charge of sales with both product

3  sales forces, and I don't know if they are even separate, based

4  on the record we have at this point. How does he do his job

5  and not with respect to mySHIELD? You didn't put on any

6  evidence that indicates they are separate sales forces,

7  separate meetings, separate strategies.

8          I mean, if you are trying to, for example, bid

9  products, and the -- at least the plaintiff's argument is that

10 if you are making a bid, you have to know about margins, you

11 have to know about cost of goods, you have to know your -- a

12 lot of information goes into a bid. The fact that you might be

13 able to find out what someone's bid is doesn't have anything to

14 do with how you structure a bid or how you make a bid. And so

15 the ability to know customers, meet with customers, have a

16 relationship with customers, the identity of specific business

17 people within an entity, those are all things that are

18 typically covered by these noncompete agreements.

19          So how do you suggest we do it? I mean, I see you're

20 standing on your argument and maybe this antitrust lens and

21 all, but, I mean, noncompete agreements are routinely enforced,

22 and the argument that somehow you can reverse -- I mean, you

23 can take a Samsung phone and figure out what is in it. You

24 might be able, through a chemical analysis, figure out the

25 ingredients of Coca-Cola. I don't think the fact that there

1  is -- and in the drug industry, for example, the FCC -- or the

2  FDA, there is almost always a list of ingredients, yet you

3  still have patent protection, you have trade secret protection,

4  you have a wide variety of that.

5         So the idea that somehow you can break apart a

6  product and figure out what it is or even look at a public

7  document, a bid document and then, therefore, know everything

8  about the customers, I just don't think you can stand just on

9  that alone.  I mean, if that's the argument you want to make,

10  you can make it, but that's why I guess I'm suggesting that you

11  all try to resolve it.

12         I have some -- to me, you know, I don't want to

13  interfere with someone's livelihood, if you don't have to do

14  it, especially for a period from now until May.  So why not try

15  to figure out some way in good faith that you all can resolve

16  this?

17         MR. POLLARD:  Your Honor, we had those -- we had

18  certain of those conversations yesterday with plaintiff's

19  counsel in Colorado where there is a separate action pending,

20  and we were unable to reach a resolution.

21         THE COURT:  Okay.  Well, tell me then how you think I

22  could carve out of an injunction mySHIELD, practically how

23  could you do that, and also tell me what you think is fair in

24  terms of a bond, if we end up having to go forward with the

25  injunction now.

Friday, October 14, 2016.

1        MR. POLLARD:  I think you could carve out mySHIELD by

2    ordering that Mr. Swando have no involvement with other lines

3    of the company's business and that his involvement be limited

4    solely to mySHIELD.  MySHIELD requires, on Mr. Swando's end, it

5    is managing a sales team, managing a sales force.

6        THE COURT:  Is it the same sales force or a different

7    one?

8        MR. POLLARD:  Separate, it is a separate -- it is a

9    separate sales team, it is a separate sales infrastructure, and

10   the customers are entirely different.  So there is essentially

11   no overlap between anything mySHIELD is doing and anything GEO

12   Group is doing, anything the rest of Numerex is doing.  He

13   could be cordoned off and put in mySHIELD and told to have no

14   other involvement with other facets of the company's business.

15       And in terms of a bond, we would be in agreement with

16   Mr. Wilson that the bond should be Mr. Swando's salary.

17       THE COURT:  So what is that, from now until May?

18       THE DEFENDANT:  Just salary, Your Honor, or total

19   compensation?

20       MR. POLLARD:  Total compensation.

21       THE COURT:  You guys are the ones figuring this out,

22   not me.

23       MR. POLLARD:  We would want total compensation, so

24   total compensation from now to approximately May, about six

25   months.

Friday, October 14, 2016.

1              THE DEFENDANT:  One hundred thirty-five thousand.

2              MR. POLLARD:  One hundred thirty-five thousand.

3              THE COURT:  You all agree with that?

4              MR. WILSON:  We have nothing to go on but also

5     nothing to dispute it with.

6              THE COURT:  All right.  What about this idea of

7     allowing him to continue to operate in the mySHIELD area?  You

8     have got a representation it's a separate sales team and --

9              Is it separate product development?  How does that

10    work?  That's one reason I would like you all to talk to each

11    other, and do some of this, but --

12             THE DEFENDANT:  There are separate engineers that do

13    the product development for the mySHIELD product, and the

14    mySHIELD product was primarily -- it is developed, it was

15    developed by Verizon.

16             THE COURT:  Okay.

17             THE DEFENDANT:  For a cellphone.

18             THE COURT:  I'm inclined to carve out mySHIELD, so

19    tell me what you think is fair in terms of trying to protect

20    interests in this GPS monitoring area.

21             MR. WILSON:  Your Honor, if I might address the

22    predecessor question or issue, you know, our position is if he

23    wanted to sell a product that wasn't involved in corrections,

24    reentering criminal justice, he is free to do that.  If there

25    was a separate company, and there probably are many selling

Friday, October 14, 2016.

1  products like mySHIELD that don't involve the same customers,

2  clients, technology, everything you heard about in common with

3  us, he has a multitude of opportunities.  Now they probably

4  wouldn't pay him as well, probably wouldn't be the number that

5  he is talking about.  And that's because he has the prior

6  experience and knowledge with us.  And that's what gives us

7  pause to say, well, you can carve it out and let him do this,

8  even though he is walking the halls with the same people.

9         We only heard about one product development

10  department.  We only heard about one engineering department.

11  We only heard about one sales document.

12         If he wants to do something outside of the

13  corrections criminal justice space, let him do that.  He is not

14  restricted from doing that.  He didn't agree not to do that,

15  but that's not what he is doing.

16         He has gone into our industry and then saying, "Well,

17  I can keep everybody above me upstream in the chain of command

18  and below me in the chain of command, I can talk to them every

19  day, communicate with them every day, but nothing will bleed

20  over to any other aspect of the business," and I just don't

21  think that's realistic or fair.

22         THE COURT:  The agreement wasn't to not work in the

23  criminal justice industry.  As competitors, sometimes

24  competitors do a variety of things, sometimes by division,

25  sometimes other ways.

Friday, October 14, 2016.

 1        Other than retreat back to your argument that I ought
 2   to enter the injunction for his work for this company, do you
 3   have any other suggestion?
 4        MR. WILSON:  I mean, certainly, we would -- you know,
 5   the injunction should address all the terms of the agreement
 6   then, if he is allowed to work for a competitor, that it should
 7   be combined to a noncompetitive, you know, sales activity with
 8   respect to this mySHIELD product and also encompass his
 9   confidentiality and nonsolicitation obligations so he is not
10   attending trade shows where he is marketing directly against us
11   in the very same market, as he admitted he just did.
12        THE COURT:  Okay.  We will enter a written order, but
13   basically what I'm going to do is I'm going to enter the
14   injunction.  I kind of explained some of the reasons why I
15   don't think there is -- I think there are legitimate interests
16   to be protected here by this agreement, but I'm going to carve
17   out from that mySHIELD operations.
18        There will be some requirement of confidentiality
19   from the sales force strategy meetings and sales activities
20   involving the GPS monitoring, that type of business, so that he
21   can work on mySHIELD, mySHIELD activities, but not involve
22   himself in the other activities for the period of time of this
23   preliminary injunction.
24        And I urge you all to try to resolve the thing so
25   that we are not waiting until May because, otherwise, I mean,

Friday, October 14, 2016.

1  they are going to be doing discovery of trying to figure out

2  people.  As the lawyers here know, it is an invasive process.

3  It is not good for either side, and so I -- and I will order a

4  bond of $135,000, which is the compensation -- apparently total

5  compensation between now and May.

6        MR. WILSON:  I would presume if he is going to

7  continue to work there, we wouldn't need a bond.  I mean --

8        THE COURT:  You have a point there.  He is going

9  to keep --

10        MR. POLLARD:  We are not clear yet, in terms of what

11  is going to happen with his position.  It's hopeful that he

12  will be able to segue simply into mySHIELD and maintain his

13  compensation, but it is plausible that he may not and simply

14  may be out on the street.

15        THE COURT:  All right.  I'm going to, at this point,

16  order a $50,000 bond, however, that is subject if he ends up

17  not being able to work, I'm going to make it 135,000 between

18  now and may; but for present purposes, it is $50,000.

19        MR. WILSON:  Understood, Your Honor.

20        THE COURT:  And the parties should let me know if

21  there is some change in his circumstances, that would -- okay.

22        Anything else either side want to say today?

23        MR. WILSON:  We do have the two exhibits that were

24  admitted.

25        THE COURT:  Okay, give those, if you would, to Ms.

Friday, October 14, 2016.

1  Castillo.

2          Okay.  Well, thank you for your arguments today.

3  Have a good weekend.

4          MR. WILSON:  Thank you, Your Honor.

5          (PROCEEDINGS ADJOURNED AT 12:20 P.M.)

6                  **C-E-R-T-I-F-I-C-A-T-E**

7          I hereby certify that the foregoing is

8      an accurate transcription and proceedings in the

9      above-entitled matter.

10

   ***10/18/2016***                   ***/s/DIANE MILLER***
11  DATE                         DIANE MILLER, RMR, CRR
                                 Official Court Reporter
12                               United States District Court
                                 701 Clematis Street, Room 259
13                               West Palm Beach, FL  33401
                                 561-514-3728

14

15

16

17

18

19

20

21

22

23

24

25

Friday, October 14, 2016.

**$**

**$10,000 [1]**  27/12
**$12 [1]**  16/19
**$135,000 [1]**  84/4
**$50,000 [2]**  84/16 84/18

**'**

**'14 [1]**  56/1
**'15 [4]**  55/23 55/24 56/1
56/4
**'16 [1]**  56/3
**'17 [1]**  10/6
**'18 [1]**  10/6

**/**

**/s/DIANE [1]**  85/10

**1**

**10 [1]**  16/19
**10,000-dollar [1]**  17/12
**10/18/2016 [1]**  85/10
**100 [3]**  18/15 22/7 66/9
**103 [1]**  1/6
**11 [1]**  47/17
**11:35 [1]**  61/23
**11:45 [1]**  61/24
**12-year [1]**  5/7
**1200 [1]**  3/20
**12:20 [1]**  85/5
**135,000 [1]**  84/17
**14 [1]**  1/5
**1400 [1]**  1/19
**1500 [1]**  1/14
**16-81530 [1]**  3/4
**16-81530-CIV-DMM [1]**  1/2
**17 [1]**  47/18

**2**

**20 [1]**  48/17
**2004 [7]**  5/4 5/5 14/15
14/17 15/15 26/15 67/7
**2005-2006 [1]**  68/21
**2006 [1]**  68/21
**2009 [1]**  14/17
**2014 [1]**  14/18
**2015 [5]**  24/5 26/2 55/12
55/22 62/20
**2016 [2]**  1/5 85/10
**2018 [1]**  53/16
**2019 [3]**  14/23 15/9 53/16
**24 [2]**  72/21 72/24
**259 [1]**  85/12
**26 [1]**  2/5
**28 [1]**  35/10

**3**

**30 [2]**  8/9 30/6
**33131 [1]**  1/15
**33301 [1]**  1/19
**33401 [2]**  1/23 85/13
**34 [1]**  14/8
**3728 [2]**  1/24 85/13
**3M [10]**  32/21 32/23 32/25
33/2 33/7 33/12 33/17 58/24
59/1 59/4
**4**

**40 [1]**  8/9

**401 [1]**  1/18

**5**

**5,000 [1]**  17/11
**50 [2]**  8/9 44/17
**514-3728 [1]**  1/24
**542.335 [1]**  76/14
**561 [1]**  1/24
**561-514-3728 [1]**  85/13
**57 [1]**  2/6
**5:30 [1]**  25/18

**6**

**62 [1]**  2/9
**64 [1]**  2/10
**65 [1]**  14/4
**66 [1]**  2/13

**7**

**70 [1]**  2/14
**701 [2]**  1/23 85/12

**8**

**81530 [1]**  3/4

**9**

**95 [1]**  77/1

**A**

**a.m [2]**  61/23 61/24
**ability [3]**  35/19 73/12
78/15
**able [8]**  13/4 34/25 35/14
75/1 78/13 78/24 84/12
84/17
**aboard [1]**  75/6
**above [2]**  82/17 85/9
**above-entitled [1]**  85/9
**absence [2]**  5/19 61/9
**absolutely [3]**  23/3 57/12
61/20
**ACA [1]**  22/9
**access [18]**  7/8 7/10 7/24
11/4 11/6 11/19 16/3 16/6
21/13 23/11 23/15 47/9
47/11 49/24 52/12 56/10
58/17 60/16
**accessed [1]**  54/16
**accomplish [1]**  6/7
**account [1]**  11/11
**accurate [1]**  85/8
**achieve [1]**  64/9
**acquired [2]**  18/23 67/7
**acquisition [4]**  20/21 21/1
21/3 21/12
**acquisitions [9]**  20/17 20/18
20/19 20/24 21/6 21/8 21/17
21/19 21/20
**Act [1]**  76/15
**acting [1]**  24/7
**action [3]**  27/10 29/11 79/19
**activities [3]**  83/19 83/21
83/22
**activity [1]**  83/7
**actual [4]**  6/23 40/11 44/3
44/12
**actually [6]**  8/14 9/21 12/16
27/9 36/24 58/2

**add [1]**  31/5
**addition [1]**  46/21
**address [8]**  23/21 24/3 25/19
36/20 73/3 73/4 81/21 83/5
**adequate [1]**  15/19
**ADJOURNED [1]**  85/5
**Administrative [1]**  13/2
**admissible [1]**  38/9
**admit [2]**  42/4 49/16
**admitted [6]**  42/7 42/8 49/20
73/24 83/11 84/24
**advance [1]**  9/12
**advanced [1]**  5/21
**advancement [1]**  6/12
**advantage [2]**  34/25 60/6
**advertising [2]**  22/2 22/16
**advised [1]**  24/6
**affect [1]**  60/18
**affidavit [3]**  3/19 25/11
60/18
**afford [1]**  70/14
**after [4]**  52/25 52/25 71/6
72/16
**afternoon [2]**  26/9 65/1
**again [29]**  11/3 12/15 17/22
18/8 18/14 19/9 19/24 20/11
21/2 21/12 24/10 27/14
27/17 30/19 32/11 33/19
35/23 42/19 42/19 44/7
45/21 50/20 51/19 51/23
52/8 52/14 54/21 56/25 61/2
**against [4]**  29/10 43/17 77/2
83/10
**agencies [13]**  9/2 9/9 12/2
12/20 12/23 13/1 13/7 17/4
31/7 33/3 46/4 52/6 54/4
**agency [19]**  9/23 12/12 12/15
12/16 13/3 13/8 15/14 15/20
15/22 17/14 17/14 18/14
31/15 31/24 33/9 33/22
34/11 47/14 51/25
**ago [13]**  5/17 30/11 30/17
32/6 39/14 40/4 50/2 50/11
50/14 50/17 51/15 55/13
72/16
**agree [7]**  25/12 48/3 48/13
54/1 60/25 81/3 82/14
**agreed [4]**  27/11 27/16 27/23
72/12
**agreement [14]**  7/22 17/17
23/14 24/12 26/19 38/7 48/3
60/24 69/4 76/17 80/15
82/22 83/5 83/16
**agreements [4]**  59/24 76/14
78/18 78/21
**ahead [3]**  4/2 41/13 62/3
**alcohol [1]**  18/11
**alert [1]**  12/16
**all [60]**  3/17 6/13 6/13 9/4
11/4 11/6 14/22 16/9 16/12
20/8 20/15 22/14 23/22 24/1
26/4 30/8 30/22 37/9 38/5
38/6 39/12 39/13 40/17 41/8
41/24 42/7 43/12 44/15
47/25 49/1 49/7 49/14 51/2
52/25 54/2 55/21 57/9 58/12
59/13 62/2 66/13 66/15 68/1
68/2 70/1 72/1 72/3 72/3

**A**

**all... [12]**  74/5 74/11 78/17
78/21 79/11 79/15 81/3 81/6
81/10 83/5 83/24 84/15
**allegations [1]**  29/13
**alleged [1]**  54/18
**alleging [1]**  35/21
**allow [1]**  73/12
**allowed [1]**  83/6
**allowing [1]**  81/7
**allows [1]**  74/24
**almost [4]**  18/2 55/1 73/19
79/2
**alone [2]**  31/20 79/9
**along [2]**  23/1 57/11
**already [11]**  33/8
**also [30]**  5/24 9/5 14/7
14/11 14/16 15/18 16/25
17/14 19/16 19/19 19/23
22/16 27/24 30/6 31/15 32/2
39/17 44/7 49/22 52/10
55/10 58/16 58/18 60/22
68/25 69/12 74/10 79/23
81/4 83/8
**alternative [1]**  13/20
**always [4]**  31/16 73/19 76/1
79/2
**am [2]**  28/4 51/11
**American [2]**  22/8 22/9
**among [1]**  34/16
**amount [5]**  16/16 17/8 18/15
22/16 43/7
**analysis [2]**  44/17 78/24
**ankle [6]**  28/16 37/10 46/18
65/10 65/11 66/10
**ankle-worn [1]**  28/16
**anklet [2]**  68/23 68/24
**Ann [7]**  3/8 20/1 20/4 24/2
24/2 24/5 24/19
**Ann's [1]**  50/21
**annual [3]**  19/14 20/8 64/10
**annually [1]**  15/8
**another [1]**  16/22
**answer [7]**  9/5 9/9 37/1
37/13 39/24 40/4 51/6
**anticipating [1]**  25/10
**antitrust [4]**  76/15 76/20
76/22 78/20
**anybody [3]**  7/16 11/16 35/4
**anyone [1]**  56/9
**anything [18]**  12/18 13/4
23/10 23/14 30/5 41/4 41/5
48/7 48/13 48/18 58/2 63/21
73/13 78/13 80/11 80/11
80/12 84/22
**anyway [1]**  74/17
**anywhere [2]**  6/21 43/9
**AOUSC [2]**  13/1 13/5
**apart [2]**  77/23 79/5
**apologize [1]**  58/15
**APPA [2]**  22/9 65/25
**apparently [6]**  40/22 40/22
41/16 74/7 78/2 84/4
**appearance [1]**  13/19
**appearances [3]**  1/12 3/5
14/8
**appears [4]**  39/7 40/10 40/11

45/22
**applications [1]**  5/24
**appreciate [1]**  77/18
**approach [2]**  38/11 45/9
**approached [1]**  24/5
**appropriate [1]**  24/2
**approximately [3]**  22/7 26/14
80/24
**area [2]**  81/7 81/20
**areas [5]**  4/17 24/17 29/22
43/24 53/5
**aren't [3]**  32/2 32/3 36/22
**argue [4]**  23/10 31/15 43/11
60/17
**argued [1]**  41/15
**arguing [1]**  61/17
**argument [1]**  25/8 59/22
74/16 76/11 77/17 77/19
78/9 78/20 78/22 79/9 83/1
**arguments [1]**  85/2
**around [4]**  19/7 51/2 52/16
53/19
**arrest [1]**  5/17
**as [111]**
**ascertain [2]**  10/8 40/2
**aside [1]**  77/10
**asked [6]**  24/7 57/15 59/4
71/12 71/20 74/1
**asking [4]**  36/12 36/13 51/4
61/2
**aspect [1]**  82/20
**aspects [2]**  73/18 73/20
**asserted [1]**  41/4
**assertion [2]**  31/9 31/11
**assign [1]**  20/22
**assigned [1]**  14/4
**assist [2]**  7/20 21/1
**assisted [1]**  14/6
**association [7]**  22/8 22/9
22/10 22/13 22/14 31/6
65/21
**assume [2]**  73/25 75/12
**assuming [1]**  75/23
**at-the-home [1]**  5/25
**ATD [1]**  13/20
**attached [1]**  12/11
**attempt [2]**  3/15 28/21
**attend [13]**  20/6 22/7 23/1
32/17 64/15 65/15 65/17
65/23 66/1 66/2 66/3 66/8
68/21
**attended [5]**  22/20 22/23
32/1 65/19 65/20
**attending [2]**  65/20 83/10
**attends [3]**  65/21 66/5 66/8
**August [1]**  24/5
**authentic [1]**  49/15
**authenticate [1]**  49/10
**authenticity [5]**  42/3 46/1
49/2 49/5 49/18
**authority [1]**  77/5
**available [5]**  14/9 37/8
53/15 54/14 68/18
**avenues [1]**  22/4
**award [1]**  9/25
**aware [1]**  56/23
**away [2]**  24/6 76/22

**B**

**B-O-M [1]**  37/16
**back [8]**  19/9 27/10 45/15
55/21 62/24 67/8 72/18 83/1
**backwards [1]**  68/8
**bad [1]**  75/12
**balance [2]**  51/10 51/11
**base [1]**  28/17
**based [8]**  4/16 12/4 24/20
37/3 40/10 53/6 77/4 78/3
**basically [5]**  69/9 69/15
71/8 75/22 83/13
**basis [5]**  7/19 11/5 15/14
15/18 73/13
**BEACH [4]**  1/2 1/4 1/23 85/13
**become [1]**  13/14
**before [7]**  1/10 25/22 43/13
48/10 62/12 63/24 72/18
**beginning [1]**  8/8
**behalf [6]**  3/6 4/14 22/20
22/23 65/17 65/19
**behind [2]**  3/13 75/9
**believe [11]**  8/25 14/8 29/16
30/7 33/5 35/10 35/23 40/25
55/11 65/21 77/14
**belonged [1]**  48/15
**below [2]**  17/8 82/18
**Berg [4]**  70/12 70/16 71/8
71/14
**best [3]**  13/3 27/14 48/17
**better [2]**  18/23 69/23
**between [10]**  16/19 24/10
45/6 46/2 47/13 48/21 75/16
80/11 84/5 84/17
**beyond [4]**  30/2 32/3 32/15
36/19
**BI [62]**  4/12 4/22 5/11 5/14
5/16 6/3 10/2 12/7 13/10
14/25 15/11 16/16 18/24
18/25 19/10 19/13 19/22
20/14 20/19 21/2 21/22
22/21 23/1 24/23 27/11
27/15 28/19 30/1 31/2 31/20
32/20 35/1 38/24 39/5 40/9
42/11 43/17 45/2 45/6 46/2
48/21 53/2 55/16 56/7 56/21
57/17 57/19 58/3 58/6 58/23
62/13 62/24 63/22 65/11
65/13 65/19 65/21 66/5 66/8
68/25 69/5 77/23
**BI's [14]**  8/19 16/3 16/12
18/13 20/21 43/20 43/22
48/3 50/5 50/8 50/10 50/16
63/1 64/1
**bid [58]**  3/21 9/2 9/8 9/12
9/13 9/15 9/16 9/20 9/21
10/10 10/15 10/18 10/20
10/22 11/5 11/9 11/12 11/14
11/21 11/21 11/23 11/25
12/9 12/10 12/20 13/11
13/13 14/17 14/17 15/7 16/9
16/17 16/20 19/4 24/22
30/20 33/23 33/24 43/7 43/9
44/8 44/19 48/8 48/10 51/14
51/15 51/16 51/21 52/1 52/7
59/22 78/8 78/10 78/12
78/13 78/14 78/14 79/7

**B**

bidder [1]   19/7
bidding [3]   8/20 16/12 76/10
bids [9]   9/10 10/5 11/24
   12/6 32/25 33/4 37/8 44/11
   51/11
big [3]   42/13 54/15 54/16
biggest [2]   22/8 24/17
bill [1]   37/17
binder [2]   42/6 45/17
Biscayne [1]   1/14
bit [10]   12/3 21/14 21/25
   23/9 24/7 28/9 29/1 32/5
   40/7 46/20
bleed [1]   82/19
blox [2]   34/22 35/25
blue [4]   33/15 33/15 33/17
   33/21
board [2]   20/8 29/5
boards [1]   42/24
Boca [1]   4/16
body [1]   5/23
body-worn [1]   5/23
BOM [1]   37/16
bond [9]   75/13 75/14 75/15
   79/24 80/15 80/16 84/4 84/7
   84/16
border [1]   13/25
boss [1]   27/7
both [9]   21/8 21/17 50/25
   58/3 65/10 70/18 72/21 74/5
   78/2
Boulder [1]   4/12
Boulevard [2]   1/14 1/18
boxes [1]   63/3
bracelet [1]   66/10
break [2]   53/20 79/5
brief [4]   57/8 57/12 62/5
   76/13
briefly [2]   23/22 25/19
bright [1]   75/7
bring [1]   6/8
budget [2]   53/7 53/8
build [8]   35/4 43/13 53/19
   68/23 69/3 69/16 69/20 70/1
building [3]   30/3 43/12 69/5
built [3]   68/21 69/1 69/15
bunch [2]   3/21 44/22
burden [1]   77/8
business [76]   4/15 4/17 4/18
   4/18 4/20 4/20 4/23 5/14
   5/17 8/19 9/3 9/4 9/5 10/12
   16/20 16/20 16/21 16/21
   16/22 18/13 18/14 18/20
   19/15 20/9 20/9 20/21 20/24
   21/3 21/22 22/2 25/4 25/15
   26/23 26/24 30/18 44/3
   48/11 50/3 50/5 50/6 50/22
   52/9 52/9 54/18 54/19 54/21
   58/12 61/15 63/10 63/11
   63/12 63/13 63/16 63/17
   63/17 63/23 65/24 69/4
   69/13 72/15 72/23 73/18
   73/20 74/12 74/15 74/24
   75/9 76/18 76/25 77/9 77/20
   78/16 80/3 80/14 82/20
   83/20

business-to-consumer [1]   22/2
businesses [1]   73/19
buy [6]   35/7 70/12 70/14
   70/15 70/19 70/20

**C**

C-E-R-T-I-F-I-C-A-T-E [1]
   85/6
California [1]   21/9
call [9]   4/4 18/9 50/24
   50/25 60/8 62/5 65/23 66/19
   69/2
called [11]   5/17 7/3 13/17
   21/10 21/11 28/3 59/4 63/12
   63/14 68/22 77/15
calls [2]   35/4 49/22
came [3]   25/18 55/24 75/5
can't [17]   12/24 13/1 15/4
   24/18 30/5 34/10 35/6 35/6
   35/18 37/7 39/24 58/23 59/8
   73/1 73/12 73/12 75/8
candid [2]   25/13 74/6
cap [1]   17/12
capacity [5]   28/10 56/7 56/9
   56/10 63/9
capitalized [1]   69/17
capture [1]   9/16
captured [1]   31/16
car [1]   43/12
care [3]   4/19 19/24 77/19
careful [1]   58/20
carefully [1]   75/10
carried [1]   77/8
carve [5]   79/22 80/1 81/18
   82/7 83/16
case [21]   1/2 3/3 3/4 12/21
   14/4 23/6 29/3 29/6 36/21
   36/21 37/3 60/22 72/22
   72/22 73/20 73/22 74/7
   74/14 76/13 76/14 77/12
cases [6]   12/15 17/9 54/17
   76/3 77/1 77/5
Castillo [1]   85/1
categories [1]   29/18
cause [1]   56/7
ceased [2]   23/23 30/11
cellphone [1]   81/17
center [1]   50/24
centers [1]   50/25
certain [5]   36/10 36/11
   37/25 46/24 79/18
certainly [12]   23/19 25/18
   52/22 35/3 35/5 35/17 47/10
   58/10 70/4 73/3 76/5 83/4
certify [1]   84/19
cetera [8]   37/9 38/5 47/6
   48/4 48/14 53/24 54/4 77/20
chain [2]   82/17 82/18
challenges [1]   53/6
challenging [1]   61/15
chance [1]   12/18
change [4]   26/2 34/3 54/24
   84/21
changed [1]   23/8
changes [1]   15/17
Chapin [1]   27/7
charge [1]   78/2
check [1]   64/25

chemical [1]   78/24
chip [6]   34/22 42/23 42/25
   53/14 53/15 54/10
chips [1]   53/17
choose [1]   12/12
Chris [1]   24/18
circuit [4]   29/5 42/24 77/12
   77/13
circumstance [1]   75/12
circumstances [1]   84/21
city [1]   14/2
CIV [1]   1/2
clarify [2]   15/1 43/16
clear [2]   77/11 84/10
clearly [1]   48/10
Clematis [2]   1/23 85/12
client [2]   3/8 3/13
clients [1]   82/2
Coca [1]   78/25
Coca-Cola [1]   78/25
code [1]   8/12
cognizant [1]   53/10
Cola [1]   78/25
collaborative [1]   8/1
colleague [2]   3/12 55/2
collect [5]   57/16 57/22 58/6
   58/19 58/21
collected [2]   59/5 71/13
collecting [2]   8/4 58/22
collection [1]   7/4
collects [2]   57/17 58/3
Colorado [17]   4/12 44/25
   45/3 45/6 45/23 46/2 46/10
   46/19 48/4 48/6 48/8 48/12
   48/15 48/16 48/18 48/21
   79/19
combined [1]   83/7
come [5]   20/2 23/22 42/21
   43/3 69/4
comes [6]   9/13 9/15 10/2
   10/10 15/25 60/21
comfortable [1]   12/8
coming [2]   10/6 30/20
Comm [3]   34/22 35/6 35/7
command [2]   82/17 82/18
commenced [1]   8/16
comments [1]   68/9
common [2]   29/2 82/2
commonly [1]   35/25
Comms [1]   35/25
communicate [1]   82/19
communication [1]   47/13
communities [1]   18/7
community [2]   4/19 19/25
companies [1]   53/2
company [37]   5/6 7/17 7/19
   8/1 10/13 11/16 12/8 15/6
   16/21 17/16 18/6 18/17
   18/22 20/12 20/23 21/10
   21/10 26/18 27/23 28/2
   30/15 32/23 35/13 36/7
   43/11 50/19 54/22 56/11
   67/6 67/7 68/17 68/22 69/1
   69/10 73/23 81/25 83/2
company's [3]   52/12 80/3
   80/14
compelling [1]   77/18
compensation [8]   75/16 80/19

**C**

compensation... **[6]**  80/20
80/23 80/24 84/4 84/5 84/13
competed **[2]**  18/25 19/3
competes **[2]**  65/11 77/24
competing **[5]**  35/13 43/17
44/5 68/17 68/19
competition **[3]**  30/16 42/12
73/11
competitive **[8]**  28/12 28/15
52/9 63/25 73/16 73/18
73/21 74/17
competitor **[20]**  6/10 13/5
25/22 26/18 32/21 37/8 40/2
42/16 47/16 54/16 60/25
68/4 69/3 72/12 72/17 73/2
73/23 73/25 75/2 83/6
competitors **[17]**  16/3 23/1
34/9 34/10 51/11 54/2 54/9
57/16 58/16 67/25 69/12
69/17 69/25 69/25 71/19
82/23 82/24
competitors' **[1]**  69/11
complaint **[7]**  29/10 29/20
34/16 36/20 37/2 49/22
52/12
complete **[1]**  56/10
completely **[1]**  26/1
completion **[1]**  48/1
complex **[2]**  46/21 53/4
complimentary **[1]**  21/4
component **[5]**  10/20 37/10
42/18 42/21 42/22
components **[10]**  37/17 39/10
52/16 56/1 68/4 68/5 68/7
68/10 68/10 68/12
computer **[3]**  10/14 30/9
47/18
conceivably **[1]**  50/16
concept **[2]**  6/23 20/24
concern **[3]**  27/18 43/20
43/22
concerns **[1]**  43/25
concludes **[1]**  23/6
concrete **[2]**  56/21 56/25
concretely **[1]**  64/7
conducts **[1]**  70/22
conference **[5]**  19/19 65/13
65/15 65/16 65/21
conferences **[6]**  22/14 65/17
65/19 65/23 66/3 66/5
confidential **[26]**  12/19
13/10 21/13 27/19 29/14
29/19 29/21 31/10 32/8 32/9
32/10 32/19 34/17 36/9
36/10 41/5 43/4 43/8 44/23
47/12 54/19 56/13 56/18
58/4 74/18 77/1
confidentiality **[2]**  83/9
83/18
confidentially **[1]**  10/19
confirm **[2]**  38/1 60/10
confused **[1]**  32/5
conjunction **[2]**  6/16 63/15
connection **[3]**  47/4 48/13
51/16
consider **[5]**  47/12 58/4

61/18 61/20 77/21
consistent **[1]**  23/16
consistently **[1]**  5/7
constitutes **[1]**  32/7
consultant **[7]**  23/14 23/17
24/14 25/6 62/14 62/15
62/17
consulting **[3]**  7/19 24/11
24/12
consumer **[3]**  22/2 54/13
63/17
consummated **[2]**  21/17 21/20
contact **[3]**  27/23 64/11
64/13
contained **[1]**  41/23
contend **[5]**  26/22 30/6 30/21
47/8 50/7
contends **[2]**  29/20 52/12
contention **[5]**  30/25 31/9
31/18 33/16 44/20
context **[1]**  76/19
continue **[3]**  60/8 81/7 84/7
contract **[37]**  9/25 14/13
14/14 14/16 14/17 14/21
14/23 14/24 15/2 15/5 15/7
15/12 15/23 18/16 24/19
24/21 24/25 31/25 45/7
45/10 45/22 46/2 46/8 46/9
46/15 46/15 46/17 46/20
47/24 48/16 48/21 51/1 51/1
71/12 76/13 76/21 76/22
contracted **[1]**  46/25
contractor **[3]**  32/4 47/23
48/1
contracts **[7]**  24/22 45/2
45/5 46/5 49/4 49/7 50/6
contractually **[1]**  7/20
conversations **[3]**  19/18
31/19 79/18
conveys **[1]**  70/25
convinced **[2]**  61/18 76/10
copy **[2]**  38/18 38/25
cordoned **[1]**  80/13
corporate **[5]**  20/6 20/10
29/25 51/7 62/22
Corporation **[1]**  62/11
correct **[33]**  8/21 13/12
13/15 15/10 16/10 16/13
17/1 17/24 20/13 22/22
26/16 29/21 30/12 30/13
31/5 32/24 32/25 35/5 35/11
39/17 44/10 44/13 44/14
47/7 50/11 53/24 55/9 55/15
58/5 65/11 70/11 71/3 71/18
correction **[1]**  19/25
corrections **[11]**  4/17 4/19
22/8 45/3 45/6 45/23 46/25
53/23 54/4 81/23 82/13
correctly **[1]**  30/25
corrects **[1]**  57/19
cost **[3]**  10/23 57/22 78/11
costs **[4]**  43/13 58/8 58/12
58/18
could **[46]**  3/4 3/24 5/23 6/9
6/9 6/10 6/18 8/7 8/25 9/19
24/17 25/19 29/1 30/15
31/24 39/8 45/24 47/17 49/9
49/23 50/15 50/15 51/5 51/8

51/16 51/22 51/24 53/7 56/6
56/14 56/15 57/3 60/15
60/18 60/22 61/13 66/25
68/12 74/4 74/11 75/24 77/2
79/22 79/23 80/1 80/13
couldn't **[4]**  37/10 42/20
69/4 70/14
counsel **[4]**  3/8 11/24 43/6
79/19
count **[2]**  14/8 25/9
country **[2]**  19/8 27/25
county **[3]**  9/1 19/4 53/8
couple **[4]**  17/4 39/8 55/13
74/19
course **[10]**  5/15 9/22 10/19
22/12 34/21 39/21 71/9
71/15 71/21 75/20
COURTNEY **[2]**  1/13 3/7
courts **[3]**  13/2 18/10 76/24
cover **[1]**  60/11
covered **[2]**  60/11 78/18
create **[3]**  44/21 51/20 68/18
created **[1]**  8/8
creates **[3]**  53/9 53/9 60/20
creation **[1]**  19/24
criminal **[4]**  4/24 81/24
82/13 82/23
cross **[10]**  2/5 2/10 2/14
13/25 26/5 26/7 58/3 64/20
64/21 70/6
cross-examination **[8]**  2/5
2/10 2/14 26/5 26/7 64/20
64/21 70/6
CRR **[2]**  1/22 85/11
Cs **[1]**  46/11
culminate **[1]**  44/18
current **[11]**  14/19 15/16
15/18 19/4 22/24 33/7 39/11
50/17 54/23 63/6 67/2
currently **[2]**  18/16 19/6
customer **[20]**  9/13 10/5
10/21 10/25 27/20 28/17
29/21 30/10 30/10 30/14
30/18 31/1 53/21 54/7 58/23
58/24 59/19 59/21 69/14
77/3
customer's **[1]**  30/23
customers **[35]**  6/9 8/24 9/12
11/7 19/4 27/23 30/3 31/3
31/3 33/6 33/7 33/13 34/13
53/6 53/23 58/11 59/2 64/13
65/15 66/7 69/9 69/19 69/22
69/22 70/11 71/9 71/13
71/14 75/7 78/15 78/15
78/16 79/8 80/10 82/1
customizations **[1]**  48/14
cut **[1]**  53/8
cycle **[4]**  6/21 10/2 10/10
14/17

**D**

data **[17]**  29/21 29/25 30/10
30/14 31/1 34/18 34/19
35/20 35/21 35/23 39/18
39/19 39/23 47/18 47/20
50/12 70/1
date **[2]**  55/11 85/11
dated **[1]**  28/9

**D**

David **[1]**  3/9
day **[6]**  30/17 42/24 44/13 73/5 82/19 82/19
DCA **[2]**  77/7 77/7
DEAKEN **[2]**  1/17 3/12
deal **[4]**  23/18 24/23 51/2 78/1
dealer **[1]**  18/2
dealing **[1]**  22/3
decide **[1]**  37/3
decision **[1]**  9/25
deem **[3]**  12/18 32/14 56/12
deems **[1]**  17/14
defendant **[3]**  1/7 1/17 23/8
defense **[3]**  27/3 42/8 49/20
define **[5]**  6/17 26/24 31/12 52/6 75/10
defines **[1]**  6/15
defining **[1]**  31/13
definition **[1]**  6/19
definitions **[1]**  46/13
degree **[2]**  38/4 60/2
delivered **[2]**  47/25 55/25
delivery **[1]**  6/23
demand **[1]**  54/13
denoted **[1]**  29/18
Denver **[1]**  19/5
deny **[3]**  41/8 41/25 42/2
department **[16]**  13/19 32/1 32/13 45/2 45/6 45/23 54/4 67/3 67/13 67/19 70/23 71/5 73/8 73/8 82/10 82/10
departments **[2]**  53/23 67/17
departure **[1]**  30/1
depend **[1]**  9/17
dependent **[1]**  12/15
depending **[4]**  8/6 8/9 25/1 51/24
depends **[2]**  11/8 11/22
derive **[2]**  16/4 44/2
derived **[1]**  32/6
describe **[3]**  8/22 37/21 43/15
described **[3]**  31/24 33/8 50/23
describing **[1]**  22/18
design **[3]**  6/18 41/4 64/4
designation **[1]**  14/3
designed **[1]**  63/19
desirable **[1]**  76/1
details **[5]**  24/1 27/8 33/3 40/7 45/8
detainee **[1]**  5/23
detention **[2]**  4/17 13/20
determination **[1]**  49/17
determine **[2]**  51/1 53/17
determined **[1]**  60/2
develop **[15]**  7/13 10/18 17/22 19/16 57/16 57/21 57/22 57/24 57/24 57/25 58/6 58/19 64/8 67/15 73/10
developed **[7]**  10/19 16/1 42/11 48/19 59/5 81/14 81/15
developers **[2]**  42/23 74/22
developing **[9]**  8/2 8/3 8/5

8/14 11/12 19/14 43/7 44/8 50/2
development **[25]**  6/2 6/4 6/6 6/21 6/24 7/4 7/20 8/7 8/15 43/23 44/5 50/7 50/25 52/17 53/14 56/2 56/15 56/19 59/19 63/10 64/4 67/10 81/9 81/13 82/9
developments **[1]**  54/10
develops **[4]**  13/10 57/17 57/19 58/3
device **[34]**  5/23 8/13 14/1 14/1 28/16 28/25 29/2 33/23 33/25 34/2 37/12 37/18 37/21 39/11 39/11 39/15 39/21 39/21 40/3 53/18 53/19 63/12 63/14 63/15 63/17 63/18 63/19 63/21 69/1 69/3 69/6 73/16 73/16 74/10
devices **[9]**  28/8 28/12 28/13 28/15 28/15 28/16 42/18 68/3 68/4
devote **[1]**  58/18
devoted **[1]**  8/4
diane **[4]**  1/22 1/24 85/10 85/11
did **[41]**  5/5 5/12 11/18 14/14 21/12 21/15 21/19 23/22 24/8 24/15 24/16 25/3 26/17 26/19 26/21 26/22 27/2 27/2 28/19 28/20 28/23 28/24 39/22 39/25 62/12 62/16 62/19 62/21 62/24 63/1 63/3 63/22 69/7 69/21 70/12 70/17 71/7 71/11 71/11 75/5 83/11
didn't **[13]**  3/19 23/10 23/14 27/14 27/15 29/7 30/8 56/3 58/14 60/18 70/20 78/5 82/14
different **[23]**  9/21 10/9 12/3 15/21 24/17 27/25 34/1 34/5 37/9 41/7 50/10 50/13 50/18 51/17 51/18 51/22 59/20 71/13 71/15 75/6 75/6 80/6 80/10
differently **[1]**  12/4
difficult **[1]**  68/8
direct **[12]**  2/4 2/9 2/13 4/6 18/14 36/19 58/3 62/6 66/21 73/11 73/23 73/25
direction **[2]**  19/23 23/9
directions **[1]**  20/3
directly **[7]**  6/9 16/21 18/25 19/3 64/14 73/21 83/10
disclose **[1]**  36/3
disclosed **[3]**  11/14 11/16 34/7
discovery **[1]**  84/1
discuss **[1]**  15/16
discussion **[1]**  43/8
displaying **[1]**  65/9
dispute **[2]**  43/16 81/5
distinctions **[1]**  73/22
distress **[1]**  75/23
distribute **[1]**  18/9
distributor **[1]**  18/2

district **[7]**  1/1 1/1 1/10 17/9 77/6 77/6 85/12
division **[7]**  1/2 20/4 20/9 62/13 63/8 67/12 82/24
divisional **[16]**  4/12 4/25 5/10 7/7 7/25 8/16 11/3 11/18 16/7 19/10 19/21 20/14 20/18 22/19 23/23 25/14
divisions **[3]**  4/20 17/19 20/2
DMM **[1]**  1/2
DOC **[1]**  45/22
document **[22]**  6/15 6/15 6/20 6/25 7/2 7/3 11/2 12/18 31/14 38/8 38/24 40/8 41/23 42/20 42/24 45/19 46/1 47/17 58/1 79/7 79/7 82/11
documents **[12]**  3/21 37/8 38/1 41/2 42/17 47/18 47/21 59/22 62/22 63/4 67/24 68/18
does **[26]**  9/2 16/6 16/16 21/3 21/22 33/2 33/6 34/18 35/6 45/2 49/25 52/13 54/24 57/19 57/22 58/6 63/21 65/12 67/12 67/15 70/10 75/20 76/21 77/17 78/4 81/9
doesn't **[9]**  10/3 10/25 13/10 35/3 35/5 73/16 73/22 77/19 78/13
doing **[19]**  6/10 10/2 30/4 30/6 30/18 30/24 46/22 56/11 59/7 66/24 67/25 69/12 74/24 80/11 80/12 80/12 82/14 82/15 84/1
dollar **[3]**  16/16 17/8 17/12
DONALD **[1]**  1/10
done **[4]**  8/19 23/10 47/3 68/13
doors **[1]**  75/9
doubt **[2]**  46/1 49/4
down **[3]**  34/1 47/17 54/3
download **[1]**  63/1
dozens **[2]**  22/12 22/12
Dr **[1]**  24/19
drafts **[1]**  47/22
dramatically **[2]**  5/22 50/18
drastic **[1]**  77/14
drawings **[1]**  47/21
drive **[2]**  20/23 56/18
driven **[1]**  53/21
drivers **[2]**  54/15 54/16
drug **[1]**  79/1
duration **[2]**  25/19 72/14
during **[5]**  6/24 7/4 27/12 30/15 67/21

**E**

each **[4]**  38/6 59/13 71/12 81/10
earlier **[9]**  15/13 28/2 31/12 37/13 42/12 43/6 44/17 52/14 67/21
early **[1]**  42/1
easier **[1]**  27/5
easily **[1]**  5/13
effective **[1]**  75/10

**E**

effectively [1]   75/1
effort [1]   8/1
efforts [2]   15/11 63/10
either [11]   16/16 16/20
 19/21 46/24 53/18 60/6 60/7
 64/3 77/1 84/3 84/22
electronic [12]   10/14 16/18
 24/21 43/23 46/10 46/14
 50/5 63/11 67/6 68/23 70/13
 70/17
Eleventh [1]   77/12
else [2]   76/1 84/22
emergency [2]   63/13 63/20
employed [1]   62/10
employee [4]   25/6 25/7 62/14
 62/17
employees [2]   18/6 58/9
employer [3]   22/24 27/2 27/6
employment [4]   4/11 56/22
 62/19 62/21
encompass [1]   83/8
encourage [1]   60/3
end [7]   10/3 10/21 62/19
 72/16 76/4 79/24 80/4
ended [1]   27/22
ends [1]   84/16
enforce [1]   72/20
enforceable [2]   76/17 76/23
enforced [1]   78/21
enforcement [1]   41/6
engage [2]   27/15 30/16
engaged [1]   10/4
engineer [3]   42/20 67/14
 67/25
engineering [5]   67/3 67/17
 67/20 71/1 82/10
engineers [9]   6/17 7/13 8/13
 39/25 40/1 42/22 67/23
 73/10 81/12
enough [1]   75/10
entail [1]   52/13
entails [2]   4/20 49/24
enter [4]   17/17 83/2 83/12
 83/13
entire [3]   11/10 18/3 31/20
entirely [3]   41/7 77/23
 80/10
entirety [1]   9/17
entities [5]   9/7 31/4 34/23
 35/25 44/12
entitled [5]   36/8 72/10
 72/20 73/1 85/9
entity [6]   17/16 17/21 18/8
 20/6 22/2 78/17
envelop [1]   12/11
EOIR [1]   13/22
equipment [4]   46/23 47/2
 47/3 62/22
especially [1]   79/14
ESQ [3]   1/13 1/17 1/17
essentially [5]   14/5 20/3
 23/9 27/11 80/10
estimate [1]   16/18
et [8]   37/9 38/5 47/5 48/4
 48/14 53/24 54/4 77/20
evaluation [1]   9/24

even [17]   5/25 6/18 8/9
 13/14 26/1 26/1 34/18 40/17
 56/1 72/14 73/7 74/2 75/9
 77/18 78/3 79/6 82/8
eventually [1]   68/15
ever [2]   28/19 68/17
every [8]   30/17 33/5 35/19
 42/24 43/11 73/5 82/18
 82/19
everybody [1]   82/17
everyone [1]   30/2
everything [7]   37/15 40/5
 40/6 48/11 56/11 79/7 82/18
evidence [12]   29/24 36/24
 37/3 38/8 40/13 42/8 48/22
 49/20 56/17 72/3 77/16 78/6
exact [3]   34/12 55/11 55/21
exactly [2]   35/21 58/24
examination [16]   2/4 2/5 2/6
 2/9 2/10 2/13 2/14 4/6 26/5
 26/7 57/13 62/6 64/20 64/21
 66/21 70/6
example [19]   10/4 12/6 12/25
 17/3 19/2 19/5 32/12 33/21
 46/20 50/24 51/10 51/14
 53/7 59/1 60/24 63/17 65/20
 78/8 79/1
examples [2]   5/14 16/15
exceedingly [2]   62/5 76/12
except [1]   74/3
exclusive [2]   35/1 47/24
Excuse [1]   36/16
excused [3]   59/11 66/16 72/2
executive [2]   13/23 72/23
exempt [1]   60/4
exercised [1]   14/22
exhibit [11]   38/22 39/2 39/3
 40/16 40/18 40/25 41/10
 42/2 42/8 45/17 49/20
exhibits [1]   84/23
exist [2]   56/3 73/12
existence [1]   61/15
existing [2]   48/9 69/14
expand [1]   15/22
expect [2]   11/7 70/11
expenses [1]   58/11
experience [7]   13/6 40/1
 67/23 68/17 69/7 76/5 82/6
experts [1]   20/22
explain [5]   4/14 17/2 17/25
 41/14 49/23
explained [1]   83/14
explore [1]   76/7
explored [1]   24/16
exposed [4]   30/14 30/18 31/2
 51/5
exposure [1]   28/12
extensive [1]   43/7
extraordinary [2]   36/8 77/14

**F**

fabulous [1]   26/13
face [5]   31/7 31/7 53/6
 53/7 73/7
facets [1]   80/14
facie [2]   23/6 36/21
facilities [2]   43/17 43/18
fact [8]   15/13 18/23 21/8

39/14 42/4 73/23 78/12
 78/25
fair [9]   13/9 18/15 35/14
 37/2 43/22 58/17 79/23
 81/19 82/21
faith [2]   75/12 79/15
falls [1]   11/25
familiar [8]   18/17 18/19
 28/2 28/6 28/8 29/10 29/13
 45/5
family [1]   75/23
far [5]   57/9 59/15 61/18
 72/14 73/17
fast [2]   54/24 54/25
FCC [25]   29/3 29/5 37/9
 37/13 37/17 38/1 38/3 38/24
 39/13 39/13 39/17 39/19 40/7
 40/9 40/10 40/11 41/23
 42/17 67/21 67/24 68/1
 68/11 79/1
FDA [1]   79/2
features [1]   53/16
federal [9]   8/25 12/2 13/3
 13/7 14/22 17/7 17/9 30/19
 53/9
feel [3]   4/1 4/1 36/3
fees [1]   27/12
ferret [1]   33/3
few [4]   8/7 40/4 50/1 69/22
field [2]   28/12 75/4
Fifth [1]   77/7
figure [10]   40/6 53/2 60/5
 69/18 75/24 78/23 78/24
 79/6 79/15 84/1
figuring [1]   80/21
file [1]   3/18
filed [7]   3/18 29/10 38/23
 40/21 40/25 41/16 42/4
filing [2]   23/9 23/17
filings [1]   67/24
final [2]   4/22 11/1
finances [3]   50/8 50/10
 50/11
financial [11]   20/25 49/23
 49/24 50/3 50/4 50/17 50/19
 51/4 51/19 54/22 75/23
financially [1]   50/23
financials [8]   12/9 12/9
 12/10 12/11 12/13 51/5 51/7
 52/1
find [8]   28/19 28/24 68/11
 70/10 71/12 74/20 77/17
 78/13
finished [1]   55/2
firm [2]   4/22 7/21
firms [2]   7/19 35/25
first [8]   16/15 23/22 31/21
 45/24 68/20 68/23 68/23
 76/20
fiscal [1]   54/23
fit [1]   21/3
five [2]   81/1 81/2
FL [2]   1/23 85/13
flip [1]   39/8
FLORIDA [10]   1/1 1/4 1/15
 1/19 4/16 41/22 76/15 76/15
 77/5 77/6
flsd.uscourts.gov [1]   1/24

**F**

flush [1]   29/1
Focal [2]   63/12 66/10
focus [1]   36/23
focused [1]   25/14
focusing [1]   66/7
FOIA [10]   11/25 12/1 12/14
  12/17 13/4 13/6 16/25 41/20
  41/21 46/5
folks [6]   5/25 7/18 9/18
  21/2 34/21 55/20
follow [2]   38/7 57/21
followed [1]   40/22
following [1]   32/11
force [3]   80/5 80/6 83/19
forces [2]   78/3 78/6
forecast [1]   54/20
forecasts [2]   54/18 54/22
foregoing [1]   85/7
form [1]   76/25
formal [1]   31/14
forms [1]   9/19
formulating [1]   10/15
Fort [1]   1/19
forth [1]   27/10
forward [3]   37/23 51/25
  79/24
found [3]   11/23 29/7 46/11
foundation [1]   55/23
founded [2]   67/6 69/10
founder [1]   5/16
four [1]   14/21
Fourth [1]   77/7
free [2]   17/17 81/24
frequency [2]   5/18 46/14
front [2]   39/3 45/19
fronts [1]   64/3
fruition [1]   6/23
fully [1]   11/23
function [2]   64/6 64/8
fund [1]   27/12
fundamentals [1]   52/8
further [5]   57/4 64/18 66/12
  70/5 71/24
future [5]   31/8 49/6 52/18
  52/22 54/23

**G**

gained [1]   27/24
gains [1]   30/3
garage [1]   69/10
gathering [1]   58/12
gauge [1]   15/16
general [6]   42/25 43/11
  46/12 67/17 68/1 68/16
generally [12]   4/15 11/22
  17/11 18/19 19/20 20/22
  22/3 29/16 40/5 68/3 73/22
  76/25
gentleman [1]   73/6
GEO [19]   1/3 3/3 3/7 4/14
  4/15 4/19 19/24 19/25 20/5
  20/24 24/10 27/2 38/24 40/9
  56/8 56/21 62/13 77/24
  80/11
get [18]   4/2 10/17 15/11
  17/19 22/5 22/15 37/7 38/3

43/10 43/20 51/11 53/4 53/5
  54/6 61/1 63/19 71/10 71/16
gets [2]   12/19 43/13
getting [1]   13/6
gist [2]   25/10 25/12
give [11]   5/13 12/17 16/14
  19/2 23/15 23/16 62/24
  67/15 75/25 76/6 84/25
given [5]   12/16 27/17 28/9
  37/2 41/25
gives [4]   17/9 74/20 74/21
  82/6
go [29]   4/2 9/2 9/7 9/9
  9/21 9/24 13/10 14/3 14/6
  17/5 18/10 28/19 33/23 35/6
  37/8 41/13 42/16 44/22
  46/25 47/17 52/25 52/25
  58/11 58/21 59/2 62/3 75/6
  79/24 81/4
goes [12]   10/23 10/25 11/6
  34/10 37/18 38/5 43/12
  44/18 50/1 67/20 76/22
  78/12
gone [3]   37/13 68/3 82/16
good [17]   3/2 3/6 3/10 3/11
  26/9 26/9 26/10 33/9 64/23
  64/24 66/23 66/24 70/8 76/3
  79/15 84/3 85/3
goods [1]   78/11
gospel [1]   72/15
got [6]   8/13 33/12 41/2
  41/17 72/18 81/8
gotten [1]   59/16
governed [1]   76/14
government [34]   8/25 9/1 9/1
  9/2 12/2 14/11 14/23 16/22
  16/23 17/7 17/7 18/13 18/14
  22/4 30/19 30/19 31/4 31/7
  31/11 31/12 31/18 31/24
  32/4 32/7 33/3 33/14 33/16
  34/8 34/11 41/22 44/12
  44/21 53/9 54/4
government's [1]   31/9
governments [1]   41/21
GPS [14]   5/22 14/1 14/1
  18/11 28/15 28/16 39/11
  46/14 46/18 63/11 65/10
  74/11 81/20 83/20
graphics [1]   38/2
great [3]   24/23 51/2 51/12
group [19]   1/3 3/3 3/7 4/14
  4/15 4/16 11/10 19/25 20/5
  20/25 24/10 27/2 38/24 40/9
  56/8 56/21 62/13 77/24
  80/12
guess [6]   3/21 23/12 33/8
  38/8 72/7 79/10
guidance [1]   67/15
guide [2]   56/14 56/15
guy [1]   27/7
guys [1]   80/21

**H**

hadn't [1]   23/10
half [4]   51/15 53/20 57/10
  67/8
halls [1]   82/8
hallway [1]   19/19

halves [1]   53/20
handed [1]   48/19
handful [2]   22/11 76/4
handle [1]   43/20
happen [2]   19/21 84/11
happened [3]   27/4 46/6 61/2
happening [2]   37/22 53/11
harder [1]   13/7
hardly [1]   32/2
hardware [4]   7/13 8/13 71/2
  74/21
harm [7]   56/6 56/21 73/5
  77/11 77/12 77/16 77/20
Harvey [1]   3/9
has [31]   4/16 5/21 12/17
  18/25 19/7 22/25 25/24 33/5
  33/7 34/21 35/23 37/12 43/3
  50/18 51/17 56/10 56/21
  58/23 58/24 67/18 68/3
  68/18 72/12 74/8 76/5 77/7
  77/11 77/12 82/3 82/5 82/16
have [165]
haven't [5]   3/22 28/10 55/25
  59/16 60/21
having [5]   31/19 41/5 54/3
  73/6 79/24
he [86]
heard [6]   65/2 73/20 82/2
  82/9 82/10 82/11
hearing [5]   1/9 3/3 42/1
  49/11 49/17
Heavens [1]   31/21
held [2]   32/16 76/24
help [3]   59/18 60/5 70/19
helpful [1]   37/25
her [1]   20/4
here [11]   4/14 25/17 35/21
  36/14 46/6 49/8 60/21 67/21
  77/15 83/16 84/2
Here's [1]   27/4
hereby [1]   85/7
herein [1]   29/18
hereof [1]   48/1
Hey [1]   69/2
high [2]   45/7 75/2
him [18]   5/7 5/10 24/15
  26/17 29/25 30/5 37/1 38/8
  38/9 45/10 72/18 73/7 74/8
  75/25 81/7 82/4 82/7 82/13
himself [1]   83/22
hinge [1]   54/13
hire [2]   7/19 26/17
hired [5]   5/6 26/14 27/6
  27/11 68/22 69/1 69/5 69/13
hiring [1]   27/16
hold [1]   20/1
home [4]   5/19 5/20 5/25
  46/14
Homeland [4]   13/20 32/1
  32/13 32/16
homes [1]   63/19
Honor [46]   3/6 3/11 3/24
  23/4 25/7 25/13 26/6 36/18
  37/5 37/24 38/3 38/11 38/18
  40/12 40/15 41/10 42/9 45/9
  48/20 48/24 49/19 55/1 57/4
  57/7 59/15 60/10 61/6 61/14
  61/21 62/1 62/4 64/18 66/14

**H**

Honor... **[13]**   66/18 70/3
70/5 71/24 72/5 72/10 76/6
76/12 79/17 80/18 81/21
84/19 85/4
Honor's **[1]**   40/24
HONORABLE **[1]**   1/10
hopeful **[1]**   84/11
hour **[1]**   57/9
house **[2]**   3/8 5/17
however **[1]**   84/16
huge **[1]**   68/24
huh **[1]**   48/2
hundred **[2]**   81/1 81/2
hypothetical **[1]**   33/15
hypothetically **[1]**   59/4

**I**

I'd **[1]**   15/1
I'll **[4]**   19/13 42/19 49/16
64/15
I'm **[52]**   4/22 18/19 20/7
26/13 26/13 28/8 32/5 32/11
33/12 36/12 36/13 36/17
36/22 36/25 37/7 37/21
39/20 41/8 41/25 42/2 42/19
43/18 43/20 45/8 45/25
46/11 55/1 56/10 56/23
57/21 57/24 58/14 59/21
60/13 61/2 61/14 61/17
61/17 63/23 65/20 66/24
67/13 73/3 73/17 76/10
79/10 81/18 83/13 83/13
83/16 84/15 84/17
I've **[2]**   30/6 67/8
I-N-D-E-X **[1]**   2/1
ICAP **[1]**   51/1
ID **[1]**   40/10
idea **[3]**   42/21 79/5 81/6
ideas **[2]**   55/24 56/3
identified **[2]**   42/13 68/7
identify **[8]**   35/14 35/19
37/9 38/9 42/17 57/1 68/8
68/15
identity **[1]**   78/16
Illinois **[2]**   21/10 22/13
imagine **[1]**   59/8
immigrants **[1]**   14/11
immigration **[3]**   13/23 13/24
14/6
impact **[1]**   51/13
implement **[1]**   69/8
implements **[1]**   67/20
implore **[1]**   77/21
important **[3]**   10/20 18/21
52/2
importantly **[1]**   52/4
impossible **[1]**   74/14
impressed **[2]**   59/21 74/5
in-house **[1]**   3/8
inadvertently **[1]**   74/2
inappropriate **[1]**   31/22
INC **[1]**   1/3
inclined **[1]**   81/18
include **[1]**   74/9
included **[2]**   13/14 74/10
including **[3]**   3/18 47/22

77/5
incorporate **[1]**   53/18
incur **[1]**   58/18
indicated **[1]**   46/3
indicates **[2]**   34/16 78/6
indication **[1]**   23/13
indirectly **[1]**   64/14
individual **[2]**   20/3 56/14
individuals **[3]**   13/22 13/25
32/18
industry **[15]**   18/25 21/23
22/17 30/3 30/8 30/22 31/2
31/6 31/20 54/25 69/18
70/18 79/1 82/16 82/23
inferring **[1]**   31/22
informal **[1]**   19/18
information **[87]**
informed **[2]**   13/16 22/25
infrastructure **[1]**   80/9
ingredients **[2]**   78/25 79/2
initial **[1]**   23/17
initially **[1]**   69/10
injunction **[20]**   1/9 25/17
25/23 34/18 36/8 49/10
60/14 72/9 72/11 72/25 73/1
73/14 74/4 74/9 74/22 79/25
83/2 83/5 83/14 83/23
injunctions **[2]**   42/2 77/13
input **[6]**   54/6 71/10 71/13
71/14 73/9 73/9
inputs **[4]**   51/17 53/4 53/5
71/16
Insight **[4]**   70/12 70/16 71/8
71/14
install **[1]**   47/2
installation **[1]**   46/23
institution **[1]**   47/1
intelligence **[1]**   11/6
intend **[2]**   19/16 19/17
intensive **[1]**   13/18
interact **[1]**   67/17
interaction **[1]**   24/15
interacts **[1]**   71/4
interest **[4]**   60/20 61/15
76/18 76/25
interested **[3]**   34/1 60/13
60/14
interests **[8]**   25/15 26/23
26/25 75/25 77/9 77/20
81/20 83/15
interfere **[1]**   79/13
interim **[1]**   73/5
interlends **[1]**   18/7
internal **[6]**   11/24 20/22
20/23 39/10 43/7 71/9
internally **[1]**   10/19
interpretation **[2]**   48/7
72/19
interrupt **[1]**   41/13
Intertek **[1]**   40/11
intimate **[1]**   23/25
introduce **[1]**   37/25
introduced **[1]**   56/3
invalid **[1]**   59/24
invasive **[1]**   84/2
inventory **[1]**   46/23
invest **[1]**   58/6
invitation **[1]**   9/20

involve **[2]**   82/1 83/21
involved **[15]**   14/24 15/2
18/20 18/24 19/11 19/23
21/7 24/4 44/5 58/9 63/23
63/24 64/3 72/15 81/23
involvement **[6]**   15/5 43/21
43/22 80/2 80/3 80/14
involving **[1]**   83/20
irrelevant **[2]**   41/3 61/3
irreparable **[6]**   56/6 73/5
77/11 77/12 77/16 77/20
irrespective **[1]**   33/6
is **[346]**
Is it **[1]**   81/9
ISAP **[10]**   13/16 13/17 13/21
14/9 14/15 14/20 14/24 15/2
15/5 31/25
isn't **[10]**   8/11 10/21 10/25
15/17 32/23 37/19 37/21
56/13 57/2 74/7
issue **[18]**   17/10 29/15 29/21
34/17 35/22 36/14 41/7 43/5
49/2 49/3 49/8 49/22 53/8
59/14 60/22 72/13 77/10
81/22
issues **[2]**   25/18 53/6 59/25
it **[240]**
it's **[15]**   8/1 13/22 16/18
25/20 31/6 35/13 44/7 50/5
50/6 51/19 54/21 57/3 73/23
81/8 84/11
ITB **[1]**   9/19
items **[2]**   36/1 36/2
iteration **[3]**   14/16 14/20
33/25
iterative **[1]**   15/23
its **[7]**   9/16 21/22 23/9
31/19 34/9 47/23 50/10
itself **[1]**   11/23

**J**

job **[6]**   9/10 9/10 63/9 64/6
64/8 78/4
JOCK **[4]**   2/3 3/9 4/5 4/9
joined **[3]**   55/22 27/22 72/16
joining **[1]**   71/6
JONATHAN **[2]**   1/17 3/11
JUDGE **[1]**   1/10
Judge's **[1]**   22/14
judicial **[4]**   3/20 38/23
65/24 65/24
July **[2]**   24/5 24/13
July-August **[1]**   24/5
June **[3]**   55/19 55/20 72/17
justice **[5]**   4/24 24/20 81/24
82/13 82/23

**K**

keep **[4]**   73/24 75/1 82/17
84/9
key **[1]**   25/4
kind **[9]**   10/4 17/20 17/20
18/6 19/10 35/16 67/24 74/7
83/14
kinds **[2]**   22/14 73/22
Kingdom **[1]**   24/20
knew **[1]**   5/19
knowledge **[20]**   13/4 20/18

**K**

knowledge... **[18]**   23/25
27/14 27/20 30/2 33/2 40/8
44/2 47/10 48/17 50/16
50/20 51/2 51/16 52/7 56/5
63/25 74/8 82/6
knowledgeable **[2]**   24/24 47/9
known **[8]**   4/19 5/3 5/16
35/16 35/18 35/25 36/12
37/16

**L**

lab **[1]**   68/2
languages **[1]**   14/9
laptop **[1]**   23/16
laptops **[1]**   62/22
large **[3]**   32/23 42/15 73/19
largest **[2]**   14/12 24/21
Las **[1]**   1/18
last **[12]**   3/15 14/8 24/22
25/21 40/21 40/22 41/16
41/17 54/18 55/9 60/17
60/17
late **[1]**   68/21
later **[5]**   36/20 49/17 51/5
68/25 74/20
latest **[2]**   23/9 73/4
latitude **[1]**   75/25
Lauderdale **[1]**   1/19
launched **[1]**   68/21
launches **[1]**   54/12
law **[3]**   72/22 73/22 74/14
lawyers **[1]**   84/2
lead **[1]**   64/8
leaders **[2]**   20/2 20/23
leadership **[1]**   15/6
learn **[2]**   34/13 37/15
learned **[4]**   6/11 68/25 69/12
69/14
learning **[1]**   11/7
least **[4]**   41/17 54/18 60/17
78/9
leave **[1]**   3/18
led **[3]**   19/20 24/23 41/22
left **[1]**   24/11
legal **[6]**   11/24 20/25 27/3
27/10 27/12 29/8
legitimate **[9]**   25/15 26/22
26/24 61/15 76/18 76/25
77/8 77/20 83/15
lens **[6]**   76/20 76/20 76/20
76/21 76/22 78/20
lenses **[1]**   76/19
less **[1]**   35/18
let **[7]**   16/15 23/7 57/22
59/12 82/7 82/13 84/20
let's **[12]**   3/23 4/2 30/10
33/14 34/14 43/1 53/20 54/8
57/11 60/7 60/8 72/8
letter **[1]**   40/11
level **[8]**   18/3 18/5 19/13
19/22 19/24 45/7 53/8 75/2
lifetime **[1]**   10/4
like **[51]**   3/25 4/1 4/4 9/6
13/1 16/21 18/2 18/12 18/24
25/8 25/10 25/12 29/4 29/17
32/20 33/22 34/21 35/13

35/25 36/3 36/3 36/23 37/25
38/18 39/5 40/2 40/12 42/20
42/23 46/17 46/17 47/4 47/4
47/16 48/20 49/4 51/1 52/25
56/9 57/25 60/1 62/4 66/18
69/23 69/24 69/24 69/25
71/8 73/16 81/10 82/1
likelihood **[1]**   49/14
limbo **[1]**   75/23
limited **[5]**   22/4 22/16 36/23
44/4 80/3
line **[2]**   36/18 75/8
lines **[1]**   80/2
list **[11]**   35/7 35/8 35/9
35/10 38/22 40/16 41/3
41/11 42/3 68/13 79/2
listed **[1]**   29/18
Listen **[1]**   59/5
lists **[4]**   37/17 40/18 40/25
70/13
little **[7]**   12/3 21/25 23/9
23/16 32/5 68/13 72/20
Littler **[1]**   1/13
live **[1]**   45/1
livelihood **[1]**   79/13
LLC **[1]**   1/18
loan **[1]**   63/16
local **[3]**   13/7 18/8 18/8
locations **[3]**   12/3 18/5
46/24
logical **[1]**   58/25
long **[7]**   5/3 6/4 6/22 10/1
17/8 20/20 74/10
longer **[3]**   25/14 25/24 57/10
look **[12]**   15/18 21/2 29/3
37/8 39/22 40/1 42/20 42/24
46/13 67/24 68/3 79/6
looked **[5]**   39/17 39/19 39/23
39/24 69/11
looking **[12]**   9/14 9/17 10/8
10/10 31/16 33/4 33/25 34/3
37/16 39/20 46/7 69/15
looks **[1]**   49/3
looming **[1]**   25/1
lot **[16]**   10/23 13/9 17/13
17/19 25/24 27/10 30/7
32/25 35/11 37/18 40/21
40/22 43/12 59/5 59/22
78/12
lots **[2]**   9/20 46/4

**M**

made **[4]**   15/18 17/23 40/9
77/11
Magazine **[1]**   22/3
main **[2]**   43/20 43/22
maintain **[3]**   35/1 53/12
84/12
major **[6]**   4/16 13/16 68/4
68/5 68/7 68/10
majority **[3]**   8/19 8/24 9/3
make **[9]**   9/24 15/21 33/8
44/16 73/22 78/14 79/9
79/10 84/17
makes **[1]**   59/23
making **[3]**   37/18 76/11 78/10
managed **[2]**   14/5 14/7
management **[7]**   52/19 67/18

67/18 70/24 70/25 71/4
74/21
manager **[3]**   14/5 71/7 73/9
managing **[2]**   80/5 80/5
manufacture **[1]**   28/21
manufactured **[1]**   29/6
manufacturer **[3]**   28/19 28/24
39/16
manufacturer's **[1]**   43/14
many **[10]**   5/16 8/3 16/1 16/1
16/1 17/9 18/5 54/17 60/8
81/25
mapping **[1]**   54/1
margins **[3]**   11/11 11/14
78/10
market **[23]**   4/24 5/21 22/1
35/15 37/12 44/4 44/9 50/18
52/22 52/23 52/23 53/3 54/2
54/24 57/25 68/24 69/18
70/10 70/12 70/22 72/18
77/23 83/11
marketed **[1]**   68/20
marketing **[20]**   6/5 6/8 6/12
6/15 6/19 6/24 7/2 52/11
52/13 52/17 52/19 52/21
53/1 54/12 59/20 65/9 70/13
70/16 70/17 83/10
marketplace **[5]**   18/4 42/15
59/20 60/4 76/10
markets **[1]**   19/16
massive **[1]**   8/10
materials **[2]**   37/17 47/22
Matt **[23]**   3/4 3/13 5/2 5/6
15/1 21/9 24/2 24/6 24/10
24/16 24/22 25/3 27/6 27/11
27/16 27/16 27/22 30/5
30/22 56/9 62/9 67/12 67/15
Matt's **[2]**   27/17 27/20
matter **[6]**   20/22 27/3 29/20
52/5 77/21 85/9
MATTHEW **[3]**   1/6 2/8 62/5
maybe **[6]**   23/13 25/9 34/11
60/14 61/2 78/20
mean **[32]**   3/25 17/2 18/1
25/8 26/24 33/21 34/19
39/19 40/18 49/6 49/7 49/25
52/2 52/3 54/20 57/24 59/17
59/25 61/7 61/11 67/17 71/6
74/3 75/22 78/8 78/19 78/21
78/22 79/9 83/4 83/25 84/7
meant **[1]**   25/7
mechanisms **[1]**   9/21
medical **[1]**   63/16
meet **[7]**   5/5 15/14 31/7
34/2 34/13 46/25 78/15
meeting **[15]**   20/8 32/12
32/16 32/17 33/13 55/9
55/20 55/21 55/23 55/24
55/25 56/1 56/1 58/23 58/24
meetings **[27]**   15/15 16/1
16/4 19/10 19/12 20/1 20/7
20/7 20/8 20/15 31/23 31/25
32/3 32/7 32/14 32/15 33/2
33/5 33/7 33/11 52/15 54/3
55/7 55/16 64/15 78/7 83/19
meets **[2]**   6/19 34/11
member **[1]**   25/4
members **[2]**   32/15 32/16

**M**

**Mendelson [1]**  1/13
**mention [1]**  3/20
**mentioned [11]**  16/9 28/2
28/13 36/22 42/12 44/1
52/14 53/12 55/6 67/5 71/8
**Miami [1]**  1/15
**Middle [1]**  77/6
**MIDDLEBROOKS [1]**  1/10
**might [23]**  8/11 10/5 10/8
15/17 15/20 23/4 27/4 33/6
36/11 42/21 44/17 52/23
52/24 53/5 53/7 57/16 58/9
61/18 68/13 75/5 78/12
78/24 81/21
**migrate [1]**  34/5
**miller [4]**  1/22 1/24 85/10
85/11
**million [1]**  16/19
**mind [1]**  75/13
**minimum [1]**  77/21
**Ministry [1]**  24/20
**minutes [4]**  40/4 59/12 60/7
60/10
**misses [1]**  44/16
**mobile [3]**  63/13 73/15 74/10
**model [4]**  10/20 10/22 10/24
44/2
**modeling [1]**  43/10
**models [1]**  47/21
**MOJ [2]**  24/19 24/25
**moment [3]**  55/2 64/17 70/3
**moments [3]**  32/5 39/14 50/1
**Monday [1]**  40/25
**money [6]**  57/20 57/22 58/8
58/12 59/2 59/7
**monitor [5]**  37/10 46/18
46/18 65/10 65/11
**monitored [1]**  14/1
**monitoring [22]**  4/23 5/16
5/25 5/25 16/18 24/21 28/5
43/23 44/5 44/9 44/11 46/10
46/14 50/5 54/9 63/11 63/16
67/6 68/24 74/11 81/20
83/20
**monthly [5]**  15/14 15/15
31/25 32/13 47/15
**months [10]**  25/22 25/25 34/4
48/9 55/14 72/17 72/20
72/21 72/24 80/25
**more [14]**  5/13 14/4 17/13
18/21 21/3 31/5 34/1 35/11
36/1 46/21 52/3 52/8 63/16
68/13
**morning [12]**  3/2 3/6 3/10
3/11 26/9 26/10 40/25 64/23
64/24 64/25 66/23 70/8
**most [13]**  9/1 14/18 15/1
15/3 15/4 21/8 28/8 28/12
39/11 52/2 55/18 55/19
72/23
**mostly [1]**  5/22
**motion [5]**  1/9 3/18 38/23
41/6 42/2
**Motorola [2]**  34/22 35/5
**Motors [1]**  43/11
**move [2]**  40/12 57/11

**moved [1]**  48/21
**moves [1]**  7/12
**moving [2]**  14/2 70/18
**Mr [24]**  2/4 2/5 2/6 2/9
2/10 2/13 2/14 26/9 31/18
32/5 36/5 37/7 38/1 38/16
42/11 44/4 45/19 49/22 55/6
56/5 56/6 57/15 60/12 65/2
**Mr. [59]**  3/9 4/4 4/10 5/3
5/5 7/10 7/24 8/16 11/3
11/18 14/24 16/6 18/17 19/9
20/14 20/17 21/6 21/15
21/19 22/19 23/5 23/23
24/14 25/24 26/14 26/19
27/2 29/11 29/24 29/24
30/11 30/14 31/2 39/5 40/8
43/21 43/22 45/14 47/8
49/24 50/15 51/15 52/12
55/9 56/6 56/17 56/22 62/10
64/23 66/8 71/5 72/11 72/23
73/6 75/16 80/2 80/4 80/16
80/16
**Mr. David [1]**  3/9
**Mr. Swando [40]**  5/3 5/5 7/10
7/24 8/16 11/3 11/18 14/24
16/6 18/17 19/9 20/14 20/17
21/6 21/15 21/19 22/19
22/23 26/14 26/19 29/11
29/24 30/11 30/14 31/2 47/8
49/24 50/15 51/15 52/12
55/9 56/6 56/17 62/10 64/23
71/5 72/11 72/23 73/6 80/2
**Mr. Swando's [8]**  24/14 27/2
43/21 43/22 56/22 75/16
80/4 80/16
**Mr. Waldo [9]**  4/4 4/10 23/5
25/24 29/24 39/5 40/8 45/14
66/8
**Mr. Wilson [1]**  80/16
**MRD [3]**  7/3 7/4 8/8
**Ms [1]**  84/25
**much [7]**  11/8 11/9 13/7
13/7 16/1 60/11 69/21
**multitude [1]**  82/3
**municipal [2]**  18/4 18/10
**municipalities [1]**  9/1
**must [4]**  34/17 35/21 76/17
76/24
**muster [1]**  76/21
**myself [2]**  30/2 30/22
**mySHIELD [24]**  63/14 63/21
65/10 73/15 74/9 77/22
77/22 78/5 79/22 80/1 80/4
80/4 80/11 80/13 81/7 81/13
81/14 81/18 82/1 83/8 83/17
83/21 83/21 84/12

**N**

**name [9]**  3/15 4/8 26/14
27/7 62/8 66/11 66/25 67/1
70/8
**named [2]**  27/15 32/21
**names [1]**  36/12
**Nascent [1]**  53/14
**national [3]**  22/10 22/11
65/20
**nature [1]**  29/14
**NCPO [3]**  17/6 17/6 17/12

**NDA [2]**  12/11 12/13
**NDAs [1]**  7/21
**necessarily [5]**  8/11 11/1
30/8 37/18 37/19
**necessary [1]**  76/18
**need [22]**  4/2 15/17 15/22
23/5 31/3 31/10 31/15 32/20
33/15 33/16 33/17 33/18
37/15 42/1 53/9 60/1 60/11
75/11 75/12 76/6 84/7
**need-to-know [1]**  32/20
**needed [2]**  33/14 33/15
**needs [5]**  17/23 30/23 31/8
31/12 31/20
**negatives [1]**  47/21
**negotiate [1]**  61/13
**never [6]**  13/4 39/24 41/2
48/17 48/18 63/24
**new [14]**  8/3 15/22 51/16
53/14 53/14 53/16 53/17
54/9 54/12 56/3 63/23 67/15
69/8 70/20
**next [12]**  7/12 10/10 15/25
16/2 52/18 52/18 52/23 53/2
54/2 69/6 69/21 70/1
**night [4]**  40/21 40/23 41/17
41/17
**nine [5]**  25/21 25/25 72/17
72/20 72/24
**no [41]**  1/2 7/6 7/15 7/18
11/15 11/17 16/5 23/15
25/13 31/11 31/21 35/4 35/4
40/20 42/3 46/3 50/9 52/5
52/7 52/7 59/8 62/23 63/2
63/5 63/23 64/2 64/5 64/12
65/20 65/25 66/14 67/13
67/17 70/9 71/21 72/5 75/7
77/15 80/2 80/11 80/13
**non [1]**  16/22
**non-government [1]**  16/22
**noncompete [13]**  25/16 26/19
41/6 59/23 72/21 72/21
74/23 74/25 76/14 76/17
76/19 78/18 78/21
**noncompetitive [2]**  17/6 83/7
**Nondisclosure [1]**  7/22
**none [2]**  17/22 20/11
**nonsolicitation [1]**  83/9
**normal [1]**  35/16
**not [96]**
**notebook [1]**  38/21
**notebooks [1]**  39/1
**noted [5]**  15/13 37/13 39/12
39/17 40/4
**nothing [9]**  56/23 56/25 57/4
64/18 70/5 71/24 81/4 81/5
82/19
**notice [2]**  3/20 38/23
**NSA [1]**  22/10
**nuances [1]**  9/14
**number [15]**  3/4 9/6 17/18
24/16 28/11 34/20 38/10
40/10 41/20 41/23 42/5
44/18 47/18 58/22 84/4
**numbers [2]**  50/12 51/18
**Numerex [33]**  18/18 18/19
18/22 18/22 23/2 35/13
35/14 35/18 43/16 43/21

**N**

Numerex... **[23]**   50/18 51/6
51/17 56/7 56/22 62/11 63/6
63/24 65/8 65/17 67/3 67/4
67/7 67/9 67/18 70/10 70/12
70/14 70/15 70/20 71/7
72/12 80/12
Numerex's **[1]**   56/18

**O**

object **[2]**   36/18 40/15
objection **[6]**   36/25 40/14
40/19 41/9 48/23 48/24
obligations **[2]**   47/23 83/9
obtained **[2]**   41/19 41/19
obvious **[1]**   33/22
obviously **[2]**   35/16 56/12
occasionally **[1]**   64/15
occupation **[1]**   67/2
occur **[1]**   57/3
OCTOBER **[5]**   1/5 26/2 62/20
67/7 72/16
off **[3]**   31/19 31/21 80/13
off-the-record **[1]**   31/19
offender **[1]**   5/19
offenders **[1]**   47/1
offer **[3]**   14/10 19/16 28/18
office **[7]**   13/2 13/23 15/22
15/22 15/23 22/13 63/3
officer **[2]**   53/10 53/10
offices **[4]**   14/4 14/9 21/4
46/25
Official **[2]**   1/22 85/11
officials **[1]**   33/3
often **[5]**   5/17 6/21 17/11
18/5 63/18
Olas **[1]**   1/18
OM300 **[2]**   28/7 28/14
OM310 **[1]**   28/7
OM400 **[1]**   28/8
Omni **[2]**   28/9 34/21
OmniLink **[21]**   18/22 18/23
18/24 18/25 19/5 19/6 28/3
28/5 28/17 39/16 42/12 67/4
67/5 67/5 67/6 67/7 68/23
69/7 69/10 70/14 70/20
OmniLink's **[1]**   28/19
once **[6]**   7/12 11/21 19/21
41/4 68/7 68/10
one **[54]**   4/17 4/21 6/22
12/7 12/17 14/3 14/21 14/21
15/3 15/4 15/4 17/5 17/19
17/20 19/5 21/9 22/5 24/21
29/22 33/13 34/10 35/9
35/11 39/15 41/21 43/24
44/1 44/18 45/15 49/4 50/24
52/16 53/21 55/2 55/18
55/19 57/10 57/10 63/11
64/17 66/1 66/2 70/3 70/16
71/11 71/14 75/21 80/7 81/1
81/2 81/10 82/9 82/10 82/11
one-of-a-kind **[1]**   17/20
one-person **[1]**   35/9
one-year **[2]**   14/21 14/21
ones **[3]**   3/18 22/8 80/21
ongoing **[7]**   8/18 10/11 15/13
15/18 15/24 56/2 58/12

only **[15]**   7/18 15/16 34/12
41/16 47/13 66/1 66/2 72/17
73/24 74/25 75/3 76/4 82/9
82/10 82/11
open **[1]**   15/22
opened **[1]**   39/15
opening **[2]**   28/25 29/2
openings **[1]**   3/24
operate **[2]**   50/24 81/7
operated **[1]**   13/19
operates **[3]**   8/12 13/21
37/19
operations **[1]**   83/17
opportunities **[1]**   82/3
opportunity **[5]**   12/16 17/10
24/18 25/1 25/2
order **[8]**   17/6 17/10 40/24
58/6 76/16 83/12 84/3 84/16
ordering **[1]**   80/2
organization **[10]**   6/5 6/8
6/17 9/11 13/21 16/23 24/11
32/17 32/20 52/20
organization's **[1]**   9/10
organizations **[4]**   6/13 22/11
22/12 22/17
other **[28]**   4/18 6/12 15/19
17/16 17/16 21/10 23/1 33/3
38/6 39/23 43/25 47/21 57/9
59/13 65/17 65/23 66/3
67/24 69/17 80/2 80/14
80/14 81/11 82/20 82/25
83/1 83/3 83/22
others **[2]**   24/10 30/22
otherwise **[3]**   4/2 38/7 83/25
ought **[3]**   60/6 74/3 83/1
our **[79]**   4/23 6/5 6/9 8/24
9/10 11/24 12/8 12/9 12/10
12/17 13/9 14/3 14/9 14/12
16/21 17/19 19/14 20/3 21/3
21/8 22/1 23/6 24/23 25/20
25/23 26/2 28/15 31/24
32/17 36/20 36/21 38/22
38/23 39/10 39/11 39/21
39/25 40/11 41/6 42/6 42/15
43/6 44/2 45/22 46/10 46/15
46/24 47/16 48/11 50/3 50/5
50/5 50/22 50/24 50/24
50/25 52/15 52/16 52/22
52/22 52/22 53/5 55/19
58/11 58/16 68/20 68/23
70/1 70/19 71/9 71/12
71/15 72/12 72/20 74/13
77/4 81/22 82/10
ours **[3]**   28/18 73/19 73/21
out **[61]**   9/2 9/7 9/9 9/13
9/15 9/21 9/23 10/2 10/11
15/9 15/25 18/21 22/5 22/15
24/22 26/1 29/1 29/7 30/20
33/3 33/23 33/24 35/19 40/6
53/2 54/1 58/21 59/2 60/5
60/21 63/3 63/18 68/11 69/3
69/8 69/10 70/10 70/13
72/18 73/25 74/20 75/1 75/8
75/24 77/5 77/6 77/6 77/7
78/13 78/23 78/24 79/6
79/15 79/22 80/1 80/21
81/18 82/7 83/17 84/1 84/14
outside **[7]**   7/16 7/18 11/16

20/11 32/18 70/18 82/12
outstanding **[1]**   41/20
over **[10]**   5/7 18/15 30/11
48/11 48/18 55/13 55/16
66/9 71/7 82/20
overall **[2]**   15/6 20/10
overcome **[1]**   49/5
overlap **[2]**   75/7 80/11
overrule **[1]**   36/25
oversee **[3]**   63/10 63/13
65/10
oversight **[1]**   65/24
overwhelming **[1]**   77/4
own **[5]**   19/14 39/21 46/24
58/21 59/6

**P**

P-R-O-C-E-E-D-I-N-G-S **[1]**   3/1
P.C **[1]**   1/13
P.M **[1]**   85/5
packages **[1]**   15/21
page **[3]**   2/2 11/1 47/17
pages **[3]**   1/6 3/20 44/17
paid **[1]**   61/1
PALM **[4]**   1/2 1/4 1/23 85/13
paper **[1]**   30/9
papers **[2]**   3/18 61/18
parameters **[1]**   37/2
parcel **[1]**   52/20
parent **[2]**   18/22 20/6
parole **[2]**   22/9 65/16
part **[16]**   9/10 9/10 11/8
15/15 15/15 21/12 21/22
27/25 37/20 52/20 53/1
56/24 57/2 58/11 60/24
74/12
participants **[1]**   14/11
participate **[2]**   21/19 21/23
particular **[9]**   11/25 17/8
20/23 21/6 28/5 35/15 46/20
48/14 51/20
particularly **[4]**   17/19 51/23
72/22 77/19
parties **[2]**   75/21 84/20
partly **[1]**   44/7
partner **[1]**   18/8
partnered **[2]**   21/9 29/8
parts **[3]**   36/13 37/10 42/18
pass **[1]**   76/21
patent **[1]**   79/3
pause **[1]**   82/7
pay **[2]**   27/2 82/4
payment **[1]**   60/20
peers **[1]**   30/8
pending **[1]**   79/19
Pennsylvania **[1]**   22/13
people **[11]**   35/10 59/2 66/3
69/11 69/13 69/16 70/13
71/10 78/17 82/8 84/2
per **[4]**   11/5 22/7 44/12
44/13
percent **[1]**   77/1
percentage **[2]**   16/16 76/3
perform **[1]**   73/1
performance **[4]**   47/15 47/23
50/13 50/17
performing **[1]**   72/11
perhaps **[1]**   8/9

**P**

period **[5]**  5/8 9/24 75/24 79/14 83/22
person **[3]**  35/9 75/1 75/22
personal **[4]**  63/8 63/13 73/15 74/10
personnel **[1]**  8/4
perspective **[1]**  54/22
phase **[1]**  7/12
phone **[4]**  6/1 23/16 29/7 78/23
phonetic **[2]**  24/19 27/7
photograph **[3]**  37/16 37/20 40/6
photographs **[5]**  29/4 29/4 39/8 39/10 47/21
physically **[2]**  29/25 30/5
picked **[1]**  29/6
picture **[1]**  50/19
pictures **[3]**  38/5 39/22 68/11
piece **[5]**  30/9 51/4 54/7 54/8 54/19
pilot **[1]**  14/15
place **[2]**  7/21 48/9
placed **[2]**  5/10 14/1
plaintiff **[9]**  1/4 1/13 3/7 4/5 35/20 66/20 77/3 77/7 77/11
plaintiff's **[3]**  29/13 78/9 79/18
plan **[2]**  64/8 69/7
planning **[7]**  30/20 52/15 52/15 52/16 52/22 52/22 55/6
plausible **[1]**  84/13
play **[2]**  54/2 71/7
pleading **[1]**  77/8
please **[10]**  3/2 3/4 38/12 55/3 57/8 61/25 62/5 64/17 66/19 70/3
point **[22]**  10/7 10/17 12/7 14/3 16/7 18/21 19/5 20/20 26/20 38/19 39/15 42/14 44/16 49/6 51/22 59/18 60/1 63/12 66/10 78/4 84/8 84/15
police **[1]**  74/14
POLLARD **[6]**  1/17 1/18 2/5 2/9 2/13 3/12
pools **[1]**  6/13
pop **[1]**  10/15
position **[24]**  4/11 4/25 5/10 18/6 20/17 24/6 24/8 25/20 25/21 26/3 34/6 34/8 36/5 36/7 36/10 50/20 50/21 50/21 61/16 63/7 73/6 77/4 81/22 84/11
possible **[4]**  42/16 51/22 67/23 77/16
possibly **[2]**  33/19 56/7
potential **[1]**  20/19
potentially **[3]**  8/14 11/8 53/22
practically **[1]**  79/22
practice **[1]**  29/2
predecessor **[2]**  4/25 81/22
preface **[1]**  23/25

preliminary **[13]**  1/9 25/17 25/23 36/8 42/1 49/10 60/14 72/11 72/25 73/1 73/14 77/13 83/19
preparation **[2]**  11/9 50/2
prepare **[1]**  54/22
prepared **[2]**  47/23 48/7
presence **[1]**  5/19
presence/absence **[1]**  5/19
present **[4]**  3/24 4/10 56/22 84/18
presented **[2]**  36/24 37/4
presently **[1]**  62/10
president **[17]**  4/13 5/1 5/10 7/7 7/25 8/17 11/3 11/18 16/7 19/10 19/21 20/14 20/18 22/19 23/24 25/14 63/8
pressured **[1]**  74/1
presume **[6]**  24/24 30/7 46/5 46/9 54/11 84/6
pretrial **[2]**  5/23 13/3
pretty **[4]**  17/11 29/2 60/11 69/21
prevent **[1]**  69/5
previously **[1]**  53/12
price **[5]**  10/22 11/12 43/14 44/12 52/9
pricing **[15]**  10/18 10/20 10/22 10/25 11/1 11/4 43/1 43/3 43/4 43/8 43/10 44/2 44/2 44/8 59/19
prima **[2]**  23/6 36/21
primarily **[2]**  74/6 81/14
primary **[1]**  18/13
principally **[2]**  9/11 31/4
printed **[2]**  29/5 42/23
prior **[7]**  10/2 11/7 46/4 62/17 70/14 70/20 82/5
private **[3]**  9/6 12/8 59/21
privy **[2]**  33/12 51/15
proactive **[1]**  70/17
probably **[13]**  15/1 15/2 18/21 35/18 49/7 54/3 60/1 74/3 75/9 75/15 81/25 82/3 82/4
probation **[4]**  13/3 22/9 22/14 65/16
probationer **[1]**  5/23
problem **[6]**  49/5 49/6 49/12 49/18 53/9 74/8
problems **[2]**  69/14 70/16
proceedings **[3]**  61/23 85/5 85/8
process **[23]**  6/3 6/4 8/7 8/18 8/22 10/11 11/9 11/25 13/23 13/23 13/24 14/6 15/13 15/23 17/5 27/13 27/16 31/23 46/5 53/4 56/2 58/9 84/2
processes **[2]**  8/15 25/24
procurement **[7]**  9/21 9/23 16/23 17/13 31/14 31/20 52/6
procurements **[1]**  19/7
produced **[2]**  28/16 63/15
producing **[1]**  28/10
product **[60]**  6/2 6/4 6/16

6/18 6/21 8/3 8/15 28/22 41/4 41/4 42/11 44/22 47/4 47/22 47/25 48/4 48/14 50/7 50/25 52/17 52/18 52/19 53/3 54/12 56/2 56/14 56/19 57/24 59/19 63/25 64/3 65/10 66/10 67/10 67/13 67/18 67/18 67/19 68/19 68/20 68/20 69/21 70/1 70/24 70/25 71/4 71/6 71/7 71/11 73/9 74/20 78/2 79/6 81/9 81/13 81/13 81/14 81/23 82/9 83/8
products **[19]**  17/23 19/5 28/5 42/12 43/23 44/6 44/9 44/11 65/9 67/4 67/16 69/8 69/15 69/15 69/16 70/20 73/10 78/9 82/1
professionals **[1]**  64/9
profitable **[1]**  52/10
profits **[2]**  11/11 11/14
program **[6]**  13/17 13/18 13/19 13/21 14/12 15/16
programs **[1]**  21/23
project **[1]**  8/10
promptness **[1]**  41/25
pronounce **[2]**  3/15 70/8
properly **[1]**  56/13
property **[1]**  47/24
proposal **[2]**  44/8 44/21
proposals **[4]**  8/23 9/19 12/17 32/25
proposition **[1]**  60/4
proprietary **[7]**  29/14 29/19 43/4 47/12 49/23 56/12 77/2
propriety **[2]**  12/19 27/19
prospective **[1]**  10/21
Protech **[7]**  26/18 26/19 26/22 27/15 27/18 27/18 27/24
protect **[7]**  36/9 73/24 74/25 75/1 75/25 76/18 81/19
protected **[4]**  34/17 35/21 56/13 83/16
protection **[4]**  60/23 76/6 79/3 79/3
Protocol **[1]**  21/11
provide **[10]**  4/23 5/24 10/1 17/2 17/18 18/11 46/8 51/1 53/17 60/23
provided **[4]**  6/19 15/19 17/15 17/16
provider **[2]**  33/5 47/14
providers **[2]**  34/22 53/13
provides **[4]**  4/21 67/19 73/9 73/9
providing **[9]**  10/24 15/6 17/22 19/6 33/9 46/18 46/21 47/14 48/5
province **[1]**  48/5
proving **[1]**  77/8
provisions **[1]**  46/12
public **[20]**  7/14 8/19 9/8 11/21 13/14 16/12 16/17 16/20 17/23 38/23 39/13 44/15 52/5 59/20 59/21 59/23 60/4 67/24 76/10 79/6
publications **[1]**  22/17

GEO Group v. Swando

98

**P**

**publicly [3]**   7/5 37/8 68/18
**purchase [2]**   17/6 17/10
**pure [2]**   56/24 57/2
**purple [2]**   33/18 33/21
**purportedly [1]**   56/18
**purposes [5]**   25/20 25/23
49/10 49/16 84/18
**pursue [3]**   19/17 25/4 52/23
**push [1]**   70/19
**puts [2]**   31/13 49/22
**putting [3]**   12/9 75/22 77/10

**Q**

**Qual [4]**   34/22 35/6 35/7
35/25
**qualifying [1]**   20/20
**quarterly [4]**   20/1 20/7 20/8
64/9
**question [10]**   9/9 23/7 37/1
37/2 39/24 42/3 45/25 51/14
61/3 81/22
**questioning [1]**   36/19
**questions [5]**   29/17 57/15
66/12 74/7 74/19
**quite [4]**   5/4 21/14 40/7
72/16
**quotation [1]**   9/20

**R**

**radio [2]**   5/18 46/14
**raised [1]**   72/13
**RAJALA [4]**   2/12 66/19 66/20
67/1
**range [1]**   10/1
**rather [2]**   12/9 26/9
**ratios [1]**   50/23
**Raton [1]**   4/16
**reach [2]**   38/7 79/20
**reached [2]**   69/3 77/10
**read [5]**   3/17 3/19 3/22
12/12 23/12
**readily [1]**   35/14
**ready [1]**   26/5
**real [2]**   49/6 49/8
**realistic [1]**   82/21
**really [24]**   8/6 9/12 9/16
9/17 10/3 10/11 11/22 14/10
17/4 24/1 26/2 27/19 27/20
31/15 33/17 33/23 33/25
34/3 36/3 44/4 54/13 60/16
73/13 75/7
**realtors [2]**   63/18 65/21
**reason [6]**   41/18 46/1 75/21
76/16 76/16 81/10
**reasonably [2]**   42/16 76/18
**reasons [1]**   83/14
**rebuttal [3]**   23/5 72/4 72/5
**recall [6]**   21/6 23/5 27/8
27/12 40/17 55/11
**received [1]**   41/21
**recent [8]**   15/3 15/4 21/8
39/11 55/16 55/18 55/19
77/5
**recently [4]**   14/18 41/17
65/3 72/14
**Recess [1]**   61/23

**recognize [2]**   45/19 45/21
**recognizing [2]**   9/15 28/9
**recollection [2]**   27/4 27/17
**record [6]**   4/8 31/19 62/8
66/25 77/15 78/4
**records [1]**   59/23
**redact [1]**   12/18
**redirect [2]**   2/6 57/6 57/13
66/13 71/23
**reengage [1]**   25/3
**reentering [1]**   81/24
**reentry [1]**   4/21
**refer [1]**   6/14
**referenced [1]**   44/19
**referred [1]**   17/5
**reflected [1]**   11/1
**reflects [1]**   77/22
**regular [2]**   20/6 31/25
**regularly [1]**   19/20
**relates [1]**   30/23
**relations [1]**   27/21
**relationship [7]**   6/11 10/5
10/7 10/11 34/21 34/23
78/16
**relationships [9]**   9/11 30/3
34/20 35/1 35/24 46/22
53/13 59/19 77/3
**relative [3]**   20/21 50/2
50/23
**relaxed [1]**   49/11
**release [2]**   12/20 46/5
**released [9]**   12/7 12/19
37/12 37/22 41/5 43/9 43/9
47/1 53/16
**releasing [1]**   12/8
**relevance [4]**   41/9 41/25
49/3 51/8
**relevant [3]**   51/23 51/24
60/21
**remedy [3]**   36/8 77/14 77/15
**remove [1]**   47/2
**renderings [1]**   39/9
**renewal [1]**   15/11
**renewals [2]**   14/21 14/22
**renewed [1]**   15/8
**repeatedly [2]**   43/3 76/24
**rephrase [1]**   57/22
**report [5]**   39/12 40/2 70/13
70/19 71/8
**reported [2]**   1/22 24/2
**Reporter [2]**   1/22 85/11
**reports [12]**   47/5 47/15
47/15 47/15 47/20 48/4
52/19 68/2 70/15 70/16
70/17 70/21
**represent [2]**   9/3 58/23
**representation [1]**   81/8
**representative [1]**   3/8
**representatives [2]**   32/1
71/12
**represented [1]**   43/6
**representing [1]**   65/8
**reps [2]**   64/14 65/9
**request [5]**   8/22 9/19 9/20
41/22 48/20
**requested [1]**   12/17
**requests [2]**   16/25 41/20
**require [2]**   37/1 58/9

**required [4]**   9/2 40/24 51/24
51/25
**requirement [3]**   7/2 40/18
83/18
**requirements [6]**   6/15 6/20
7/1 16/24 57/25 67/19
**requires [3]**   44/8 58/10 80/4
**requiring [1]**   12/12
**research [7]**   6/24 47/20
52/23 69/18 70/10 70/12
70/22
**reseller [3]**   16/22 18/2 18/9
**resellers [4]**   9/7 17/25
18/15 18/24
**reselling [1]**   18/20
**resolution [1]**   79/20
**resolve [6]**   60/2 60/15 75/21
79/11 79/15 83/24
**resolved [1]**   76/4
**resolving [1]**   59/14
**resources [2]**   58/6 58/18
**respect [8]**   31/1 41/10 43/21
51/14 77/18 77/19 78/5 83/8
**respectfully [1]**   61/8
**respond [1]**   9/22
**responding [1]**   8/22
**response [5]**   10/16 41/21
44/8 48/8 63/14
**responses [1]**   74/6
**responsible [2]**   4/22 19/14
**rest [4]**   60/9 62/1 71/24
80/12
**restraint [2]**   76/13 76/21
**restrict [1]**   75/5
**restricted [1]**   82/14
**restricting [1]**   72/11
**restrictions [1]**   29/8
**result [1]**   56/21
**resulting [1]**   10/22
**results [2]**   32/3 68/2
**resumed [1]**   61/24
**retail [1]**   43/14
**retain [2]**   23/4 62/22
**retreat [1]**   83/1
**reveals [1]**   68/1
**reverse [2]**   67/25 78/22
**Review [1]**   13/23
**reviewing [1]**   11/24
**RFB [2]**   10/2 11/7
**RFP [4]**   9/18 15/25 16/2
34/7
**RFQ [1]**   9/20
**right [29]**   23/4 26/4 30/15
35/3 37/19 39/20 40/24 41/8
41/24 42/7 44/16 46/12 49/1
50/10 51/6 51/17 53/21 54/7
58/20 62/2 66/13 66/15 68/6
68/20 72/1 72/3 72/18 81/6
84/15
**rights [1]**   47/18
**RMR [2]**   1/22 85/11
**road [1]**   34/1
**role [7]**   24/7 24/11 24/14
27/18 30/11 50/21 63/6
**roll [2]**   20/3 20/10
**room [5]**   19/19 32/19 55/10
76/7 85/12
**rough [1]**   16/16

**R**

routinely [1]   78/21
RPs [1]   19/7
rule [1]   41/12
rules [2]   38/7 49/11
ruling [1]   48/25
run [4]   14/23 15/8 25/24
 43/18
running [1]   43/17
runs [1]   60/16
Ryan [1]   24/18

**S**

said [9]   23/17 30/17 36/11
 39/22 42/19 58/16 66/9
 70/10 77/13
salaried [1]   58/8
salary [2]   80/16 80/18
sales [34]   9/11 9/18 27/18
 28/10 56/7 56/15 63/8 64/8
 64/9 64/10 64/14 65/9 67/13
 69/13 71/5 71/9 73/8 73/8
 74/17 74/19 74/20 78/2 78/3
 78/6 80/5 80/5 80/6 80/9
 80/9 81/8 82/11 83/7 83/19
 83/19
salespeople [1]   71/15
salesperson [2]   10/3 75/4
same [25]   7/24 34/11 34/12
 48/24 51/14 51/21 55/21
 57/16 58/17 58/19 58/20
 58/22 58/25 65/13 65/19
 66/5 66/7 69/1 73/23 74/16
 74/22 80/6 82/1 82/8 83/11
Samsung [1]   78/23
saw [1]   39/15
say [17]   13/9 15/1 25/5
 26/14 31/11 33/14 33/15
 33/22 35/14 41/24 42/19
 43/22 46/18 58/17 74/18
 82/7 84/22
saying [5]   23/25 49/12 61/14
 69/2 82/16
says [4]   23/14 29/5 47/20
 49/3
scenario [1]   74/22
scheduled [2]   19/20 31/23
Schlarb [2]   3/8 20/1
schooled [1]   42/22
scope [5]   36/19 43/16 59/25
 61/5 72/14
screen [1]   10/15
scroll [1]   45/24
sealed [1]   12/10
seat [1]   3/13
seated [2]   3/2 61/25
second [4]   4/21 30/17 63/13
 76/20
secret [5]   31/19 31/21 32/2
 32/9 79/3
secure [2]   43/17 43/18
Security [4]   13/20 32/2
 32/13 32/16
see [8]   10/22 15/20 38/3
 49/3 53/13 75/8 75/8 78/19
seeing [1]   46/9
seem [1]   60/13

seemed [1]   25/10
seems [8]   23/8 23/10 25/8
 25/12 59/17 60/17 60/18
 61/4
seen [1]   60/22
sees [1]   10/21
segment [2]   44/3 44/4
segue [1]   84/12
sell [1]   81/23
selling [1]   81/25
send [2]   59/2 69/5
sending [1]   10/16
Sendum [12]   29/6 29/7 34/21
 34/22 35/3 39/15 42/13
 42/13 68/22 68/22 69/1 69/2
senior [1]   72/23
sense [4]   15/21 22/1 32/18
 42/25
sensitive [1]   25/21
sentence [1]   31/16
separate [19]   4/20 12/10
 12/11 12/13 63/10 77/23
 78/3 78/6 78/7 78/7 79/19
 80/8 80/8 80/9 80/9 81/8
 81/9 81/12 81/25
separation [2]   24/25 25/5
September [2]   14/18 14/23
served [2]   23/17 41/20
service [11]   6/18 8/12 10/24
 14/10 15/21 17/10 33/9 47/4
 50/6 51/24 56/2
services [14]   4/21 4/22 4/23
 10/9 10/10 17/15 17/18
 17/23 19/15 46/23 48/5 48/9
 72/12 73/2
sessions [2]   19/20 55/6
set [2]   73/2 75/18
sets [2]   42/23 53/15
setting [1]   36/4
several [1]   39/14
severance [4]   23/13 60/19
 60/20 60/24
shall [2]   47/24 47/25
share [6]   59/6 71/19 74/1
 74/1 74/2 74/11
shared [11]   7/5 7/14 7/16
 11/9 12/5 20/11 32/3 32/14
 32/15 32/17 58/25
shareholder [1]   20/7
she [1]   50/21
sheet [1]   51/10
sheets [1]   51/11
Sheriff's [2]   22/10 22/13
Shields [1]   60/3
shouldn't [1]   25/9
show [5]   16/2 29/5 45/10
 58/10 65/3
shown [1]   73/13
shows [9]   21/23 22/6 22/7
 22/20 22/23 23/1 31/6 59/3
 83/10
SHULER [2]   1/17 3/12
side [13]   4/7 4/18 4/19
 16/18 19/24 19/25 54/6 60/6
 65/24 74/17 74/19 84/3
 84/22
sign [1]   12/13
signed [1]   25/16

significance [1]   61/1
similar [3]   28/17 28/21 33/2
similarly [1]   20/5
simply [6]   10/14 24/4 31/1
 76/22 84/12 84/13
since [2]   15/14 67/8
single [1]   14/12
sir [26]   3/16 26/11 29/1
 30/25 32/5 38/14 39/2 44/25
 45/12 45/14 45/19 46/16
 57/2 59/9 62/4 62/8 64/5
 65/4 65/6 66/14 66/15 66/18
 66/25 67/2 70/8 72/1
sitting [2]   10/14 54/3
situation [3]   46/17 73/11
 74/22
six [2]   34/4 80/24
small [2]   17/11 69/9
smaller [1]   18/7
smart [1]   5/25
Soberlink [1]   21/10
software [7]   7/13 8/11 47/18
 47/20 71/2 73/10 74/21
sold [1]   28/17
sole [7]   9/5 16/20 17/2
 17/5 17/13 17/17 17/20
solely [1]   80/4
solutions [2]   49/23 49/24
some [37]   3/20 4/2 6/12 12/2
 12/2 12/6 12/15 12/20 13/9
 13/13 22/20 23/13 24/3
 29/17 39/23 49/1 49/4 49/5
 49/8 49/17 55/25 59/25 60/1
 60/20 66/5 68/12 69/13
 74/13 75/24 75/25 76/6
 79/12 79/15 81/11 83/14
 83/18 84/21
somehow [5]   43/3 59/23 60/4
 78/22 79/5
someone [2]   50/20 63/20
someone's [2]   78/13 79/13
something [25]   6/5 6/10 6/18
 6/22 8/2 17/7 18/11 19/18
 24/1 25/10 33/14 33/22 35/7
 36/3 36/20 38/8 39/5 44/21
 52/24 53/14 53/18 60/23
 74/25 76/1 82/12
sometime [1]   5/4
sometimes [4]   12/15 82/23
 82/24 82/25
somewhat [1]   49/11
sorry [4]   36/17 43/18 57/24
 58/14
sort [3]   34/4 34/4 47/8
sound [1]   73/16
source [7]   9/5 16/20 17/2
 17/5 17/13 17/17 17/20
sources [2]   6/9 71/17
SOUTHERN [2]   1/1 77/6
space [3]   35/15 70/14 82/13
speak [9]   14/8 15/4 18/23
 24/4 24/18 30/5 34/10 34/12
 35/18
speaking [2]   11/22 22/4
speaks [1]   46/13
spearheaded [1]   24/23
spec [1]   34/2
special [1]   35/8

GEO Group v. Swando
100

**S**

**specialty [2]**   36/1 36/2
**specific [7]**   13/1 27/8 30/14
 50/12 50/12 65/16 78/16
**specifically [5]**   45/21 48/8
 51/7 51/12 64/6
**specification [1]**   31/13
**specifications [1]**   9/16
**specificity [1]**   38/4
**specifics [2]**   31/17 45/8
**specs [1]**   38/2
**speculation [3]**   56/24 57/2
 57/3
**spend [3]**   57/20 59/1 59/6
**spent [1]**   24/23
**spoke [1]**   24/16
**spot [1]**   49/9
**spreadsheets [1]**   44/18
**spring [2]**   55/12 55/22
**Sprint [1]**   6/11
**staff [6]**   18/10 20/25 21/4
 46/24 46/24 46/25
**stage [1]**   72/25
**stand [1]**   79/8
**standing [1]**   78/20
**standpoint [7]**   10/7 20/24
 34/25 50/13 52/21 53/1 54/1
**stands [2]**   13/18 60/3
**start [4]**   3/23 14/14 19/13
 72/8
**started [2]**   14/15 41/24
**starts [2]**   6/5 6/6
**state [26]**   4/8 9/1 13/1 13/7
 22/12 30/19 45/3 46/2 46/10
 46/15 46/19 46/22 47/1
 47/25 47/25 48/5 48/11
 48/15 48/16 48/18 53/8
 53/10 62/8 66/25 69/20
 74/24
**stated [1]**   43/24
**states [10]**   1/1 1/10 12/2
 13/2 13/22 14/2 18/7 53/23
 54/3 85/12
**static [1]**   50/8
**status [2]**   15/16 47/15
**statute [2]**   72/21 76/15
**stay [1]**   10/12
**stayed [1]**   24/11
**stays [1]**   17/8
**step [2]**   21/1 24/7
**Steve [1]**   27/7
**still [6]**   8/15 18/15 60/13
 64/25 68/15 79/3
**stipend [1]**   27/11
**strategic [4]**   19/23 52/15
 52/15 52/16
**strategies [7]**   20/3 20/10
 52/11 52/13 54/12 59/20
 78/7
**strategy [12]**   19/10 19/12
 19/14 19/20 20/10 21/22
 53/1 55/6 55/16 55/20 56/15
 83/19
**street [4]**   1/23 75/8 84/14
 85/12
**strike [6]**   27/1 36/5 43/19
 52/2 56/5 62/16

**strive [1]**   10/13
**structure [3]**   10/23 11/4
 78/14
**studies [2]**   47/5 47/20
**stuff [3]**   34/8 47/8 74/8
**subject [8]**   12/14 16/23
 16/25 20/22 36/22 49/17
 60/23 84/16
**subject if [1]**   84/16
**subjects [1]**   58/2
**submission [3]**   40/9 40/11
 41/23
**submissions [2]**   19/4 38/5
**submit [5]**   11/21 12/4 39/5
 44/11 44/12
**submits [1]**   32/25
**submitted [6]**   9/23 38/3
 38/24 39/13 40/2 48/10
**submitting [1]**   10/17
**Subsequent [1]**   24/9
**subsequently [1]**   47/2
**substantial [1]**   77/3
**substantive [1]**   40/19
**Substantively [1]**   41/3
**subtleties [1]**   9/14
**successful [1]**   68/24
**such [2]**   53/2 55/9
**suffered [1]**   56/21
**suffering [1]**   73/5
**suggest [1]**   78/19
**suggested [2]**   43/14 75/21
**suggesting [1]**   79/10
**suggestion [1]**   83/3
**suggests [1]**   23/12
**Suite [2]**   1/14 1/19
**supervised [1]**   13/18
**supervisor [1]**   20/1
**supplemental [1]**   3/19
**supplier [9]**   34/18 34/19
 35/19 35/20 35/24 36/10
 42/13 42/13 42/15
**suppliers [13]**   34/14 34/20
 35/1 35/15 35/17 35/17
 36/11 36/13 36/22 42/18
 64/11 68/9 68/12
**supply [1]**   68/13
**support [6]**   20/4 20/10 22/17
 27/16 64/9 72/22
**sure [12]**   20/7 33/1 33/8
 36/23 38/13 38/13 45/11
 51/12 55/4 57/21 73/3 73/17
**surreply [1]**   3/19
**suspect [3]**   46/3 57/10 59/24
**SWANDO [50]**   1/6 2/8 3/4 3/13
 5/2 5/3 5/5 7/10 7/24 8/16
 11/3 11/18 14/24 16/6 18/17
 19/9 20/14 20/17 21/6 21/15
 21/19 22/19 23/23 26/14
 26/19 29/11 29/24 30/11
 30/14 31/2 44/4 47/8 49/24
 50/15 51/15 52/12 55/9 56/6
 56/17 62/5 62/9 62/10 64/23
 67/12 67/15 71/5 72/11
 72/23 73/6 80/2
**Swando's [8]**   24/14 27/2
 43/21 43/22 56/22 75/16
 80/4 80/16
**swell [1]**   8/9

**SWORN [2]**   4/5 66/20
**system [1]**   63/14

**T**

**tab [2]**   39/3 40/8
**table [2]**   3/7 3/12
**tackle [1]**   53/3
**tailor [1]**   74/4
**tailoring [1]**   74/9
**take [9]**   33/19 34/25 56/14
 59/12 60/6 60/7 68/13 73/7
 78/23
**taken [3]**   11/11 36/9 57/9
**takes [1]**   76/25
**taking [3]**   36/5 36/7 72/14
**talk [14]**   21/25 30/10 34/14
 38/6 43/1 52/1 52/11 54/8
 59/2 59/13 60/7 69/22 81/10
 82/18
**talked [9]**   17/25 25/24 29/7
 52/14 69/9 69/11 70/22
 71/10 72/4
**talking [14]**   13/17 25/6 34/2
 36/15 38/4 50/1 51/7 61/4
 61/8 71/8 71/9 72/24 75/4
 82/5
**tamper [1]**   47/15
**targets [1]**   64/10
**team [10]**   8/11 21/12 24/23
 25/4 52/19 64/9 71/10 80/5
 80/9 81/8
**teams [1]**   21/19
**technological [2]**   6/12 54/9
**technologies [3]**   15/20 19/15
 54/14
**technology [23]**   4/23 5/18
 5/18 5/19 5/21 5/22 5/24
 8/5 15/19 18/11 18/11 19/6
 34/5 34/24 35/4 37/22 46/21
 48/9 51/25 53/13 54/8 54/10
 82/2
**tell [14]**   4/10 6/2 33/16
 33/17 39/9 46/7 59/17 72/7
 72/8 74/4 76/9 79/21 79/23
 81/19
**telling [3]**   34/8 34/9 61/17
**ten [4]**   59/12 60/7 60/10
 71/13
**tenure [1]**   30/15
**term [2]**   14/19 56/25
**terminal [1]**   10/14
**terminated [2]**   24/12 26/2
**termination [4]**   23/13 48/1
 60/19 62/21
**terms [19]**   14/19 16/15 23/6
 35/13 38/4 43/17 44/3 45/5
 54/10 63/6 71/1 72/9 74/6
 74/18 79/24 80/15 81/19
 83/5 84/10
**territory [2]**   27/20 75/6
**test [1]**   39/12
**testified [1]**   39/14
**testify [1]**   65/2
**testifying [1]**   32/8
**testimony [4]**   34/9 46/4
 67/21 77/22
**testing [2]**   37/13 47/5
**than [13]**   10/9 12/9 13/7

**T**

**than... [10]**  14/4 18/22
25/24 31/5 35/11 50/10
50/13 50/19 59/21 83/1
**thanks [1]**  26/12
**that [484]**
**their [27]**  5/25 13/20 14/2
14/7 14/7 18/10 25/8 28/24
31/8 33/6 33/7 33/13 35/7
35/7 35/18 40/15 41/3 46/5
58/21 59/2 63/3 67/25 70/11
73/18 73/20 74/6 77/8
**themselves [1]**  63/19
**there [88]**
**therefore [1]**  79/7
**these [31]**  20/9 25/9 26/22
28/13 28/13 30/10 32/6
32/25 33/4 33/11 34/23 35/1
36/2 36/12 38/1 38/2 38/5
38/25 39/8 39/9 40/25 42/17
42/18 44/11 48/5 53/23 55/6
59/23 64/3 76/3 78/18
**they [91]**
**they're [1]**  48/5
**thing [4]**  34/1 34/12 60/15
83/24
**things [15]**  21/5 22/14 30/7
47/16 48/19 50/22 56/16
59/22 60/1 61/4 69/23 69/24
75/22 78/17 82/24
**think [56]**  3/25 15/1 20/20
23/5 24/17 25/20 25/22 28/7
28/7 31/22 33/7 33/19 37/1
37/20 40/4 40/5 40/6 41/3
41/17 42/19 42/22 44/1 49/9
50/1 54/9 55/1 59/18 60/3
60/9 60/11 65/24 66/8 69/17
71/6 72/8 72/8 72/9 72/10
72/19 72/25 73/13 74/13
74/22 75/2 75/15 76/2 76/6
78/25 79/8 79/21 79/23 80/1
81/19 82/21 83/15 83/15
**third [2]**  14/16 14/16
**thirty [2]**  81/1 81/2
**thirty-five [2]**  81/1 81/2
**this [116]**
**those [52]**  3/21 6/13 7/20
9/12 9/22 15/15 16/1 16/4
17/11 17/18 17/23 19/18
19/21 20/15 20/23 21/5
21/17 21/18 22/17 22/20
22/23 23/1 25/18 25/21 28/8
28/9 28/15 32/3 32/14 32/18
32/19 32/20 51/19 53/17
54/15 54/16 58/18 58/18
61/4 65/19 66/5 68/9 70/15
70/21 71/10 71/15 71/17
73/22 78/17 79/17 79/18
84/25
**though [2]**  13/14 82/8
**thought [1]**  41/15
**thousand [2]**  81/1 81/2
**three [13]**  4/20 6/22 8/8
14/15 15/2 15/5 39/1 52/24
66/8 71/10 71/15 71/17 74/5
**threshold [1]**  17/9
**through [19]**  8/19 13/20

13/22 14/6 14/12 14/23 17/5
17/18 22/5 27/16 31/23
37/13 39/8 42/17 45/24
46/11 50/15 68/3 78/24
**throughout [7]**  8/1 10/4
11/10 13/21 14/2 14/4 46/22
**thus [1]**  59/15
**time [22]**  8/6 10/2 12/7 15/7
22/2 24/1 24/23 24/25 25/15
26/20 27/6 27/17 36/23
39/15 42/11 59/25 60/15
61/5 61/11 72/20 75/24
83/22
**timeframe [1]**  24/5
**times [1]**  24/16
**title [1]**  45/22
**to keep [1]**  84/9
**today [19]**  10/6 10/9 22/3
28/10 30/12 30/16 33/24
34/3 35/10 36/24 41/6 50/13
50/17 51/17 56/10 57/1
77/15 84/22 85/2
**today's [2]**  5/21 25/20
**together [5]**  6/14 20/2 21/9
44/20 70/1
**told [6]**  32/6 34/12 72/7
73/7 76/9 80/13
**took [3]**  29/25 30/5 74/8
**top [1]**  71/12
**total [5]**  80/18 80/20 80/23
80/24 84/4
**touch [2]**  10/12 63/20
**touched [2]**  16/14 58/2
**tracking [6]**  5/22 28/16
39/11 39/11 53/15 63/8
**trade [14]**  21/23 22/6 22/7
22/20 22/23 23/1 31/6 58/10
59/3 65/2 76/14 76/21 79/3
83/10
**TRANSCRIPT [1]**  1/9
**transcription [1]**  85/8
**travel [2]**  58/10 58/10
**trial [5]**  36/21 73/2 75/17
75/18 76/4
**tried [2]**  31/12 59/13
**true [2]**  25/13 25/21
**try [15]**  15/11 34/23 38/6
53/20 57/8 57/11 60/2 60/15
69/12 70/8 75/21 75/21
79/11 79/14 83/24
**trying [12]**  6/6 10/8 37/7
37/21 43/15 43/20 44/16
45/25 60/5 78/8 81/19 84/1
**Ts [1]**  46/11
**turn [1]**  47/17
**turned [1]**  48/18
**turning [1]**  48/11
**twice [1]**  19/22
**two [21]**  4/16 8/7 21/8 25/9
50/24 51/21 53/20 54/15
60/15 60/25 61/10 61/10
63/10 65/8 65/9 67/7 71/7
71/12 74/6 76/19 84/23
**type [3]**  35/20 47/22 83/20
**types [2]**  21/5 38/2
**typical [2]**  10/1 31/23
**typically [5]**  7/3 12/4 18/8
28/11 78/18

**U**

**U-blox [2]**  34/22 35/25
**U.S [3]**  14/4 18/16 27/25
**Uh [1]**  48/2
**Uh-huh [1]**  48/2
**UK [1]**  24/24
**ultimate [1]**  43/10
**ultimately [6]**  9/24 10/17
15/7 15/25 25/3 27/22
**unable [1]**  79/20
**under [10]**  4/3 11/25 12/10
12/17 12/18 16/16 47/24 48/3 66/3
72/19 76/22
**underlying [1]**  52/1
**underpinnings [3]**  50/3 50/4
51/20
**understand [17]**  3/22 5/13
9/13 9/18 11/24 24/12 30/25
34/24 45/25 48/25 51/6
58/14 61/12 61/12 61/16
72/13 77/17
**understanding [10]**  10/7
10/23 24/9 25/1 30/4 31/7
33/9 45/7 51/19 53/16
**Understood [3]**  29/23 46/16
84/19
**undertaking [1]**  15/11
**unequivocal [1]**  77/12
**unfair [1]**  30/16
**unfairly [1]**  77/2
**Unfortunately [1]**  69/4
**unintelligible [2]**  68/2
68/25
**unique [6]**  17/15 22/1 35/24
36/11 36/13 52/7
**uniqueness [1]**  52/7
**unit [7]**  20/9 20/9 44/13
63/12 63/13 63/23 72/24
**UNITED [8]**  1/1 1/10 13/2
13/21 14/2 18/7 24/20 85/12
**units [1]**  63/11
**unless [1]**  60/14
**until [3]**  79/14 80/17 83/25
**up [21]**  10/15 16/2 16/6
20/3 20/10 23/15 23/16
25/15 25/18 27/12 27/22
28/25 29/6 39/15 43/3 55/24
58/12 69/4 76/4 79/24 84/16
**upon [3]**  29/25 48/1 62/21
**upstream [1]**  82/17
**urge [1]**  83/24
**us [29]**  3/9 3/13 7/20 7/21
12/16 12/18 29/8 30/22
40/24 41/22 46/7 47/13
59/12 67/19 69/3 69/23
69/24 70/18 70/18 70/19
73/11 73/24 74/17 75/6 76/6
82/3 82/6 82/6 83/10
**USA [1]**  22/3
**use [10]**  17/7 17/8 28/21
30/15 50/16 51/5 51/16
56/14 56/25 63/18
**used [6]**  19/5 51/20 55/23
56/15 68/18 77/2
**using [2]**  56/17 59/1

**V**

**valid [1]**  76/17

**V**

valuable [4]   30/21 34/16
54/19 77/1
value [1]   73/7
varies [1]   8/6
variety [10]   5/24 6/8 9/19
19/7 19/12 42/17 53/5 56/16
79/4 82/24
various [4]   12/3 18/10 20/2
41/21
vast [1]   8/24
vender [1]   47/14
vendor [1]   17/14
Verizon [3]   6/11 63/15 81/15
versus [3]   3/3 10/9 72/24
very [16]   8/8 15/23 24/24
24/24 34/16 39/3 41/17 43/8
53/4 54/25 61/17 68/25
72/13 73/4 76/10 83/11
via [1]   13/6
vice [17]   4/13 5/1 5/10 7/7
7/25 8/17 11/3 11/18 16/7
19/10 19/21 20/14 20/18
22/19 23/24 25/14 63/8
vice-president [17]   4/13 5/1
5/10 7/7 7/25 8/17 11/3
11/18 16/7 19/10 19/21
20/14 20/18 22/19 23/24
25/14 63/8
view [3]   32/13 74/13 76/9
virtually [2]   33/5 43/11
virtue [1]   31/1
visit [1]   58/11
volume [1]   16/15

**W**

wait [1]   41/12
waiting [2]   10/14 83/25
WALDO [29]   2/3 3/9 4/4 4/5
4/9 4/10 23/5 25/24 26/9
29/24 31/18 32/5 36/5 37/7
38/1 38/16 39/5 40/8 42/11
45/14 45/19 49/22 55/6 56/5
56/6 57/15 60/12 65/2 66/8
walk [2]   50/15 63/3
walking [1]   82/8
want [14]   9/25 15/20 33/23
41/12 45/15 58/19 60/2
69/16 69/19 70/11 79/9
79/12 80/23 84/22
wanted [4]   41/14 68/20 69/20
81/23
wants [4]   9/13 33/10 60/6
82/12
was [87]
wasn't [4]   41/2 41/14 81/23
82/22
way [9]   4/3 12/25 31/22
59/14 73/24 74/25 75/3
75/24 79/15
ways [3]   17/4 38/10 82/25
we [279]
we'll [1]   37/3
website [4]   29/3 29/5 37/9
68/1
websites [1]   69/11
weekend [1]   85/3

weight [1]   77/5
weighted [1]   52/3
weighting [2]   52/5 52/6
well [48]   3/17 8/6 9/6 9/12
10/3 10/24 12/24 15/17
15/17 17/18 19/12 20/8
21/15 26/12 30/17 33/23
34/22 35/18 36/12 36/15
37/7 39/12 39/18 43/6 43/25
44/1 45/21 49/1 50/12 53/12
54/21 55/13 56/9 61/10
68/25 69/17 71/25 72/8 74/3
74/16 74/19 74/19 75/11
79/21 82/4 82/7 82/16 85/2
well-known [2]   35/18 36/12
went [3]   27/9 48/4 69/20
were [30]   8/16 12/8 20/21
21/9 21/17 21/18 25/2 32/19
40/25 42/15 48/9 50/13
52/17 56/1 56/3 57/15 60/25
62/14 62/14 62/17 64/25
65/2 65/5 65/7 65/14 65/15
67/21 77/25 79/20 84/23
weren't [3]   21/20 27/15
36/22
WEST [4]   1/2 1/4 1/23 85/13
Western [1]   27/25
what's [2]   46/6 74/8
whatever [4]   37/3 42/4 51/5
75/16
when [46]   7/25 8/2 8/3 8/8
8/16 9/13 9/15 9/18 10/10
10/17 12/17 14/14 14/24
15/25 19/9 22/19 24/22 25/5
25/16 27/6 27/10 27/22
27/24 29/3 31/11 34/13
42/13 43/6 44/20 46/13 47/1
47/3 50/21 52/1 52/14 55/9
55/18 57/19 58/16 60/16
62/16 62/19 69/20 74/14
75/5 75/18
where [40]   8/6 10/12 10/13
17/18 18/5 19/14 19/15 20/1
20/4 20/8 20/24 23/9 25/2
26/17 27/22 28/11 30/4
30/24 31/8 34/24 42/21
46/22 49/11 52/17 54/6
54/21 55/9 56/11 58/3 60/22
62/10 62/12 68/12 68/17
71/5 73/16 74/7 75/5 79/19
83/10
whereabouts [1]   14/7
whereas [1]   75/24
whether [7]   30/18 38/2 38/9
60/16 60/19 60/20 60/22
while [1]   24/14
who [10]   4/25 7/18 13/22
33/6 35/14 36/11 65/15
70/22 72/23 73/9
whole [3]   36/18 44/21 60/15
whom [1]   9/25
why [8]   33/20 41/14 65/7
74/23 74/23 79/10 79/14
83/14
wide [1]   79/4
WILSON [3]   1/13 2/4 2/6 2/10
2/14 3/7 80/16
Wireless [3]   68/22 68/22

69/1
with the [1]   7/21
within [5]   11/23 24/10 32/20
53/8 78/17
without [1]   46/9
witness [10]   3/9 3/13 4/5
38/11 45/9 59/11 64/18
66/16 66/20 72/2
witnesses [7]   2/2 4/2 57/9
57/11 60/8 74/5 74/5
won [1]   15/7
won't [3]   60/25 70/8 73/25
word [2]   22/5 22/15
work [36]   4/12 5/6 9/7 10/2
16/9 16/9 16/12 16/16 17/13
17/20 18/3 24/17 34/20
37/19 42/23 43/12 44/17
44/22 47/22 47/25 48/4 50/2
60/25 62/12 63/22 67/3
67/12 68/8 68/13 81/10
82/22 83/2 83/6 83/21 84/7
84/17
worked [3]   5/7 27/24 27/25
workers [1]   63/16
working [12]   7/12 8/10 8/12
10/6 18/24 29/8 31/2 50/18
56/7 67/8 67/10 71/1
works [3]   18/18 56/9 71/5
world [1]   24/22
worn [2]   5/23 28/16
worries [1]   70/9
wouldn't [8]   12/14 26/2
35/24 49/11 51/23 82/4 82/4
84/7
write [1]   8/12
written [1]   83/12

**Y**

yeah [1]   58/12
year [26]   5/7 14/21 14/21
16/19 19/22 22/7 23/11
24/13 25/9 30/11 34/4 50/11
50/14 50/17 51/5 51/15
51/21 52/24 55/13 55/13
55/19 55/21 60/17 66/8
72/16 72/17
years [18]   5/17 5/17 6/22
14/19 25/9 28/11 30/6 30/20
48/10 48/17 52/24 54/23
60/15 60/25 61/10 61/10
67/8 71/7
yes [75]   4/9 4/12 5/15 6/4
7/23 8/1 8/18 8/24 11/5
12/22 16/8 17/4 18/2 18/24
19/1 20/16 20/20 21/8 21/14
21/16 23/3 27/10 28/7 29/12
29/16 29/22 29/22 31/14
33/7 34/2 35/12 37/14 38/17
39/2 39/7 40/5 40/7 40/10
44/24 45/1 45/16 46/13
46/14 50/13 53/25 54/5
54/17 55/8 57/7 57/18 58/8
58/11 58/25 59/3 62/4 62/18
62/25 65/4 65/6 65/18 66/2
66/4 66/6 66/8 66/11 66/18
66/21 67/22 68/11 68/10
68/16 69/20 69/20 71/6 72/5
yesterday [2]   25/18 79/18

GEO Group v. Swando

| Y | | |
|---|---|---|
| **yet [5]**  46/9 46/11 55/25  79/2 84/10 | | |
| **YOGANAND [3]**  2/12 66/20 67/1 | | |
| **Yogi [4]**  3/14 3/15 66/19  66/23 | | |
| **you [332]** | | |
| **you're [2]**  46/18 78/19 | | |
| **youth [1]**  4/21 | | |
| **Z** | | |
| **Zoley [1]**  24/19 | | |